UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| WILLIAM SPONN, Individually on Behalf of )<br>All Others Similarly Situated, )<br>7B West Mystic Avenue )<br>Mystic, CT 06355 )<br><div style="text-align:right">Plaintiff, )</div><br>vs. )<br>)<br>EMERGENT BIOSOLUTIONS, INC., )<br>HQ: )<br>400 Professional Drive, Suite 400 )<br>Gaithersburg, MD 20879 )<br>)<br>Registered Agent: )<br>  The Corporation Trust Company )<br>  Corporation Trust Center )<br>  1209 Orange Street )<br>  Wilmington, DE 19801, )<br>)<br>and )<br>)<br>FUAD EL-HIBRI, )<br>13340 Signal Tree Lane )<br>Potomac, MD 20854, )<br>)<br>and )<br>)<br>DANIEL J. ABDUN-NABI, )<br>24490 New Post Road )<br>Saint Michaels, MD 21663, )<br>)<br>and )<br>)<br>ROBERT G. KRAMER, )<br>6872 Oleander Lane )<br>Portage, MI 49024, )<br>)<br>and )<br>)<br>ADAM HAVEY, )<br>1200 Holt Road )<br>Mason, MI 48854, )<br>)<br><div style="text-align:right">Defendants. )</div> | Civil Action No.:_____<br><br>**COMPLAINT FOR VIOLATIONS OF**<br>**THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff William Sponn, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Emergent Biosolutions Inc. ("Emergent" or the "Company"), as well as media reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Emergent between January 11, 2016 and June 21, 2016, inclusive (the "Class Period"), seeking to pursue remedies pursuant to §§10(b) and 20(a) of the federal securities laws. Defendants include Emergent and certain of it senior executives and/or directors.

2.      Defendant Emergent is a specialty biopharmaceutical company. The Company's primary source of revenues is sales of its only U.S. Food and Drug Administration ("FDA")-licensed product, BioThrax (anthrax Vaccine Adsorbed) ("BioThrax"), an anthrax vaccine, to the U.S. government.

3.      Emergent' s anthrax vaccine is the only one licensed by the FDA, giving the Company a virtual monopoly over anthrax vaccines, and the U.S. government has historically purchased almost all of the Company's BioThrax production. In September 2011, Emergent entered into a five-year procurement contract with the U.S. government. By March 31, 2016, Emergent had

sold approximately 39 million of the 44.75 million doses called for by the 2011 procurement contract to the U.S. government.

4.      By the start of the Class Period, Emergent reported having sold all of its BioThrax on hand and being on track to complete construction of a massive expansion of its BioThrax production facilities in collaboration with (and funded by) the U.S. government.  Instead of the seven to nine million doses annually the Company then had the ability to produce, the new facility would allow it to produce another 20 to 25 million doses annually, permitting the Company to provide all of the anthrax vaccine doses Emergent said the U.S. government sought to purchase in order to build the U.S. Strategic National Stockpile ("SNS") to 75 million does over the following five years.

5.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial prospects.  Specifically, Emergent claimed the U.S. government's strong and growing demand for BioThrax was keeping the Company on track to receive a renewal of its lucrative 5-year exclusive anthrax vaccine procurement contract with the U.S. government.  Emergent also repeatedly emphasized the U.S. government's implied ongoing strong –even growing – demand for BioThrax in light of the U.S. government's funding of Emergent' s massive expansion of its BioThrax production facility, claiming it would enable the Company to manufacture some 20 to 25 million *additional* doses of BioThrax annually, primarily to be sold to the U.S. government over the following five year period in order to build the U.S. governments' SNS of Emergent' s anthrax vaccine to 75 million doses.

6.      As a result of defendants' false and misleading Class Period statements, the investment community was led to believe that the U.S. government's demand for BioThrax remained strong and even growing, such that Emergent was on track to sell an estimated 19 million doses of BioThrax to the U.S. government during 2016 alone.  Investors were further led to believe that the

U.S. government's demand for BioThrax was increasing and that upon completion of the build-out of the massive manufacturing expansion, the U.S. government's demand for Emergent's first-generation anthrax vaccine would expand to its new production capacity.

7.       Defendants' materially false and misleading statements had their intended effect, causing the price of Emergent common stock to rise, reaching a Class Period high of $44.38 by June 7, 2016. Emergent's senior executives then cashed in, with the four executives named as defendants herein alone selling more than **$14.5 million** of their personally-held shares of Emergent common stock to the unsuspecting investing public. These sales were highly unusual both in scope and timing as several of the selling defendants named herein (and identified below) had not sold any shares at all since November 2015. Furthermore, cashing out their shares in the spring of 2016 made no economic sense if these executives then truly believed that the Company was on the cusp of securing another mammoth exclusive contract to sell its anthrax vaccine to the U.S. government.

8.       Unbeknownst to investors, the U.S. government's demand for BioThrax had actually declined significantly as the U.S. government had made its top priority funding the development of alternative, next generation anthrax vaccines – those that worked quicker by requiring fewer than the three doses that BioThrax required. Emergent knew the government was prioritizing the development of quicker-acting, alternative next-gen anthrax vaccines requiring only one or two doses because Emergent itself was in the process of trying to develop its own such alternative next-gen anthrax vaccine to meet that demand.

9.       On June 22, 2016, before the opening of trading, Emergent issued a press release disclosing that the U.S. Department of Health and Human Services ("HHS") had issued two official solicitation notices indicating that not only was the U.S. government not purchasing more BioThrax, it would only be purchasing 29.4 million doses of Emergent's BioThrax vaccine for the U.S.

government's SNS over the following five years – approximately one-third *less* than the five-year

contract for 44.8 million doses it was replacing. The Company also disclosed that instead of more

first generation anthrax vaccine BioThrax, the U.S. government sought to procure between 14 and 27

million doses of a next-gen anthrax vaccine, once one was approved, and that the U.S. government

was putting its supply bid for the rest of its anthrax vaccine procurement out to other companies,

such that Emergent stood to lose its lucrative exclusivity.

      10.     In response to this news, the price of Emergent stock declined from its close of

$39.32 per share on the evening of June 21, 2016 to close at $31.33 per share on June 22, 2016 on

extremely heavy trading volume.

## JURISDICTION AND VENUE

      11.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities and

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17

C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

      12.     Venue is proper in this District pursuant to §27 of the Exchange Act. Acts and

transactions giving rise to the violations of law complained of occurred in this District.

## THE PARTIES

      13.     Plaintiff, William Sponn, purchased Emergent common stock during the Class

Period, as described in the Certification attached hereto and incorporated herein by reference, and

suffered damages thereon.

      14.     Defendant Emergent is a specialty biopharmaceutical company that develops,

manufactures and markets a portfolio of medical countermeasures for biological and chemical

threats. During the Class Period, Emergent had more than 40 million shares of common stock

outstanding, which shares traded in an efficient market on the New York Stock Exchange ("NYSE")

under the ticker symbol "EBS."

15.     Defendant Fuad El-Hibri ("El-Hibri") is, and was at all relevant times, the Founder, Executive Chairman of the Emergent Board of Directors (the "Board"), Chairman of the Board's Strategic Operations Committee and a Member of the Board's Pricing Committee.

16.     Defendant Daniel J. Abdun-Nabi ("Abdun-Nabi") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of Emergent and a Member of the Board's Pricing Committee and a Member of the Board's Strategic Operations Committee.

17.     Defendant Robert G. Kramer ("Kramer") is, and was at all relevant times, the Chief Financial Officer ("CFO"), the Executive Vice President of Corporate Services Division and the Treasurer of Emergent.

18.     Defendant Adam Havey ("Havey") is, and was at all relevant times, the Executive Vice President of Emergent' s Biodefense Division.

19.     Defendants El-Hibri, Abdun-Nabi, Kramer and Havey are sometimes referred to herein as the "Individual Defendants."

### BACKGROUND TO THE CLASS PERIOD

20.     According to the U.S. National Library of Medicine, BioThrax was first made available as an anthrax vaccine in 1970.

21.     Defendant Emergent originally commenced operations as BioPort Corporation ("BioPort") in September 1998 through an acquisition of the Michigan Biologic Products Institute, which included: acquired rights to the marketed product BioThrax, vaccine manufacturing facilities at a multi-building campus on approximately 12.5 acres in Lansing, Michigan and vaccine development and production know-how.

22.     In December 2001, just following the 9/11 terrorist attacks, the FDA approved a supplement to BioPort's manufacturing facility license for the manufacture of BioThrax.

23.     In June 2004, the Company completed a corporate reorganization, changing its name to Emergent Biosolutions Inc.

24.     Following a study by scientists from the U.S. Centers for Disease Control and Prevention (the "CDC"), on December 19, 2008, Emergent received final FDA licensing for use of BioThrax five doses for intramuscular injection.

25.     In July 2010, the Company was awarded a six-year contract (ending in July 2016) from the U.S. Biomedical Advanced Research and Development Authority ("BARDA") to expand its Lansing, Michigan facility that produces BioThrax. At the time of the contract signing, Emergent produced BioThrax only at Building 12 at the Lansing facility, which produced seven to nine million doses a year. Pursuant to the BARDA contract, Emergent was to construct and obtain FDA approval to significantly expand its manufacture of BioThrax at a new Building 55, which was to be capable of producing 20 million to 25 million doses a year.

26.     On September 30, 2011, Emergent entered into a five-year contract with the CDC to supply up to 44.75 million doses of BioThrax to the CDC.

27.     In April 2014, the FDA granted BioThrax an "orphan drug" designation for the pre-exposure use of BioThrax as a vaccine, ensuring Emergent exclusivity over its manufacture and distribution of BioThrax. According to the CDC, BioThrax had historically only been licensed for use by the FDA before exposure to anthrax, but on November 23, 2015, the FDA approved the vaccine for use after exposure as well.

28.     BioThrax currently remains the only anthrax vaccine approved for use and licensed by the FDA. The primary purchaser of BioThrax has been the CDC, which buys BioThrax for the U.S. Strategic National Stockpile (the "SNS"). The U.S. government uses the SNS to protect the public in the event of a national emergency like a terrorist attack. As such, the substantial majority

of the Company's revenues have historically been derived from its sales of BioThrax to the U.S. government.  Emergent derived $293.9 million of its total 2015 product sales of $356.9 million, and $245.9 million of its total 2014 product sales of $311.9 million, from the sale of BioThrax.

## MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

29.     The Class Period starts on January 11, 2016.  On that day prior to the opening of trading, Emergent issued a press release entitled "Emergent Biosolutions Announces Preliminary 2015 Financial Results, Provides 2016 Financial Outlook, And Outlines New Five-Year (2016-2020) Strategic Growth Plan."  The release stated that the Company would outline its 2016-2020 strategic growth plan in detail on January 11, 2016 during a presentation at the 34th Annual J.P. Morgan Healthcare Conference to be held after the close of trading, stating that the Company would "discuss preliminary 2015 financial results, recap the accomplishments from its previous three-year growth plan, and provide a 2016 financial outlook."  The title of the January 11th release emphasized the following 2016 Forecast and 2012 Key Financial and Operational Goals in pertinent part:

- **2016 Forecast:**

  - *Total revenues of $600 to $630 million*
  - GAAP net income of $75 to $85 million
  - Adjusted net income of $90 to $100 million
  - EBITDA of $150 to $160 million

- **2020 Key Financial and Operational Goals:**

  - *Annual revenue of $1B*
  - >10% of revenue from ex-US markets
  - Net income CAGR of >20%
  - Six products in clinical or advanced development, with at least three being dual use, prioritizing those with third party funding

30.     Further detailing the Company's 2016 Forecasts and expressly representing that the

Company was then on track to achieve them by emphasizing the U.S. government's planned

purchases of BioThrax during 2016, the release stated in pertinent part as follows:

**Full Year 2016**

For the full year of 2016, the company forecasts total revenues of $600 to $630 million, ***driven by growth in BioThrax sales which are anticipated to be between $305 to $320 million***, continued domestic and international sales of the other Biodefense division products, and continued robust development funding through contracts and grants revenues. The company also forecasts full year 2016 GAAP net income of $75 to $85 million, non-GAAP adjusted net income of $90 to $100 million, and EBITDA of $150 to $160 million (see "Reconciliation of GAAP Net Income to Adjusted Net Income and EBITDA" for a definition of terms and a reconciliation table).

The company's outlook for 2016 includes the impact of a successful spin-off of Aptevo Therapeutics in mid-2016 and continuous delivery of BioThrax to the CDC under an anticipated follow-on, multi-year procurement contract, ***but does not include any estimates for BioThrax deliveries from Building 55, the company's large scale BioThrax manufacturing facility***, or any estimates for potential new corporate development or other M&A transactions.

**Q1 2016**

For the first quarter of 2016, the company anticipates total revenues of $105 to $120 million.

31.     Further detailing the Company's 2016-2020 Strategic Growth Plans and representing

how the Company was on track to achieve them through planned U.S. government purchases of

BioThrax, the release stated in pertinent part as follows:

**(III)     2016-2020 Strategic Growth Plan**

The company announced today a growth plan that is intended to advance its mission by expanding and diversifying its business as measured by achieving the following goals by December 31, 2020:

- Annual revenue of $1B

- >10% of revenue from ex-US markets

- Net income CAGR (2016-2020) of >20%

- Six products in clinical or advanced development, with at least three being dual use and prioritizing those with third party funding.

***To achieve the goals of the growth plan, the company intends to leverage its core competencies in government relations, medical countermeasure development, quality manufacturing, strategic acquisitions, and financial discipline to execute on the following key strategies:***

- ***Expanding its leadership positions in the public health threats market***

- ***Developing innovative products in partnership with governments*** and NGOs

- ***Growing through revenue generating and accretive business and product acquisitions***

- Delivering attractive net income growth

- ***Enhancing culture to create a sustainable competitive advantage***

32.     The release further quoted Defendant Abdun-Nabi representing that the Company was on track to achieve its financial goals, through the sales of BioThrax to the U.S. government, stating in pertinent part as follows:

Having successfully implemented our 2012-2015 growth plan and delivered financial results in excess of our expectations, ***we are well-positioned for continued success and growth***. Looking ahead we will remain focused on addressing the growing public health threats market ***and will build on our momentum to achieve our newly established 2020 goals of $1B in revenue,*** generating more than 10% of our revenue from ex-US markets, six products in clinical or advanced development with a focus on products supported by third party funding, ***and a five-year net income CAGR of >20%. We continue to strive toward our vision of protecting and enhancing 50 million lives by 2025***.

33.     On February 25, 2016, after the close of trading, Emergent issued a press release announcing its fiscal 2015 financial results for the period ended December 31, 2015 and reiterating its fiscal 2016 guidance.  The Company once again stated that largely through the sales of BioThrax to the U.S. government, it remained on track to achieve "Full Year: revenue of $600 to $630 million; GAAP net income of $75 to $85 million, non-GAAP adjusted net income of $90 to $100 million, and EBITDA of $150 to $160 million." The press release also emphasized as one of the Company's

"2015 Business Accomplishments" its "[c]ontinued progress towards achieving licensure of

Building 55." The release also provided the following further detail supporting its 2016 guidance,

including the "anticipated follow-on, multiyear procurement contract" with the CDC for BioThrax,

stating in pertinent part as follows:

> For the full year of 2016, the Company reaffirms its forecast for total revenues of
> $600 to $630 million, ***driven by growth in BioThrax sales of $305 to $320 million***,
> continued domestic and international sales of the other Biodefense division products,
> and continued robust development funding through contracts and grants revenues.
> The Company also forecasts full year 2016 GAAP net income of $75 to $85 million,
> non-GAAP adjusted net income of $90 to $100 million, and EBITDA of $150 to
> $160 million …. ***The Company's outlook for 2016 includes the … continuous
> delivery of BioThrax to the CDC under an anticipated follow-on, multiyear
> procurement contract***, but does not include any estimates for BioThrax deliveries
> from Building 55, the Company's large scale BioThrax manufacturing facility….

34.     During a conference call held with analysts and investors held later that day to discuss

the Company's then-present business metrics and 2016 guidance, Defendant Abdun-Nabi opened the

call stating that 2015 had been "a very successful year" for Emergent and reiterated the previously-

provided 2016 guidance based in large part upon the Company's remaining on track to be awarded

the "anticipated follow-on contract with the CDC," Defendant Abdun-Nabi stated in pertinent part as

follows:

> In 2016, we are forecasting continued growth in revenues, net income and EBITDA.
> The financial forecast that we announced today reaffirms the guidance that we
> provided at the JPMorgan Healthcare Conference in January. ***We plan to achieve our
> 2016 revenue target based on a number of factors. First, continued BioThrax sales
> under our existing procurement contract, as well as under the anticipated follow-
> on contract with the CDC;*** second, through anticipated sales of our other portfolio
> products to the U.S. government under existing procurement contracts; third, through
> an expansion of our contract manufacturing services in both our Maryland and
> Winnipeg operations; fourth, by securing additional funding for contracts and grants,
> both existing and new; and finally, through increasing international sales.

35.     Addressing the Company's then-ongoing efforts with the FDA to expand its

BioThrax production through the build-out of Building 55 and the anticipated renewal of its lucrative

BioThrax procurement contract with the CDC, Defendant Abdun-Nabi assured investors the

Company remained on track, stating in pertinent part as follows during his prepared opening remarks:

> Turning now to Building 55. As we previously announced, the FDA requested that we perform a reanalysis on one of the more than 30 assays used for comparability before filing our sBLA. *We are on track to complete their request during the first half of the year*, after which we expect to submit the sBLA. *As a reminder, we anticipate a PDUFA date of four months following acceptance by the FDA of the sBLA filing.*
>
> Moving on to our follow-on BioThrax procurement contract with the CDC, *we have had a preliminary meeting and exchanges of communication with the CDC on this topic*. *The CDC recognizes the importance of the anthrax preparedness and with FY2016 funding levels, we anticipate that a follow-on multi-year contract will be put in place to ensure an uninterrupted supply of BioThrax through the SNS.*

36.     Discussing the ongoing negotiations with the CDC concerning the "follow-on multi-year contract," though Defendant Abdun-Nabi refused to disclose what the relevant U.S. government agencies had told Emergent about the U.S. government's demand for BioTrax, he emphasized that the U.S. government's demand for BioThrax was strong, stating in pertinent part as follows:

> Moving on to our follow-on BioThrax procurement contract with the CDC, we have had a preliminary meeting and exchanges of communication with the CDC on this topic. *The CDC recognizes the importance of the anthrax preparedness and with FY2016 funding levels, we anticipate that a follow-on multi-year contract will be put in place to ensure an uninterrupted supply of BioThrax through the SNS.*

37.     Defendant Kramer then expanded upon Defendant Abdun-Nabi's 2016 guidance comments during his own prepared opening remarks, assuring investors the Company remained on track to achieve the lucrative renewal contract with CDC, stating in pertinent part as follows:

> Across the board, 2015 performance was substantially improved over the prior year, *positioning us to achieve our 2016 financial goals, which include total revenues of between $600 million and $630 million; GAAP net income of between $75 million and $85 million; adjusted net income of between $90 million and $100 million; and finally, EBITDA of between $150 million and $160 million. This forecast includes the impact of … continuous delivery of BioThrax to the CDC under an anticipated follow-on multi-year procurement contract*, but importantly does not include any estimates for BioThrax deliveries from Building 55….

38.     During the Q&A portion of the call, Defendant Abdun-Nabi explicitly stated that the Company then "[saw] a high degree of confidence in getting that building online and approved this year."

39.     During the Q&A session, Defendant Abdun-Nabi was also asked to "just describe how – as you negotiate the next contract with the CDC, how do you contemplate assuming Building 55 comes online, but what if it doesn't, you have to sort of outline two scenarios when you negotiate that contract, how does that work?"  Essentially, the analyst was asking what the Company's negotiating posture with the CDC was in light of the fact that Building 12 could only then produce 7-9 million does annually, whereas once Building 55 came on line, Emergent could produce 20-25 million doses, inquiring whether the Company was able to negotiate the sale of its soon-to-be much larger capacity, with BioThrax production at Building 55 not yet having been approved by the FDA. Responding to this analyst's question, Defendant Abdun-Nabi refused to reveal the content of the ongoing negotiations, but confirmed the implicit implication that the multi-year renewal contract then being negotiated with the CDC did in fact contemplate much larger sales to the U.S. government, with Defendant Abdun-Nabi stating in pertinent part as follows:

> [W]ith respect to the contract negotiations, you put your finger on an interesting and dynamic point, which is what do you do with respect to Building 12 versus Building 55? And we have some pretty concrete thoughts there in terms of how we will handle that. I prefer not to share that with you because *it does get into some of the details of the contract negotiation thinking that we have internally*, and as you can appreciate, it's important that we keep that confidential as part of this entire process. *But we have thought that through and we have some – I think some creative solutions to how that could work going forward.*

40.     During the Q&A session Defendant Abdun-Nabi also responded to an analyst's query concerning the "longer term competitive landscape for anthrax vaccines" the Company then faced, stating in pertinent part that the Company did not "see" competitors developing a meaningfully

competitive product to its existing BioThrax product "in the next five – maybe even five years to 10 years, *certainly within the lifetime of the upcoming contract that we anticipate with the CDC*."

41.     Also during the Q&A session, Defendant Abdun-Nabi responded to another analyst's question concerning the ongoing negotiation of the "follow-on contract with the CDC," emphatically stating again that "*it's safe to say the CDC does continue to recognize the importance of being prepared for the anthrax threat. And with the fiscal year 2016 funding levels, we do anticipate the follow-on multi-year contract will be in place to ensure that there is no interruption in this by BioThrax to the SNS*."

42.     On February 29, 2016, Emergent filed its 2015 Annual Report on Form 10-K with the SEC, which was signed by Defendants El-Hibri, Abdun-Nabi and Kramer, among others. The Form 10-K discussed the Company's need to extensively expand its BioThrax manufacturing capabilities through its contract with BARDA at its much larger Building 55 facility, purportedly to keep up with the U.S. government's growing demand for BioThrax. The Form 10-K stated in pertinent part as follows:

> Our current contract with the Centers for Disease Control and Prevention, or CDC, an agency within the U.S. Department of Health and Human Services, or HHS, specifies that we supply up to 44.75 million doses of BioThrax into the Strategic National Stockpile, or SNS, over a five-year period ending in September 2016. *The maximum amount that could be paid to us under this current contract is approximately $1.25 billion*, subject to availability of funding to the CDC. As of December 31, 2015, *$1.1 billion in funding has been committed*, of which approximately $1.0 billion has been delivered under the contract, which represents approximately 37 million doses. *To date, the principal customer for BioThrax has been the U.S. government, specifically HHS (including CDC).*

> *     *     *

> **Biodefense Division**

> We have a manufacturing facility, Building 12, focused on bacterial fermentation located at our 12.5 acre, multi-building campus in Lansing, Michigan. We currently manufacture BioThrax at the 100-liter scale in Building 12. *To expand our existing BioThrax manufacturing capabilities*, we have constructed adjacent to

Building 12 a large-scale, multi-product facility, or *Building 55, capable of producing BioThrax at the 1320-liter scale*. In July 2010, we entered into a multi-year development contract with BARDA that provides up to $104 million of funding to support the work needed to approve the manufacturing of BioThrax in Building 55. We continue to pursue FDA approval for BioThrax at this *larger production scale*. In February 2015, we completed the in-life phase of a pivotal nonclinical efficacy study designed to demonstrate that BioThrax manufactured at large scale in Building 55, is comparable to the BioThrax currently manufactured in Building 12. Analysis of data shows that the primary endpoints were met. Data from this study will be used to support an expected mid-2016 submission of an sBLA to the FDA for Building 55 licensure, which we anticipate by year end 2016. Building 12 produces 8 to 10 million doses of BioThrax annually. *Building 55 has the potential to increase manufacturing capacity to an estimated 20 to 25 million doses annually, on a single manufacturing train.*

*       *       *

### Manufacturing Infrastructure

#### Biodefense

We have a manufacturing facility focused on bacterial fermentation located at our 12.5 acre, multi-building campus in Lansing, Michigan. We currently manufacture BioThrax at the 100 liter scale at this facility. *To augment our existing BioThrax manufacturing capabilities, we have constructed a large-scale, multi-product facility capable of producing BioThrax at the 1320 liter scale.* In July 2010, we entered into a contract with BARDA which provides funding to support the work needed to approve manufacturing of BioThrax at the larger scale.

43.     On April 12, 2016 Emergent presented at the Needham Healthcare Conference.

Defendant Havey appeared for the Company and during his opening remarks stated: "*we're going to obtain 55 licensure and move from Building 12 small-scale to Building 55 large-scale manufacturing for BioThrax*" and "*[w]e're going to secure a multiyear follow-on BioThrax contract with the CDC*." Responding to inquiries as to whether the Company anticipated any competition in regards to the upcoming BioThrax renewal contract from other companies, Defendant Havey just as emphatically claimed their was really no such competition and that the Company then contemplated obtaining the renewal all for itself, stating in pertinent part as follows:

Yes, so right now *the contracts have been sole-source contracts, because we're the only licensed FDA products. And I would expect that to happen this time as well.* I

know there are a few competitors in early-stage development, Phase 1; and I know some competitors are out there talking about EUA and the next 12 to 24 months. I'm not as optimistic as they are on that, obviously.

**But as of right now I think the requirement is an FDA-licensed product.** And one of the more important points of that is the PEP indication that we just received licensure on -- now that that's licensed, the stockpile is no longer being managed under an EUA; I think it's a pretty high bar for some of our competitors. You know, we are a three-dose primary series with a PEP indication. **I think that solidifies our position, at least in the short term.**

\*       \*       \*

That's a procurement contract, **you should assume it's exclusively for BioThrax**. Nobody can submit something to be procured at this point. **So for all intents and purposes, it would be a sole-source procurement contract for BioThrax.**

Different than a development contract, where there are other candidates where it can be (inaudible), and it is. But from a procurement perspective for the vaccine, currently BioThrax has the only license.

44.     On April 18, 2016, Emergent issued a release announcing that it had submitted its supplemental Biologics License Application ("sBLA") to the FDA seeking approval of the manufacture of BioThrax in Building 55. The release emphasized that Emergent was expanding its BioThrax production facilities in order to support additional sales of BioThrax to the U.S. government based on the U.S. government's purportedly growing demand for BioThrax, expressly referencing the U.S. government's demand for "75 million doses" of BioThrax for the SNS, stating in pertinent part as follows:

> **Building 55 has the potential to expand manufacturing capacity of BioThrax to an estimated 20 to 25 million doses annually** from the seven to nine million doses produced annually out of the currently-licensed facility. **The capability to manufacture BioThrax at large scale positions the company to meet the government's desire of stockpiling 75 million doses of a licensed anthrax vaccine.**

45.     On May 5, 2016, after the close of trading, Emergent issued a press release announcing its first quarter 2016 financial results for the period ended March 31, 2016. The release emphasized that the "**CDC [had] notifie[d] the Company of its intent to award a follow-on**

*BioThrax procurement contract on October 1, 2016*" and stated that "*[i]n transitioning to the follow-on contract*, the Company [was] *temporarily postponing* its 2016 financial guidance until CDC *confirm[ed]* level of Q2 and Q3 BioThrax procurement." Defendant Abdun-Nabi was quoted in the release stating that Emergent was "extremely pleased that the CDC ha[d] now *confirmed its intention to award a follow-on BioThrax procurement contract* on October 1, 2016," and that "[w]ith [the Company's] large-scale manufacturing facility coming online, [Emergent] anticipate[d] this [would] be a multi-year contract *requiring significantly increased deliveries* in order to satisfy the U.S. government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile."

46.     The release contained a section entitled "Update On CDC BioThrax Procurement Contract," in which Emergent stated in pertinent part as follows:

> By letter dated April 1, 2016, *the CDC informed the Company of its intent to award a follow-on BioThrax procurement contract, thereby ensuring an uninterrupted supply of BioThrax into the Strategic National Stockpile*. The Company's current BioThrax procurement contract with the CDC is scheduled to expire on September 30, 2016. *The CDC reaffirmed their intent in a follow-up letter dated April 26, 2016*, in which the CDC stated that *their acquisition planning process is ongoing* and that *they project to issue an award for a follow-on BioThrax procurement contract* on October 1, 2016.
>
> *In its April 26 letter, the CDC further stated that it anticipates continuing to purchase doses of BioThrax in Q2 and Q3 of 2016 under the Company's current procurement contract*, although it did not specify the number of doses to be purchased. The CDC did state that they anticipate the quantity to be less than the total remaining doses available to be purchased under the current contract. *<u>The Company believes these letters from the CDC reflect their transition planning associated with procuring BioThrax manufactured from the Company's large-scale manufacturing facility, Building 55, under a new multi-year follow-on contract expected to be in place on October 1, 2016.</u>*
>
> Until such time as the Company can secure greater clarity on *the number of BioThrax doses to be delivered in Q2 and Q3, expected within the next 60 days*, the Company believes it is prudent to temporarily postpone its financial guidance for 2016.

47.     During a conference call held later that day with investors and analysts, Defendant

Abdun-Nabi continued his bullish mantra concerning the U.S. government's intent to significantly

expand its purchases of BioThrax from Emergent under the soon-to-be announced renewed

exclusive procurement contract once Building 55 was approved and came on line, and intentionally

negated any implication that the U.S. government's demand for BioThrax was waning, stating in

pertinent part as follows:

> Now let me turn in to Building 55 and our procurement contract with the CDC. As
> previously announced, last month, we submitted our sBLA for Building 55 to the
> FDA. We anticipate a typical FDA review cycle of four months, which includes a
> pre-approval inspection. Accordingly, we estimate that the review process will be
> completed in the fall of this year. We believe that with the sBLA being filed earlier
> than anticipated, and with BioThrax deliveries nearing completion under our current
> contract, *the CDC has updated its thinking, on how best to transition from the
> current contract to the expected multi-year follow-on contract*.
>
> To that end, *we received a letter from the CDC dated April 1 informing us that their
> intent to award a follow-on contract for procurement of BioThrax,* hereby ensuring
> an uninterrupted supply of BioThrax into the Strategic National Stockpile.
>
> As a reminder, our current BioThrax procurement contract with the CDC is
> scheduled to expire on September 30, 2016. *The CDC reaffirmed its intent in a
> follow-up letter dated April 26, in which they have stated that their acquisition
> planning process is ongoing and that they project to issue an award for a follow-on
> contract on October 1, 2016. This is entirely consisting with our expectation for
> continued uninterrupted supply of BioThrax to the Strategic National Stockpile*.
>
> While still in the April 26 letter, the CDC advised that – that they anticipate
> continued procurement of BioThrax in the second quarter and third quarters,
> although they had not specified the specific number of doses to be purchased.
>
> As stated, however, that the anticipated purchase in quantity is less than the total
> remaining doses under the contract. *With these letters, we have some, but not total
> visibility into the CDC's planning and thinking, allowing the process of
> transitioning to a follow-on contract. We believe, their thinking has been
> influenced by the earlier than expected tradition of the sBLA, the Building 55, the
> plausible licensure of that facility earlier than previously forecast, and that will
> come into the end of the delivery schedule on our current contract.* We've had
> initial conversations with the CDC, but have not had sufficient time to fully or
> properly address these important questions prior to our call today.

Thus until such time as we can secure greater clarity on a specific number of doses to be purchased in Q2 and Q3, we believe it's prudent to temporarily postpone our financial guidance for 2016. We expect that within the next 60 days, we will have clarification on the CDC's plans for the second quarter and third quarters and we will update you accordingly. *We view this as part of the transition planning process and moving to a new follow-on procurement contract.*

And in our experience, situations like this with government agencies have always evolved in the iterative process requiring active engagement and effective management interactions.

*And I'd like to point out that over the course of our history, we have demonstrated the unique ability, to work with our government partners to our mutual benefit, and we'll remain confident that we can do so in this space.*

48.    During the Q&A session, Defendant Abdun-Nabi engaged in the following colloquy with a stock analyst from Cowen & Company, again doubling down on his denial when questioned whether the U.S. government's demand for BioThrax had declined in light of its express statement that it would be purchasing less of the vaccine in the second and third quarters of fiscal 2016, stating in pertinent part as follows:

**<Q - Marc Frahm>:** …. So when we think about the contract that's remaining, can you confirm how many doses are actually remaining on that contract? And then there is kind of disconnect here between the CDC seemingly telling you they're going to take less than that contract in the next few quarters but then have a much larger dosage contracts coming right after that, right.  And maybe, if you can give a little bit more clarity on, the machinations of government and how that would make sense on their part?

**<A - Daniel J. Abdun-Nabi>:** Yeah. Great question. So, I think you will see in the peer group that we had about 5.5 million doses remaining on the contract.  And as I indicated, they will be buying additional quantities, Q2, Q3, and we'll get some more clarity around that. *And I really don't see any consistency between — they're saying that, there may be reductions in Q2 and Q3 and the need for a significant follow-on contract that goes for multiple years.*

*They've repeatedly advised, policy makers as well as appropriators, publicly and privately, that they intend to purchase all of the doses*, the anthrax vaccine that are being produced, in order to address these data requirements. *And so this is truly a transition planning exercise and a timing exercise.*

*So I don't see this as inconsistent, I think it's part of a migration that, that needs to be done in the — I'll call it ordinary course.*  In some respects to explain the

machinations of the government agencies and how they work, probably beyond the length of the … columns … that they've made available to us. *But suffice it to say that we as a team had extensive experience in understanding how they think and what might be the best way to address the concerns that they might have. So I remain confident that at the end of the day, we're going to come out with a satisfactory conclusion for both Emergent and for our customer.*

49.     During the conference call, Defendant Abdun-Nabi expressly denied that that the U.S. government's demand for BioThrax had diminished, stating in pertinent part that *Emergent did "not anticipate any slowdown in the manufacturing and also with the B55 process being accelerated, [it was] now looking at plans to implement that manufacturing earlier than previously expected.*" And when asked if the U.S. government was seeking price concessions for the purportedly larger future procurement orders, and about the duration of any renewal BioThrax procurement contract then under negotiation with the U.S. government, Defendant Kramer too doubled down on Defendant Abdun-Nabi's prior bullish statements, stating in pertinent part that the contract termination and renewal and bringing Building 55 online "*all tie-in together,*" "*[a]s you can appreciate it, it's one big, beautiful package,*" and promising that "when we're ready to announce the contract, I look forward to laying out all the terms that you can fully understand what they are." Indeed, when asked specifically by another analyst "[a]s it relates the targeted dosage needs of the government, *I think our guidance there was about $75 million.* First question is, has there been any change in that number?," Defendant Abdun-Nabi again emphatically responded "*no we have not heard any adjustment to the government-stated requirement.*"

50.     Defendants' bullish commentary, effectively parlaying a temporary suspension of guidance into positive news that the government was really just transitioning into significantly increased purchases of BioThrax, had its intended effect and as the market impounded defendants' statements over the next couple of weeks, the price of Emergent common stock closed up from its close of $37.85 on Thursday, May 5, 2016 to close at $41.77 by May 18, 2016.

51.     On May 19, 2016, the Individual Defendants, joined by other Emergent executives and Board members, conducted the Company's 2016 annual general shareholder meeting, seeking shareholder approval of a series of proposals, including the reelection of Defendant El-Hibri to the Emergent Board, advisory approval of the 2016 executive compensation program, and an amendment of the Company's stock incentive program to increase the number of stock options available to be granted to the Company's senior executives and directors by 3.75 million shares and to increase the per participant limit on performance awards payable in cash per calendar year from $750,000 to $2 million.  Speaking on behalf of Emergent in support of each of these proposals, Defendant Kramer lauded the Company's progress in achieving its outsized long-term financial goals, ***including increasing revenues to exceed $1 billion by 2020***, through Emergent's ongoing successful efforts to obtain a renewal of the CDC BioThrax procurement contract and significantly increasing the Company's sales of BioThrax to the U.S. government through the build-out and anticipated approval of Building 55, stating in pertinent part as follows:

> As we always do, we've established certain goals that we plan to achieve by the end of the plan period of 2016 to 2020. ***The strategic goals include a specific goal around revenue growth which we intend to exceed $1 billion in total revenue by the end of 2020*** of which greater than 10% is targeted to be from customers outside of the US. ***This growth will be achieved from existing products***, from new product launches as well as through M&A of products and technologies.
>
> Secondly in the area of development, we've continued to focus and have set a goal around the development of six products in clinical and advanced development by 2020, three of which are designated dual use technologies. And finally, ***we continue to commit to grow aggressively on net income and to establish the compound annual growth rate for net income of greater than 20% by the end of 2020***. This will require us to continue to control our net R&D spin to require us to carefully manage our selling, general and administrative expenses. ***And with the revenue growth, this results in an EBITDA projection of an excess of $350 million by the end of 2020. By comparison for 2015, that number was $130 million.***
>
> As we have year-by-year, we'll establish certain operational goals in support of our long-range plans. ***These goals for 2016 include*** the completion of the spin-off of Aptevo Therapeutics by midyear of 2016. They include ***the licensure of Building 55, our large scale manufacturing facility BioThrax in Lancing. It includes securing***

*of a new multiyear follow-on contract for BioThrax with CDC. Earlier this year we're pleased to be informed of CDC's commitment to put a follow-on contract in place by October 1, thereby ensuring an uninterrupted supply of BioThrax into the strategic national stockpile.* And finally, to complete additional strategic acquisition that aligns with our core competencies in support of our growth plan.

*With this plan in place, we anticipate making significant progress on our vision of protecting and enhancing 50 million lives by 2025.* This vision will inform everything we do as *we establish Emergent as a market leader with a global impact, a financial leader generating consistent revenue, earnings growth and substantial positive returns for our shareholders* and, finally, an industry leader remaining true to our mission, our core purpose and values.

52.    The price of Emergent common stock continued rising on defendants' positive statements, reaching a Class Period high of $44.38 per share on June 7, 2016.

53.    On June 15, 2016, the Company issued a release announcing that the FDA had granted Emergent Orphan Drug status for BioThrax for post-exposure prophylaxis ("PEP") of anthrax disease resulting from suspected or confirmed *Bacillus anthracis*. According to the release, the Orphan Drug status provided market exclusivity through November 2022, representing seven years from the date on which FDA approved the PEP indication for BioThrax. The release further emphasized that BioThrax remained "*the only FDA-licensed vaccine for anthrax disease*," now "indicated for both pre-exposure and post-exposure prophylaxis of anthrax disease," and quoted Defendant Havey stating in pertinent part that BioThrax continued to "*play[] a significant role in the U.S. government's biosecurity efforts*."

54.    On June 17, 2016, Emergent issued a release announcing that the FDA had accepted Emergent's sBLA for Building 55, again emphasizing that build-out of Building 55 was "intended to increase the manufacturing capacity for BioThrax to an estimated 20 to 25 million doses annually," in "response to *the U.S. government's desire to stockpile 75 million doses of a licensed anthrax vaccine,*" stating in pertinent part as follows:

Emergent … today announced that the U.S. Food and Drug Administration (FDA) has accepted for review Emergent's supplemental Biologics License Application

(sBLA) seeking approval of the manufacture of BioThrax® (Anthrax Vaccine Adsorbed) in Building 55, the company's large-scale manufacturing facility. FDA has set a Prescription Drug User Fee Act (PDUFA) target action date of August 15, 2016.

"Emergent's large-scale manufacturing facility, *intended to increase the manufacturing capacity for BioThrax to an estimated 20 to 25 million doses annually, is a response to the U.S. government's desire to stockpile 75 million doses of a licensed anthrax vaccine,"* said Adam Havey, executive vice president and president, biodefense division at Emergent BioSolutions. "*We look forward to our continued collaboration with the U.S. government to help in its commitment to protect the nation against public health threats such as anthrax*."

The sBLA, submitted on April 15, 2016, is supported by data that demonstrate that BioThrax manufactured at large scale in Building 55 is comparable to BioThrax manufactured in the currently-licensed facility. BioThrax, the only FDA-licensed anthrax vaccine, is indicated for both pre-exposure and post-exposure prophylaxis of anthrax disease.

This program is fully funded at $104 million under contract number HHSO100201000034C by the Biomedical Advanced Research and Development Authority within the Office of the Assistant Secretary for Preparedness and Response in the U.S. Department of Health and Human Services.

55.     On June 21, 2016, Emergent issued a release announcing that the FDA had completed

its pre-approval inspection of Building 55, stating in pertinent part as follows:

Emergent … today announced that the U.S. Food and Drug Administration (FDA) has completed its Pre-Approval Inspection (PAI) of Building 55, the company's facility for large-scale manufacturing of BioThrax® (Anthrax Vaccine Adsorbed). At the conclusion of the inspection, the company received a No Action Indicated decision and no Form 483 observations. Successful completion of the PAI is one of the requirements for Building 55 licensure in connection with the company's supplemental Biologics License Application (sBLA) recently accepted by the FDA. The sBLA has a Prescription Drug User Fee Act (PDUFA) target action date of August 15, 2016.

"Emergent is pleased to have reached *this critical milestone* in our BioThrax comparability program. The positive outcome from this pre-approval inspection is a testament to our employees' tireless efforts, to our substantial financial investment in Building 55, and to our strong partnership with BARDA," said Adam Havey, executive vice president and president, biodefense division at Emergent BioSolutions. "We look forward to timely completing the process for securing FDA licensure of our facility."

The BioThrax comparability program is fully funded at $104 million under contract number HHSO100201000034C by the Biomedical Advanced Research and Development Authority within the Office of the Assistant Secretary for Preparedness and Response in the U.S. Department of Health and Human Services.

56.     The statements referenced herein at ¶¶ _-_ were materially false and misleading as they failed to disclose following adverse facts which were known to defendants or recklessly disregarded by them, as follows:

(a)     that the U.S. government's demand for purchasing additional stockpiles of Emergent's first-generation anthrax vaccine, BioThrax, had actually significantly declined prior to the start of the Class Period; and instead, the U.S. government had made funding the development of alternative, faster-acting, next-gen anthrax vaccines its top priority; and

(b)     due to Emergent's concealment of what it knew of the U.S. government's decreased demand for purchasing additional stockpiles of Emergent's first-generation anthrax vaccine, BioThrax, the Company was not on track to achieve the business and financial results Defendants led the market to believe the Company was on track to achieve during the Class Period.

57.     On June 22, 2016, Emergent issued a release disclosing that "on June 21, 2016, the U.S. Department of Health and Human Services (HHS) issued two solicitation notices with respect to the development and procurement of anthrax vaccines for the Strategic National Stockpile (SNS)."  Down significantly from the *39 million BioThrax doses* the Company had already delivered the U.S. government through the end of the first quarter 2016 of the *44.75 million doses* called for by its existing five-year exclusive contract (then set to expire on October 1, 2016), Emergent disclosed that through the first of the two solicitation notices, the U.S. government only sought "the continued procurement of *29.4 million* doses of BioThrax" over a five-year period.  Not only was the U.S. government not increasing its purchases of BioThrax to build a 75 million dose stockpile of BioThrax, the renewal contract had the U.S. government purchasing more than one-third

*less* BioThrax than the 2011 procurement contract had called for.  As such, only 6 million, instead of the 19 million doses investment analysts had been expecting to be purchased, would be actually purchased during fiscal year 2016.

58.   Instead, through the second solicitation notice, the Company disclosed that the U.S. government actually sought the "procurement of up to 27 million dose regimens of a ***next generation*** anthrax vaccine."   It also disclosed that the U.S. government was putting the procurement bid for the up to 27 million dose next-gen anthrax vaccine out for public bid, rather than "sole sourcing" it through Emergent as the 2011 procurement contract had done, stating in pertinent part as follows:

### Notice of Solicitation for Next Generation Anthrax Vaccine

In addition, HHS issued a request for proposal seeking a next generation anthrax vaccine (Solicitation No. 16-100-SOL-00015) for post-exposure prophylaxis of anthrax disease. The vaccine candidate must have the ability to confer protection in one or two doses, a favorable safety profile following completion of clinical studies through Phase 2, demonstrated efficacy in non-clinical studies, and manufacturing consistency necessary to advance towards approval by Emergency Use Authorization. The contract, anticipated to contain a base period of five years is for the development of the vaccine candidate to licensure as well as for the purchase and delivery of an initial two million doses of a next generation anthrax vaccine to the SNS, with potential additional procurement of 12 million doses up to 25 million dose regimens of final drug product.

59.   As such, there was a potential that the U.S. government would purchase only 14 million doses of the next-gen anthrax vaccine under the new contract, and those sales were not guaranteed to Emergent even if it did eventually get it's a next-gen anthrax vaccine of its own approved.

60.   On this news, on June 22, 2016 the price of Emergent common stock declined by approximately $8 per share, falling from its close of $39.32 per share on June 21st to close at $31.33 on June 22nd, down almost 30% from its Class Period high, on very unusually high trading volume

of more than 9.5 million shares trading, or 21x the average daily trading volume over the preceding ten trading days.

61.     As lamented by stock analyst Jim Molloy from Laidlaw & Company in his client note issued that day, "EBS stock is lower today on news that the next US Government (USG) BioThrax procurement contract is likely in the 29.4M dose range, far lower than the current 44.8M dose contract, *and well below what we (and investors) had believed would be the award size.*" Molloy's client note further lamented that "*the small BioThrax contract reflects the USG desire to transition over to a next-gen vaccine over the coming years*."

<div align="center">

**NO SAFE HARBOR**

</div>

62.     Emergent' s "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

63.     The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Emergent who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

64.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Emergent, their control over, and/or receipt of modification of Emergent's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Emergent, participated in the fraudulent scheme alleged herein.

65.     With the price of Emergent stock artificially inflated, certain of the Company's senior executives and directors cashed in, selling their personally-held Emergent stock at fraud-inflated prices, including each of the Individual Defendants who sold the following 363,313 shares receiving more than $14.5 million in gross proceeds:

| DEFENDANT | DATE | SHARES SOLD | PRICE | GROSS PROCEEDS |
|-----------|------|-------------|-------|----------------|
| El-Hibri | 04/06/16 | 50,000 | $38.50-$39.50 | $1,950,000 |
|  | 04/18/16 | 20,791 | $40.50 | $842,035 |
|  | 04/22/16 | 4,209 | $40.50 | $170,464 |
|  | 05/12/16 | 25,000 | $38.71 | $967,750 |
|  | 05/23/16 | 45,000 | $42.50-$42.76 | $1,918,000 |
|  | 05/24/16 | 20,000 | $42.26 | $845,200 |
|  | 05/25/16 | 20,000 | $42.57 | $851,400 |
|  | 05/26/16 | 39,759 | $42.90-$43.50 | $1,718,000 |
|  | 05/27/16 | 9,835 | $43.50 | $427,822 |
|  |  | 234,594 |  | $9,690,671 |
| Abdun-Nabi | 04/18/16 | 8,702 | $40.17 | $349,559 |
|  | 05/20/16 | 8,701 | $42.00 | $365,442 |
|  | 06/01/16 | 8,699 | $43.74 | $380,494 |
|  |  | 26,102 |  | $1,095,443 |

| Kramer | 04/01/16 | 43,572 | $35.48-$35.93 | $1,556,000 |
|--------|----------|--------|----------------|------------|
|        | 04/04/16 | 21,788 | $36.90 | $804,000 |
|        | 04/06/16 | 21,786 | $38.90 | $847,000 |
|        |          | 87,146 |        | $3,207,000 |
|        |          |        |        |            |
| Havey  | 03/11/16 | 11,112 | $33.84 | $376,000 |
|        | 03/14/16 | 4,359  | $33.96 | $148,000 |
|        |          | 15,471 |        | $524,000 |
|        |          |        |        |            |
| **Totals** |      | **363,313** |   | **$14,517,114** |

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

66.    At all relevant times, the market for Emergent's common stock was an efficient market for the following reasons, among others:

(a)    Emergent's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    According to the Company's Form 10-Q filed May 6, 2016, the Company had more than 40 million shares outstanding as of April 29, 2016. During the Class Period, on average, more than 557,000 shares of Emergent stock were traded on a daily basis, demonstrating a very active and broad market for Emergent stock and permitting a very strong presumption of an efficient market;

(c)    Emergent claims to be qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d)    as a regulated issuer, Emergent filed periodic public reports with the SEC;

(e)    Emergent regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     Emergent was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(g)     numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Emergent stock at all times during the Class Period; and

(h)     unexpected material news about Emergent was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

67.     As a result of the foregoing, the market for Emergent common stock promptly digested current information regarding Emergent from publicly available sources and reflected such information in Emergent's stock price.  Under these circumstances, all purchasers of Emergent common stock during the Class Period suffered similar injury through their purchase of Emergent common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

68.     During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Emergent's business fundamentals and engaged in a scheme to deceive the market.  By artificially inflating and manipulating Emergent's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, it caused Emergent's stock price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Emergent securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

69.     This is a class action on behalf of those who purchased or otherwise acquired Emergent common stock between January 11, 2016 and June 21, 2106, inclusive, excluding Defendants (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

70.     Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Emergent common stock; and (e) the extent of and appropriate measure of damages.

71.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

72.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

73.     Throughout the Class Period, Defendants Emergent and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Emergent common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     During the Class Period, Defendants Emergent and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Emergent common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Emergent common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Emergent and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

75.     In addition to the duties of full disclosure imposed on Defendants Emergent and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Emergent's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

76.     Defendants Emergent and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

77.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Emergent common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Emergent common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Emergent and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Emergent stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

78.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Emergent and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Emergent shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

79.     By virtue of the foregoing, Defendants Emergent and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

80.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

81.     Defendants the Individual Defendants had control over Emergent and made the material false and misleading statements and omissions on behalf of Emergent within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of his controlling shareholder status, executive positions, board membership, and stock ownership, and his culpable participation, as

alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

82.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

83.     By reason of such wrongful conduct, the Individual Defendants is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

<p style="text-align:center"><strong>PRAYER FOR RELIEF</strong></p>

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 19, 2016

_Dana W. McKee_

DANA W. MCKEE (04447)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD 21202
Telephone: 410/962-1030
410/385-0869 (fax)
dwm@browngold.com

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARY BLASY
(upon *Pro Hac Vice* application)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mblasy@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL DEES
(upon *Pro Hac Vice* application)
1200 Ashford Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com


*Attorneys for Plaintiff*