UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| WILLIAM SPONN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 8:16-cv-02625-RWT |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| EMERGENT BIOSOLUTIONS INC., FUAD EL-HIBRI, DANIEL J. ABDUN-NABI, ROBERT G. KRAMER, and ADAM R. HAVEY, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) | DEMAND FOR JURY TRIAL |

**AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs City of Cape Coral Municipal Firefighters' Retirement Plan and City of Sunrise Police Officers' Retirement Plan (collectively, "Lead Plaintiffs" or "Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Plaintiffs' counsel, which included, among other things, a review of United States Securities Exchange Commission ("SEC") filings made by Emergent Biosolutions Inc. ("Emergent" or the "Company"), as well as securities analysts' reports, advisories, press releases, media reports and other public statements issued by or about the Company.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Emergent common stock between January 11, 2016 and June 21, 2016, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Emergent is a specialty biopharmaceutical company that derives the vast majority of its revenues from the sale of BioThrax – its U.S. Food and Drug Administration ("FDA") licensed anthrax vaccine – to the United States Government (hereinafter, "the Government").  Emergent's vaccine is the only one approved for sale by the FDA.  Historically, the Government has purchased almost all of Emergent's BioThrax production.  In 2011, Emergent and the Government entered into a five-year BioThrax procurement contract, with a

value of $1.25 billion, which was set to expire on September 30, 2016 (the "BioThrax Contract"). By the start of the Class Period, January 2016, investors were keenly focused on whether that contract would be renewed and the likely terms of any renewal – in particular, the number of doses that would be contracted for in the renewal.

3.     Throughout the Class Period, Defendants repeatedly made positive statements about the renewal of the BioThrax Contract and the likely terms of that renewal. Defendants consistently pointed to the Government's stockpile requirements and the shelf-life of the vaccine and suggested that this meant the renewal of the BioThrax Contract would have to include a massive increase in doses, which would result in significantly increased revenues and profits for Emergent. For example, Defendants told investors that the renewal of the BioThrax Contract was "one big, beautiful package" calling for "significantly increased deliveries" of BioThrax. These statements lacked a reasonable basis when made and were therefore materially false and misleading because Defendants knew that the Government's demand for BioThrax vaccine had declined – the Government did not intend to buy enough doses to reach the 75 million dose stockpile, which was lower than anticipated.

4.     Defendants made sure that they were not in the dark as to the Government's position on the renewal of the BioThrax Contract and hired a phalanx of high-priced lobbyists to influence the decision-making process and gain insight into the scope of any renewal. As detailed herein, Emergent hired more than ten outside lobbying firms, in addition to its own internal lobbyists, collectively paying millions of dollars in lobbying fees. Among the high-powered lobbying line-up were a former congressman, a retired general, and numerous former senior congressional staffers. These lobbyists gave Emergent valuable insight into the

Government's decision-making process and intentions and provided Defendants with sufficient information to determine that any renewal would be on vastly different terms than the Defendants had led the market to believe.

5.     On May 5, 2016, Emergent confirmed that the Government would award the Company a renewal of the BioThrax Contract, describing it, *inter alia*, as a "a multi-year contract requiring significantly increased deliveries in order to satisfy the U.S. government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile."

6.     Following this announcement, the price of Emergent stock dramatically increased, rising from $37.85 per share on May 5, 2016 to $43.49 per share on June 1, 2016, an increase of approximately 15%.   As the price of Emergent stock rose, as detailed herein, Defendants Daniel J. Abdun-Nabi, Emergent's President and Chief Executive Officer, and Fuad El-Hibri, Chairman of Emergent's Board of Directors, sold over 175,000 shares of their personally held stock.

7.     Then, on June 22, 2016, Emergent finally revealed that the renewal of its BioThrax Contract with the Government would be for only 29.4 million BioThrax doses over a five year period.  This represented an average amount of only 6 million BioThrax doses per year, 70% less than the number of doses investors expected the Company to produce, and more than one-third fewer doses than called for by the expiring BioThrax Contract.

8.     Investors were stunned by this unexpected news, and the price of Emergent common stock declined $8 per share – approximately 20%, from $39.32 per share on the evening of June 21, 2016 to a close of $31.33 per share on June 22, 2016 on extremely heavy trading volume.

9.      Before the truth about the renewal of the BioThrax Contract was revealed to the market, certain of the Individual Defendants and other Emergent senior executives cashed in, collectively selling over $20 million of their personally-held Emergent shares to the unsuspecting investing public – the Individual Defendants sold more than ***$14.5 million*** of Emergent common stock.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

11.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

12.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  Emergent is headquartered in this District, and many of the acts and conduct complained of herein occurred in substantial part in this District.

## PARTIES

13.     Lead Plaintiff City of Cape Coral Municipal Firefighters' Retirement Plan purchased Emergent common stock during the Class Period, as set forth in the certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby.

14.     Lead Plaintiff City of Sunrise Police Officers' Retirement Plan purchased Emergent common stock during the Class Period, as set forth in the certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby.

15.     Defendant Emergent is a specialty biopharmaceutical company that develops, manufactures and markets a portfolio of medical countermeasures for biological and chemical threats.  Headquartered in Gaithersburg, Maryland, Emergent stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "EBS."  During the Class Period, Emergent had more than 40 million shares of common stock outstanding.

16.     Defendant Fuad El-Hibri ("El-Hibri") is, and was at all relevant times, the Founder, and Executive Chairman of the Board of Directors of Emergent (the "Board").  El Hibri is also Chairman of the Board's Strategic Operations Committee.

17.     Defendant Daniel J. Abdun-Nabi ("Abdun-Nabi") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of Emergent and a member of the Board's Strategic Operations Committee.

18.     Defendant Robert G. Kramer ("Kramer") is, and was at all relevant times, the Chief Financial Officer ("CFO"), the Executive Vice President of Corporate Services Division and the Treasurer of Emergent.

19.     Defendant Adam R. Havey ("Havey") is, and was at all relevant times, the Executive Vice President of Emergent's Biodefense Division.

20.     The Defendants identified in ¶¶16-19 are sometimes collectively referred to herein as the "Individual Defendants."

21.     Defendant Emergent and the Individual Defendants are sometimes collectively referred to herein as the "Defendants."

22.     During the Class Period, Defendants were privy to confidential and proprietary information concerning Emergent, its operations, finances, financial condition and present and

future business prospects.  Because of their positions with Emergent, Defendants had access to non-public information regarding the Company's prospects for securing a renewal of the BioThrax Contract *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     Defendants are liable as direct participants in the wrongs complained of herein. In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Emergent's business.

24.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

25.     As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the

federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Emergent's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Emergent stock would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Emergent stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme: (i) deceived the investing public regarding the Company's prospects for securing a lucrative renewal of the BioThrax Contract calling for a significant increase in doses; (ii) enabled the Individual Defendants to sell more than $14.5 million worth of Emergent common stock; and (iii) caused Plaintiffs and other members of the Class to purchase Emergent stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

27.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Emergent during the Class Period (the "Class"), who were damaged thereby.

28.    Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated

with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Emergent shares were actively traded on the NYSE. As of December 31, 2015, there were approximately 39.4 million shares of Emergent common stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Emergent or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

30.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

31.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and intend to prosecute this action vigorously.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Emergent's operations and business;

(c)     whether the price of Emergent common stock was artificially inflated during the Class Period; and

(d)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**The Company and Its Business**

34.     Defendant Emergent is a specialty biopharmaceutical company, headquartered in Gaithersburg, Maryland, focusing on countermeasures addressing public health threats, as well as emerging infectious diseases.  The primary purchaser of Emergent's products is the

Government.   Emergent develops, manufactures, and delivers a portfolio of medical countermeasures primarily for Government agencies in the areas of biological and chemical threats and emerging infectious diseases.

35.     According to the Secretary of Health and Human Services ("HHS"), "anthrax is a serious infectious disease caused by gram-positive, rod-shaped bacteria known as Bacillus anthracis, which can cause human disease via gastrointestinal, cutaneous or inhalation (pulmonary) routes."  The Company holds a virtual monopoly on anthrax vaccines, as BioThrax currently remains the only anthrax vaccine approved for use and licensed by the FDA.  The primary purchaser of BioThrax has been the Center for Disease Control and Prevention ("CDC"), which buys BioThrax for its stockpile.  The Government uses the stockpile to protect the public in the event of a national emergency like a terrorist attack.

36.     Following the terrorist attacks of September 11, 2001, and subsequent anthrax letter attacks, Congress passed the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, which required the HHS to, *inter alia,* "maintain a stockpile or stockpiles of drugs, vaccines and other biological products, medical devices, and other supplies in such numbers, types, and amounts as are determined by the Secretary to be appropriate and practicable . . . ."  This is commonly referred to as the "strategic national stockpile" or "SNS."

37.     On July 21, 2004, President George W. Bush signed The Project BioShield Act of 2004 ("Project BioShield") into law, to finance the development and procurement of medical countermeasures against chemical, biological, radiological, and nuclear ("CBRN") threat agents. Project BioShield also gave the FDA Commissioner the authority to issue Emergency Use

Authorizations ("EUAs") to authorize the use of unapproved medical products or unapproved uses of approved medical products during CBRN emergencies.

38.     The passage of Project BioShield authorized the appropriation of $5.6 billion in the Special Reserve Fund from 2004 through 2013 to support the late-stage development and procurement of critical medical countermeasures used against CBRN threat agents.

39.     Project BioShield's Special Reserve Fund was reauthorized at $2.8 billion for 2014 – 2018, with the passage of the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013.

40.     Emergent derives a significant portion of its revenues from the manufacture and sale of BioThrax to the Government.  In 2015, 56% of the Company's total revenues and 82% of Emergent's $356.9 million in total product sales revenues were derived from the Company's exclusive BioThrax Contract with the Government.  As a result, analysts and investors focused closely on the Company's ability to continue to secure long term procurement contracts with the Government calling for the delivery of significant annual doses of BioThrax into the strategic national stockpile.

41.     Since 2004, Emergent has secured at least six multi-year procurement contracts for BioThrax with the Government, for a total value of nearly $2.5 billion.  Emergent entered into the BioThrax Contract on September 30, 2011, which was a five-year contract with the CDC to supply up to 44.75 million (approximately 9 million annually) doses of BioThrax to the strategic national stockpile with a maximum value of $1.25 billion.  The BioThrax Contract was set to expire on September 30, 2016.

42.     In 2016, the Government targeted a strategic national stockpile of 75 million doses of anthrax vaccine.   During the Class Period, the inventory in the SNS was only approximately 34 million doses – approximately 40 million doses short of the national stockpile goal.  In addition, because BioThrax had only a shelf life of four years, the doses in the strategic national stockpile needed to be periodically replaced and updated.

43.     Historically, BioThrax was manufactured at Emergent's Building 12 facility in Lansing, Michigan ("Building 12"), which produced a maximum of 8 to 10 million doses of BioThrax annually.   The BioThrax Contract of 44.75 million doses over five years required Emergent to essentially produce its annual maximum capacity of 8 to 10 million doses from Building 12.

44.     In July 2010, the Company was awarded a six-year contract (ending in July 2016) from the U.S. Biomedical Advanced Research and Development Authority ("BARDA") to expand its BioThrax manufacturing capabilities at a new facility ("Building 55") to produce 20 million to 25 million BioThrax doses a year.  BARDA agreed to fund, in part, the expansion of Building 55.

45.     The Company stressed to investors that they anticipated Building 55 would be licensed by late 2016 and that this expected capacity to produce 20-25 million doses per year in connection with its anticipated renewal of the BioThrax Contract would result in higher future revenues and profits as the Company delivered significantly higher annual doses to the strategic national stockpile.

**Defendants Misled Investors to Believe Emergent Was on Track for a Lucrative Renewal of the BioThrax Contract**

46.     Shortly before the Class Period, in August 2015, Defendants began discussions with the CDC regarding the renewal of the BioThrax Contract expiring in September 2016.  On August 6, 2015, Defendant Abdun-Nabi told the public that "[s]o we have had an initial meeting with the CDC.  And we anticipate that probably in the fourth quarter, further discussions will continue, and I think they'll heat up as we get into the first and second quarters next year."

47.     As the only Company with a Government approved anthrax vaccine, Emergent's anticipated ability to expand BioThrax production to at least 20 million doses per year with Building 55 led the market to expect the Company's renewed BioThrax Contract would realistically call for significant increased deliveries.  For example, the August 7, 2015 Laidlaw & Company analyst report stated:

> With Building 55 on-line in 1H16 (sBLA filing 3Q15) the focus turns to the next Biothrax procurement contract from the US Government (USG).  Given the ~$100MM that the USG has spent to help validate Bldg.55 *we believe that a 20M dose/year contract* (at a lower ~$17/dose price point) *is realistic*.[1]

48.     In September 2015, Cowen and Company held an investor meeting with Defendant Kramer and Emergent's VP of Investor Relations, Bob Burrows ("Burrows").  Unlike with earnings calls, no transcript from this meeting was made public.  Following the meeting, on September 25, 2015, Cowen and Company issued a report:

> **Management Very Confident In Building 55's Approval**
>
> Earlier this week we hosted an investor meeting with Emergent's CFO Bob Kramer and VP of Investor Relations Bob Burrows.  The discussion was upbeat, in particular with regard to the prospects for Building 55's approval and an

---

[1]     All emphasis is added, unless otherwise noted.

expected expansion in BioThrax sales.  The Federal government has a stated goal of stockpiling 75MM doses of BioThrax within the Strategic National Stockpile (SNS).  Recall that Emergent's Building 12 production facility currently produces 7-9MM doses per year and BioThrax has a four year shelf life.  **As a result, Emergent estimates that the SNS currently holds ~32MM doses, well short of the government's goal.  In order to reach the government's goal of 75MM doses, Emergent estimates that the SNS must acquire 19-20MM doses/year. Consequently, Emergent has constructed a new larger production facility (Building 55).  Building 55 is capable of producing 20-25MM doses of BioThrax annually.**

*     *     *

In total, **management reports that they will be very happy if the CDC agrees to a 5 year contract for 100MM doses with a price/dose in the high teens range**.  At $17/dose, such a contract would generate $340MM/year of high margin sales (>70% gross margin, no selling costs).  Such a contract could generate $238-272MM in annual gross profits.  For comparison, Emergent's entire product portfolio produced a gross profit of ~$221 in 2014. . . .  **Importantly, Emergent already seems to have some visibility on U.S. government demand, and anticipates a new contract might call for ~20MM doses/yr.**

49.     This message was reinforced again by Defendants on November 5, 2015, during

Emergent's Q3 2015 earnings call:

Abdun-Nabi: "**On that point we have had an initial meeting with the CDC to discuss the follow-on multi-year procurement contract to address the stated requirement of securing 75 million doses of an anthrax vaccine for the Strategic National Stockpile.  We are now targeting a follow-up meeting in early 2016 to begin negotiating the next contract.  This is right in line with where we expected to be at this point**."

50.     Defendants stressed that because the Government continued to need 75 million

doses for the strategic national stockpile, the renewed BioThrax Contract would likely call for

significant increased deliveries to satisfy this goal:

<Q - Ryan J. Brinkman>: . . . [c]an you provide any comments on your discussions of how you think the government's willingness to continue stockpiling?

<A - Daniel J. Abdun-Nabi>: Yes. . . . The scope of responsibilities are going up, and what we expect to see is shoring up and expanding the capabilities of the

government to protect the nation.  *So, that is a long-winded way of saying we don't see any change in the appetite or the focus on addressing the threats to the country and doing that through the kinds of countermeasures that we manufacture and supply*.

51.    In addition, while presenting on behalf of the Company at the November 19, 2015

Southwest IDEAS Investor Conference, Burrows reiterated the Government's desire for a

75 million dose strategic national stockpile:

> Bob Burrows - Emergent BioSolutions Inc. - VP IR
>
> So the government stockpile, so *the government is currently looking to have – for anthrax vaccine specifically, okay, they want to stockpile 75 million doses*. That's basically to protect three major metropolitan cities of 8 million people each, assuming a three course regimen product 8x3x3 gets you to 75.  They currently have about 35 million doses of BioThrax in the stockpile right now.  That's theoretically the maximum that we can deliver to them because of our current small-scale manufacturing, capacity constraints, and the four-year expiry of BioThrax currently.  Around 9 million doses a year times four, there's your 36.
>
> *              *              *
>
> *We will negotiate with them, but that capacity goes from 9 million a year to 20 million to 25 million in this new building, highly efficient.  So eventually they'll be able to satisfy that 75 million dose stockpile through the larger building.*

52.    On December 1, 2015, during the Piper Jaffray Healthcare conference call,

Defendant Kramer reiterated that the market should expect that the renewed BioThrax Contract

would significantly increase the number of doses to the Government.  Defendant Kramer noted

that a "75 million dose stockpile with a four-year dated product means that they need to be

buying *roughly 19 million to 20 million doses per year to achieve and maintain that stockpile*."

Kramer went on to state that "*we'd expect [the Government] to be buying 19 million to 20*

*million doses per year out of Building 55*."

53.    Throughout the Class Period, starting on January 11, 2016, Defendants made false

statements and omissions which led the market to believe that Emergent's  renewal of its

BioThrax Contract with the Government would drive the Company's current and future revenue growth and profits by delivering significantly more BioThrax doses to the Government – up to 20 to 25 million annually over the following five-year period – to allow it to meet the strategic national stockpile goal of 75 million doses and be sufficiently prepared for the anthrax threat.

54.     On January 11, 2016, Defendants told investors that the Government's continued need to stockpile 75 million doses would result in Emergent earning $600-$630 million in revenues in 2016 and drive $1 billion in revenues by 2020.  Defendants assured investors that "***from a demand perspective on BioThrax, we really expect with 55 coming online that the US government is going to continue to purchase the capacity of that building [20 million doses/yr]***."   In February-April 2016, Defendants made similar positive statements and reassurances that the renewed BioThrax Contract would call for a significant increase in deliveries and corresponding revenues and profits (*see infra* ¶¶81-90).

55.     On May 5, 2016, Emergent confirmed that the Government would in fact award the Company a renewal of the BioThrax Contract.  In a press release, the Company described the new contract as requiring "***significantly increased deliveries in order to satisfy the U.S. government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile [of 75 million doses]***."

56.     That same day, Defendant CEO Abdun-Nabi, while refusing to disclose the specific terms of the contract, went so far as to describe the renewed BioThrax Contract as "***one big, beautiful package***" that "***goes on for multiple years***" and that did not call for "***any slowdown in manufacturing***."

57.     These statements reaffirmed the false impression created by Defendants' earlier Class Period statements that the new BioThrax contract would be for significantly higher doses and increase current and future revenues.

**Emergent Announces that the Renewed BioThrax Contract with the Government Will Be for Drastically Less Doses than Previously Represented**

58.     On June 22, 2016, Emergent disclosed that, rather than the 5 year, 20 million doses per year BioThrax procurement contract that Defendants had led the market to believe would likely be secured, the Government merely sought "the continued procurement of *29.4 million* doses of BioThrax" over a five-year period.  This number of BioThrax doses was far less than the 44.75 million called for by the expiring BioThrax Contract.  In fact, the new contract had the Government purchasing over 33% less BioThrax doses.

59.     The Company also disclosed that the Government sought the "procurement of up to 27 million dose regimens of a next generation anthrax vaccine," and was placing the bid out for public bid, rather than "sole sourcing," as had been done with BioThrax.  Emergent's next generation vaccine had yet to be approved and would only be ready by 2019 at the earliest. Thus, any potential revenues the Company might earn from the contract for a next generation vaccine were highly uncertain.

60.     The market expressed severe disappointment and surprise.  On this news, on June 22, 2016, the price of Emergent common stock declined by approximately $8 per share, falling from its close of $39.32 per share on June 21, 2016 to a close of $31.33 per share on June 22, 2016, down almost *29%* from its Class Period high, on unusually high trading volume of more than 9.5 million shares traded, or 21 times the average daily trading volume over the preceding ten trading days.

- 17 -

61.     Analysts explicitly recognized the message Defendants had created in the market via their false and misleading statements, noting "*Emergent had guided investors to expect a new 5-year BioThrax contract to be issued that might be utilized for expanded capacity to deliver 20MM+ doses/yr to the U.S. government at a moderately reduced price*."   They described the contract as "*a major disappointment*," "*well below what we (and investors) had believed would be the award size*," and responsible for causing "*incremental uncertainty on the near- and long-term revenue trajectory* for the company."   Last, with respect to the Government's open bid for 27 million doses of a next generation anthrax vaccine, analysts recognized that Emergent's next generation NuThrax vaccine would not be ready until 2019 and "*does not make up for the BioThrax shortfall*."

**During the Class Period, the Company Paid Lobbyists Millions of Dollars to Know the Specific Details of the Renewed BioThrax Contract**

62.     Because the key to the Company's future growth was securing a renewal of the BioThrax Contract with the Government at the anticipated 20 million annual dosage from Building 55 over the next five years, during the Class Period, the Company itself was in close contact with the Government.   Moreover, the Company paid lobbyists millions of dollars to be in close contact with the Government to ensure that the Company secured a renewal of the BioThrax Contract at these significantly higher levels.

63.     The following chart sets forth the amounts that Emergent paid to its numerous lobbyists during the first and second quarters of 2016:

| Lobbying Firm | Quarter | Amount Paid |
|---|---|---|
| Blank Rome LLP | 1Q16 | $50,000 |
| Blank Rome LLP | 2Q16 | $50,000 |
| Capitol Legislative Strategies | 1Q16 | $30,000 |
| Capitol Legislative Strategies | 2Q16 | $30,000 |

| Lobbying Firm | Quarter | Amount Paid |
|---|---|---|
| Dalrymple & Associates | 1Q16 | $31,000 |
| Davis & Harman | 1Q16 | $30,000 |
| Davis & Harman | 2Q16 | $30,000 |
| Emergent Biosolutions | 1Q16 | $1,020,000 |
| Emergent Biosolutions | 2Q16 | $1,300,000 |
| Ervin Hill Strategy | 1Q16 | $30,000 |
| Ervin Hill Strategy | 2Q16 | $30,000 |
| Hecht Latham Spencer & Associates, Inc. | 1Q16 | $45,000 |
| Hecht Latham Spencer & Associates, Inc. | 2Q16 | $45,000 |
| Ingram Group | 1Q16 | $50,000 |
| Ingram Group | 2Q16 | $50,000 |
| Navigators Global LLC | 1Q16 | $50,000 |
| Navigators Global LLC | 2Q16 | $50,000 |
| Nickles Group | 1Q16 | $37,500 |
| Nickles Group | 2Q16 | $37,500 |
| OB-C Group | 1Q16 | $30,000 |
| OB-C Group | 2Q16 | $30,000 |
| The Advocacy Group | 1Q16 | $30,000 |
| The Advocacy Group | 2Q16 | $30,000 |
| *Total:* | | *$3,116,000* |

64.     As noted above, Emergent paid approximately $90,000 over the first and second quarters of 2016 to Hecht Latham Spencer and Associates Inc. ("Hecht Latham"), whose named partner, Thomas P. Latham, served as a Member of the U.S. House of Representatives, representing several districts in Iowa from January 1995 through January 2015.  During his time in Congress, Rep. Latham served on the Committee on Appropriations, which regulates the expenditures of money by the Government.  According to a lobbying report, Latham and his firm worked on "provisions related to development, acquisition, and stockpiling of biodefense vaccines" on Emergent's behalf, in connection with the Department of Labor, Health, and Human Services, Education, and Related Agencies Appropriations Act of 2017.

65.     In addition, the Company commissioned a retired former general, Major General Tony Corwin, USMC (Ret.), from Blank Rome Government Relations ("Blank Rome"), to lobby

on its behalf for "funding for DHS, HHS, and DOD programs related to pandemics, infectious diseases, and chemical and biological threats."  Emergent paid approximately $100,000 to Blank Rome for its services over the first six months of 2016.

66.     Emergent also hired lobbyists during the Class Period who previously held high-ranking posts on the staffs of members of the House Ways and Means Committee, which has jurisdiction over all taxation, tariffs, and other revenue-raising measures.  Specifically, Patricia A. Nelson of The OB-C Group LLC served on the Majority Staff of the House Ways and Means Committee from 1985-1993.  Her colleague, David J. Heil, served as Chief of Staff to Rep. Sam Johnson (R-TX), a senior member and current interim chairman of the House Ways and Means Committee.

67.     The Company also paid $100,000 to the Ingram Group, whose Tom Ingram served as Chief of Staff to Sen. Lamar Alexander (R-TN), a member of the Senate's Appropriations Committee.  His colleague at the Ingram Group, Bernard Toon, served as Chief of Staff to Senators Joe Biden, (D-DE), Bill Bradley (D-NJ), Byron Dorgan (D-ND), and Jeff Bingaman (D-NM).

68.     The millions of dollars paid to these lobbyists ensured that the Company knew of the specific details regarding the renewal of the BioThrax Contract, which was the key to the Company's ability to meet its current and future revenue goals.  Thus, when during the Class Period, Defendants spoke publicly regarding the likelihood of securing this contract at significantly higher levels, either: (1) Defendants knew that the renewed BioThrax Contract would be at the drastically reduced levels and concealed this truth; or (2) if somehow, despite the millions spent on lobbying and the Company's own contact and negotiations, they were not fully

informed of the Government's reduced demand, Defendants were reckless in making these positive representations and assurances and should simply have remained silent.

**While Hiding the Truth, Defendants Made Over $14 Million by Selling Their Company Shares at Artificially Inflated Prices**

69.    Defendants' statements and failure to disclose the truth caused the Company's stock to trade at artificially inflated prices.   While in possession of this negative, material non-public information, the Individual Defendants and five other Company insiders unloaded more than half a million shares at these inflated prices for total proceeds of more than $20 million as detailed in the chart below.

<div align="center">

**EMERGENT'S INSIDER TRADING
SCHEME DURING THE CLASS PERIOD**

</div>

| Defendant | Shares Sold | Proceeds |
|---|---|---|
| Abdun-Nabi | 26,102 | $1,095,496 |
| El-Hibri | 234,594 | $9,687,133 |
| Havey | 15,471 | $524,062 |
| Kramer | 87,146 | $3,201,047 |
| Additional Insiders[2] | 163,184 | $6,239,347 |
| *Total:* | *526,497* | *$20,747,085* |

70.    The timing of Emergent stock sales by the Individual Defendants was highly suspicious.  By way of example, immediately following the Company's May 5, 2016 description of the renewed BioThrax Contract as "requiring significant increased deliveries," and as "one big, beautiful package," as well as the reassurance to investors that the Company "do[es] not anticipate any slowdown on the manufacturing," Defendants CEO Abdun-Nabi and Executive Chairman El-Hibri began unloading their Emergent shares.  From May 12, 2016 through June 1,

---

[2]   As more fully described in ¶113, the following Company insiders also dumped Emergent stock during the Class Period: Zsolt Harsanyi, Jerome M. Hauer, George A. Joulwan, Louis W. Sullivan, and Marvin L. White.

2016, Defendants Abdun-Nabi and El-Hibri together sold 176,994 Emergent shares for proceeds of **$7.4 million**.

71. The following chronology illustrates Defendants' scheme to defraud investors:



**FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

72. The Class Period begins on January 11, 2016, when Defendants led the market to believe that the renewal of the BioThrax Contract would cause the Company to achieve

$600-$630 million in revenues in 2016 and $1 billion by 2020 because it would result in significant increased deliveries into the strategic national stockpile.

73.     On January 11, 2016, Emergent issued a press release entitled "Emergent Biosolutions Announces Preliminary 2015 Financial Results, Provides 2016 Financial Outlook, And Outlines New Five-Year (2016-2020) Strategic Growth Plan."  The release emphasized the following 2016 Forecast, stating, in pertinent part, as follows:

> *For the full year of 2016, the company forecasts total revenues of $600 to $630 million, driven by growth in BioThrax sales which are anticipated to be between $305 to $320 million*[.]
>
> The company's outlook for 2016 includes . . . continuous delivery of BioThrax to the CDC under an anticipated follow-on, multi-year procurement contract, but does not include any estimates for BioThrax deliveries from Building 55, the company's large scale BioThrax manufacturing facility, or any estimates for potential new corporate development or other M&A transactions.

74.     The release also detailed the Company's 2016-2020 Strategic Growth Plan which called for "Annual revenue of $1B," stating, in pertinent part:

> Having successfully implemented our 2012-2015 growth plan and delivered financial results in excess of our expectations, we are well-positioned for continued success and growth. Looking ahead we will remain focused on addressing the growing public health threats market and will build on our momentum to achieve our newly established *2020 goals of $1B in revenue*[.]

75.     The statements referenced in ¶¶73-74 above forecasting 2016 revenues of "600 to $630 million, driven by growth in BioThrax sales which are anticipated to be between $305 to $320 million" and "2020 goals of $1B in revenue" were materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver

significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

76. Later that day, during a healthcare conference hosted by J.P. Morgan ("JPMorgan"), Defendant Havey represented that the Company expected the Government to purchase the capacity of BioThrax capable of being produced at Building 55, which would be 20 million doses annually – significantly more than the 8-10 million maximum annual doses produced at Emergent's only current facility, Building 12. Specifically, Defendant Havey stated that "*from a demand perspective on BioThrax, we really expect with 55 coming online that the US government is going to continue to purchase the capacity of that building*. . . ."

77. The statement referenced in ¶76 above that the Government was going to "purchase the capacity" of Building 55 was materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company

was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

78.    Because the key to the Company's current and future revenue growth was securing a renewal of the BioThrax Contract at the anticipated 20 million doses, investors focused in on management's confidence in securing the contract.  Analysts from Cowen and Company, on January 11, 2016 stressed, in pertinent part, that:

> **2016 total revenue guidance appears robust and likely reflects in part management's confidence in obtaining another procurement contract for BioThrax** (deliveries under the existing 5-year contract is slated to be completed by September).
>
> *        *        *
>
> . . . [w]e expect approval of Building 55 in 2016 to increase BioThrax's production capacity by 2-3x and support substantial top- and bottom-line growth.

79.    Similarly on February 19, 2016 analysts from Wells Fargo Securities, LLC ("Wells Fargo") noted that:

> . . . EBS's contract with the U.S. Centers for Disease Control and Prevention ("CDC") for delivery of BioThrax into the Strategic National Stockpile could provide a steady, high margin revenue stream for years to come.
>
> *        *        *
>
> **EBS is currently in negotiations with the CDC to secure a multiyear, follow-on contract for BioThrax that would increase the number of doses delivered for the SNS from 45 million to 75 million**.
>
> *        *        *
>
> **We believe its contract to deliver BioThrax to the CDC could provide a stable, annuity-like revenue base for years to come**, while we see strong growth opportunities in expanded capacity.
>
> *        *        *

- 25 -

With a four-year shelf-life, EBS would need to supply approximately 18-19 million doses per year in order for the CDC to maintain a steady state at the SNS. That would mean ***the 20 million dose capacity at Building 55 would be absorbed for the foreseeable future***.

<div align="center">*     *     *</div>

***EBS is currently in negotiations with the CDC to secure a multiyear follow-on contract for BioThrax that would increase the number of doses delivered for the SNS from 45 million to 75 million***.  We expect an announcement on the finalization of this contract and commitment from the CDC in the first half of 2016.  ***Such a contract has the potential to significantly increase BioThrax revenue***.  We estimate that at a price of $17 per dose, increasing the contract threshold from 45 million to 75 million doses, add approximately $510 million in revenue.  Furthermore, we estimate that by increasing SNS to 75 million doses, EBS could receive an incremental $127 million per year as it replaces expiring doses.

80.     In its February 19, 2016 report, Wells Fargo incorporated the anticipated increase in annual doses from the renewed BioThrax Contract into its discounted cash flow analyses and recommended the purchase of Emergent shares:

. . . **EBS's contract with the U.S. Centers for Disease Control and Prevention ("CDC") for delivery of BioThrax into the Strategic National Stockpile could provide a steady, high margin revenue stream for years to come**.

<div align="center">*     *     *</div>

Valuation

Our discounted cash flow analysis results in a valuation range of $42-44 per share, which represents 17% potential upside to where EBS is currently trading.

<div align="center">*     *     *</div>

As an alternative valuation approach, we focused on EBS's BioThrax franchise, which has the potential to have annuity-like qualities. Due to this characteristic, we used an ordinary annuity calculation to value BioThrax.

***Based on a Strategic National Stockpile of 75 million doses of BioThrax with a shelf-life of four years, EBS would need to replace approximately 18.75 million doses per year in order for the Stockpile to maintain a steady state***.  We estimate that EBS could charge a price per dose of approximately $17, arriving at annual

<div align="center">- 26 -</div>

revenue of $319 million.  We used a 10% cost of capital, which we believe is conservative, and a five-year holding period, which aligns with our forecast period.  Calculating the present value of an ordinary annuity with these inputs, we arrived at a total value of $1.2 billion.  Using the current number of shares outstanding – 48 million – we arrive at a price per share of $25.17.

81.     In a February 25, 2016 press release, filed with the SEC on Form 8-K, Emergent reinforced the message that future revenues and profits would increase significantly, as the Company remained in line to secure a renewed BioThrax Contract at the substantially higher levels, stating, in pertinent part, as follows:

> For the full year of 2016, the Company reaffirms its forecast for total revenues of $600 to $630 million, ***driven by growth in BioThrax sales of $305 to $320 million***, continued domestic and international sales of the other Biodefense division products, and continued robust development funding through contracts and grants revenues.  The Company also forecasts full year 2016 GAAP net income of $75 to $85 million, non-GAAP adjusted net income of $90 to $100 million, and EBITDA of $150 to $160 million . . . .   ***The Company's outlook for 2016 includes the*** . . . . ***continuous delivery of BioThrax to the CDC under an anticipated follow-on, multiyear procurement contract*** . . . .

82.     The statements referenced in ¶81 above, in which Defendants forecasted BioThrax revenues of "$305 to $320 million" for 2016 and noted the "continuous delivery of BioThrax to the CDC under an anticipated follow-on multiyear procurement contract," were materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional

stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

83.     That same day, on a conference call with analysts, Defendant Abdun-Nabi refused to disclose what the Government told Emergent about the Government's demand for BioThrax. But, he again conveyed the message that the Government's need to be prepared for the anthrax threat by maintaining a strategic national stockpile of 75 million doses, combined with the 2016 Government funding already allocated, gave Emergent confidence that it would secure a renewed BioThrax Contract at significantly higher annual levels.  Defendant Abdun-Nabi stated, in pertinent part, as follows:

> Turning now to Building 55.  As we previously announced, the FDA requested that we perform a re-analysis on one of the more than 30 assays used for comparability before filing our sBLA.  We are on track to complete their request during the first half of the year, after which we expect to submit the sBLA.  As a reminder, we anticipate a PDUFA date of four months following acceptance by the FDA of the sBLA filing.

> Moving on to our follow-on BioThrax procurement contract with the CDC, we have had a preliminary meeting and exchanges of communication with the CDC on this topic.  ***The CDC recognizes the importance of the anthrax preparedness and with FY16 funding levels, we anticipate that a follow-on, multi-year contract will be put in place to ensure an uninterrupted supply of BioThrax through the SNS.***

84.     The statement referenced in ¶83 above that Defendants "anticipate[d] that a follow-on, multi-year contract will be put in place to ensure an uninterrupted supply of BioThrax through the SNS" was materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of

BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

85.     Following Defendants' February 25, 2016 statements, analysts again incorporated Defendants' message that the Company was in line to secure a significantly more lucrative BioThrax Contract into their stock valuations.  For example, on February 26, 2016, JPMorgan recommended purchasing Emergent shares based on a discounted cash flow analysis that projected higher revenues flowing from the renewed BioThrax Contract:

> **Valuation**
>
> ***Maintain December 2016 price target of $45*** (emphasis in original).  Our DCF reflects our explicit estimates through 2020 and assumptions about the company's business thereafter.  We assume Building 55 is approved, the company secures the next BioThrax CDC contract, and that EBS eventually begins growing BioThrax sales outside the U.S.  We use a 9% WACC and 0% terminal growth rate for the business.  Taken together, this drives our $45 price target.

86.     Similarly, the March 27, 2016 Singular Research analyst report shows that the market accepted Defendants' representations that the renewed BioThrax Contract would call for significant increased delivery of BioThrax and drive up future revenues:

> **Renewal of multi-year BioThrax contract likely this year** (emphasis in original).  **EBS holds a virtual monopoly on anthrax vaccines and is the preferred supplier of anthrax vaccines and antidotes to the U.S. government's Strategic National Stockpile**.
>
> Under the existing five-year contract that expires in September 2016, EBS has supplied approximately 37 million doses of anthrax vaccine to the Strategic National Stockpile and in the process recognized roughly $1.0 billion of revenues.  BioThrax sales were $294 million in 2015 and 56% of revenues.  The Company

projects 2016 BioThrax revenues will be at least 4% higher and in a $305-320 million range.

Due to EBS' status as a preferred government supplier and the only competitor with a FDA-licensed anthrax vaccine, we believe it likely that the Company's expiring procurement contract will be renewed in 2016 at similar or higher dosing levels. ***The U.S. government targets a stockpile of 75 million doses of anthrax vaccine at any given time and the current inventory is only 34 million doses. This should drive government demand for 40+ million doses in the coming months***. In addition, with a shelf life of only four years, the BioThrax vaccine in the stockpile must be periodically updated.

***Tripling of annual BioThrax production capacity in 2017*** (emphasis in original). EBS has been capacity-constrained in producing BioThrax. Its current anthrax vaccine production facility (Building 12) has a maximum production capacity of only nine million doses a year. The Company is in the process of finalizing the BLA submission for a new facility (Building 55) that will nearly triple annual BioThrax production capacity to 25 million doses. ***Production from Building 55 is likely to commence in 2017 and we believe it likely that EBS will be asked to deliver its full 25 million annual production capacity under a new U.S. government contract, leading to a big jump in BioThrax sales beginning in 2017***. In addition to expanding deliveries to the U.S. government, BioThrax sales should benefit from approval to market the vaccine in Germany, which expands its reach in the EU market.

\*       \*       \*

Under EBS' existing contract with CDC (Centers for Disease Control and Prevention), the Company was tasked with supplying up to 44.75 million doses of BioThrax to the U.S. government's Strategic National Stockpile over a five-year period, which ends in September 2016. This contract has a maximum value of $1.25 billion. ***Through year-end 2015, EBS has delivered approximately 37 million doses to the stockpile and recognized revenues of approximately $1.0 billion from the contract. At present, there are only about 34 million doses of BioThrax inventoried at the Strategic National Stockpile, which is well short of the U.S. government's goal of 75 million doses stockpiled***. In addition, the shelf life of the vaccine is roughly four years so outdated inventory must continually be replaced with fresh doses of the vaccine.

***The main driver of BioThrax sales growth will be a new multi-year procurement contract with the U.S. government***. We believe it likely that the Company will negotiate a new multi-year procurement contract when the current contract expires in September 2016. We also think the new contract will be at similar or higher dosing levels.

87.     On April 12, 2016, Defendant Havey presented at the Needham Healthcare Conference and confirmed that the expected increase in capacity to 20 million doses per year was on track, stating, "***we're going to obtain 55 licensure and move from Building 12 small-scale to Building 55 large-scale manufacturing for BioThrax***" and "*[w]e're going to secure a multiyear follow-on BioThrax contract with the CDC*."

88.     The statements referenced in ¶87 above that BioThrax manufacturing in Building 55 would be "large scale" and that the Company was "going to secure a multiyear follow-on BioThrax contract with the CDC" were materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

89.     On April 18, 2016, Emergent issued a press release announcing that it had submitted its supplemental Biologics License Application ("sBLA") to the FDA seeking approval of the manufacture of BioThrax in Building 55. The release emphasized that Emergent was expanding its BioThrax production facilities in order to support the Government's purportedly growing demand for BioThrax, stating, in pertinent part, as follows:

Building 55 has the potential to expand manufacturing capacity of BioThrax to an estimated 20 to 25 million doses annually from the seven to nine million doses produced annually out of the currently-licensed facility. ***The capability to manufacture BioThrax at large scale positions the company to meet the government's desire of stockpiling 75 million doses of a licensed anthrax vaccine.***

90. The statement referenced in ¶89 above that Building 55 would enable the Company to "manufacture BioThrax at large scale positions the company to meet the government's desire of stockpiling 75 million doses of a licensed anthrax vaccine" was materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

91. In a May 5, 2016 press release, filed with the SEC on Form 8-K, the Company confirmed that the Government would award the Company a "multi-year" renewal of the BioThrax Procurement Contract "requiring significantly increased deliveries." The press release stated, in pertinent part, as follows:

We are extremely pleased that the CDC has now confirmed its intention to award a follow-on BioThrax procurement contract on October 1, 2016. With our large-scale manufacturing facility coming online, ***we anticipate this will be a multi-year contract requiring significantly increased deliveries in order to satisfy the***

*U.S. government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile.*

By letter dated April 1, 2016, the CDC informed the Company of its intent to award a follow-on BioThrax procurement contract, thereby ensuring an uninterrupted supply of BioThrax into the Strategic National Stockpile. The Company's current BioThrax procurement contract with the CDC is scheduled to expire on September 30, 2016. The CDC reaffirmed their intent in a follow-up letter dated April 26, 2016, in which the CDC stated that their acquisition planning process is ongoing and that they project to issue an award for a follow-on BioThrax procurement contract on October 1, 2016.

In its April 26 letter, the CDC further stated that it anticipates continuing to purchase doses of BioThrax in Q2 and Q3 of 2016 under the Company's current procurement contract, although it did not specify the number of doses to be purchased. The CDC did state that they anticipate the quantity to be less than the total remaining doses available to be purchased under the current contract. The Company believes these letters from the CDC reflect their transition planning associated with procuring BioThrax manufactured from the Company's large-scale manufacturing facility, Building 55, under a new multi-year follow-on contract expected to be in place on October 1, 2016.

Until such time as the Company can secure greater clarity on the number of BioThrax doses to be delivered in Q2 and Q3, expected within the next 60 days, the Company believes it is prudent to temporarily postpone its financial guidance for 2016.

92.     The statement referenced in ¶91 above that Defendants "anticipate[d] . . . a multi-year contract requiring significantly increased deliveries in order to satisfy the Government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile" was materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had

significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

93.    During a Company conference call later that day, Defendant Abdun-Nabi was asked for additional specifics of the renewal of the BioThrax Contract in connection with the expansion of Building 55 to allow the Company to produce 20 million doses of BioThrax per year.  Defendant Abdun-Nabi glowingly responded, in pertinent part, as follows:

**Keay Nakae -** *Chardan Capital Markets - Analyst*:

[T]he two letters that you received, while I know you are still negotiating the terms, are any of the other characteristics of the contract known to you, such as duration or anything else?

**Dan Abdun-Nabi -** *Emergent BioSolutions Inc. - President, CEO*:

Yes, we're not going to comment on any of the terms until the final contract is completed.  ***They all tie in together.  As you can appreciate, it is one big, beautiful package***, so when we are ready to announce the contract, I look forward to laying out all the terms so you can fully understand where we are.

94.    Additionally, Defendant Abdun-Nabi stressed that the Government's demand for BioThrax remained strong:

**Jim Molloy -** *Laidlaw & Company - Analyst*:

None would deny Adam Havey works miracles with the creaky old Building 12. I imagine you wouldn't want to slow that team down. Would you stockpile the excess? Would you do sell it to ex-US? Any discussions about ex-US sales?

**Dan Abdun-Nabi -** *Emergent BioSolutions Inc. - President, CEO*:

Yes, so that's a great question. No intention at all to slow down manufacturing. The team has been doing an incredible job. And the output has been quite promising.

So, what I would say there is ***I will revert back to my comment about the CDC's desire to meet the nation's requirements for the stockpile, so we do not anticipate any slowdown on the manufacturing***.

95.     The statements referenced in ¶¶93-94 above that the renewed BioThrax Contract was "one big, beautiful package" and that Defendants "do not anticipate any slowdown on the manufacturing" were materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

96.     Also during the May 5, 2016 conference call, Defendants were questioned about the fact that on the one hand the CDC was purportedly going to purchase fewer BioThrax doses in the short term, while the Company simultaneously represented, in a press release issued the same day, that the renewed BioThrax Contract "will be a multi-year contract requiring significantly increased deliveries."  Defendant Abdun-Nabi again reiterated the Government's desire for a significant renewal of the BioThrax Contract, stating in pertinent part, as follows:

**Marc Frahm –** *Cowen and Company – Analyst*:

So when we think about the contract that is remaining, can you confirm how many doses are actually remaining on that contract?

- 35 -

And then, there is a disconnect here between the CDC seemingly telling you they're going to take less than that contract in the next two quarters, but then have a much larger dosage contract coming right after that, right?  And maybe if you can give a little bit more clarity on the machinations of government and how that makes sense on their part.

**Dan Abdun-Nabi** – *Emergent BioSolutions Inc. – President, CEO*:

Yes, great question.  So I think you will see in the Q that we have about 5.5 million doses remaining on the contract, and as I indicated, they will be buying additional quantities Q2, Q3 and we will get some more clarity around that.

***And I really don't see any inconsistency between they are saying that there may be reductions in Q2 and Q3 and the need for a significant follow-on contract that goes for multiple years.  They have repeatedly advised policymakers, as well as appropriators, publicly and privately that they intend to purchase all of the doses of the anthrax vaccine that are being produced in order to address the stated requirement***.  And so, this is truly a transition (inaudible) exercise and a timing exercise, so I don't see this as inconsistent.  I think it is part of a migration that needs to be done in I will call it ordinary course.

97.    The statement referenced in ¶96 above regarding the "need for a significant follow-on contract that goes for multiple years" and that the Government had "repeatedly advised policymakers, as well as appropriators, publicly and privately that they intend to purchase all of the doses of the anthrax vaccine that are being produced in order to address the stated requirement" were materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for

purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

98.     Defendant Abdun-Nabi also reassured investors that the Company's temporary suspension of 2016 guidance resulting from the Governments' announcement that it would purchase less doses in the second and third quarters of 2016 was short term, merely a "part of the transition planning process and moving to a new follow-on procurement contract," and not indicative of any long term decrease in demand:

> While still in the April 26 letter, the CDC advised that – that they anticipate continued procurement of BioThrax in the second quarter and third quarters, although they had not specified the specific number of doses to be purchased.

> As stated, however, that the anticipated purchase in quantity is less than the total remaining doses under the contract. ***With these letters, we have some, but not total visibility into the CDC's planning and thinking, allowing the process of transitioning to a follow-on contract***.   We believe, their thinking has been influenced by the earlier than expected tradition of the sBLA, the Building 55, the plausible licensure of that facility earlier than previously forecast, and that will come into the end of the delivery schedule on our current contract.  We've had initial conversations with the CDC, but have not had sufficient time to fully or properly address these important questions prior to our call today.

> Thus until such time as we can secure greater clarity on a specific number of doses to be purchased in Q2 and Q3, we believe it's prudent to temporarily postpone our financial guidance for 2016. We expect that within the next 60 days, we will have clarification on the CDC's plans for the second quarter and third quarters and we will update you accordingly.   ***We view this as part of the transition planning process and moving to a new follow-on procurement contract.***

> And in our experience, situations like this with government agencies have always evolved in the iterative process requiring active engagement and effective management interactions.

> And I'd like to point out that over the course of our history, we have demonstrated the unique ability, to work with our government partners to our mutual benefit, and we'll remain confident that we can do so in this space.

99.     The statements referenced in ¶98 above that Defendants had "some, but not total visibility into the CDC's planning and thinking, allowing the process of transitioning to a follow-on contract" and that Defendants viewed the CDC's desire for a reduced number of BioThrax doses in the second and third quarters of 2016 as "part of the transition planning process and moving to a new follow-on procurement contract" were materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

100.     On May 19, 2016, Emergent held its 2016 annual general shareholder meeting. Defendant Kramer stressed that the renewal of the BioThrax Contract and significant build-out of Building 55, would lead the Company to achieve its long-term financial goals, including increasing revenues to exceed $1 billion by 2020, stating, in pertinent part, as follows:

> As we always do, we've established certain goals that we plan to achieve by the end of the plan period of 2016 to 2020. *The strategic goals include a specific goal around revenue growth which we intend to exceed $1 billion in total revenue by the end of 2020*. . . . *This growth will be achieved from existing products*, from new product launches as well as through M&A of products and technologies.

101.    The statement referenced in ¶100 above that Defendants "intend to exceed $1 billion in total revenue by the end of 2020" and that such revenue growth would be achieved, *inter alia*, "from existing products," which included its flagship product, BioThrax, were materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

102.    Defendant Kramer also discussed Emergent's renewal of the BioThrax Contract with the CDC, stating, in pertinent part, as follows:

> As we have year-by-year, we'll establish certain operational goals in support of our long-range plans.  These goals for 2016 include the completion of the spin-off of Aptevo Therapeutics by midyear of 2016.   They include the licensure of Building 55, our large scale manufacturing facility BioThrax in Lancing.  ***It includes securing of a new multiyear follow-on contract for BioThrax with CDC. Earlier this year we're pleased to be informed of CDC's commitment to put a follow-on contract in place by October 1, thereby ensuring an uninterrupted supply of BioThrax into the strategic national stockpile.*** And finally, to complete additional strategic acquisition that aligns with our core competencies in support of our growth plan.

103.    The statements referenced in ¶102 above that Defendants were "informed of CDC's commitment to put a follow-on contract in place by October 1, thereby ensuring an uninterrupted supply of BioThrax into the strategic national stockpile" was false and misleading

- 39 -

when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

104.    On June 17, 2016, Emergent issued a press release announcing that the FDA had accepted Emergent's sBLA for Building 55, again emphasizing that build-out of Building 55 was "***intended to increase the manufacturing capacity for BioThrax to an estimated 20 to 25 million doses annually***," in "***response to the U.S. government's desire to stockpile 75 million doses of a licensed anthrax vaccine***[.]"

105.    The statement referenced in ¶104 above that Building 55 was "intended to increase the manufacturing capacity for BioThrax to an estimated 20 to 25 million doses annually" in "response to the U.S. government's desire to stockpile 75 million doses of a licensed anthrax vaccine" was materially false and misleading when made because during the Class Period, Defendants knew, or recklessly disregarded, the fact that: (a) the renewal of the BioThrax Contract with the Government that was the key to the Company's current and future revenue growth and profits would not require Emergent to deliver significantly higher annual dosages of BioThrax into the strategic national stockpile in accordance with the 20 million doses

per year capacity of Building 55 because the Government's demand for additional stockpiles of BioThrax had significantly declined; and (b) because of the Government's decreased demand for purchasing additional stockpiles of BioThrax, the Company was not on track to achieve its 2016 financial goals or its 2016-2020 strategic growth long range plan.

### ADDITIONAL SCIENTER ALLEGATIONS

106.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   Defendants, by virtue of their receipt of information reflecting the true facts regarding Emergent, their control over, and/or receipt and/or modification of Emergent's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

107.    Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.   The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

108.    Defendants possessed knowledge of facts or had access to information contradicting each of their public statements, and thus knew, or recklessly disregarded the fact

that the Company was not on track to receive a renewal of the BioThrax Contract from the Government at significantly higher levels and thus would not achieve its 2016 financial goals or its 2016-2020 strategic long range plan.

109.   To begin, the fraud alleged herein relates to the core business of Emergent so knowledge of the fraud may be imputed to Defendants.  As noted above, in 2015, 56% of the Company's total revenues and 82% of its total product sales revenues were derived from its exclusive BioThrax procurement contract with the Government.  With the Company's BioThrax Contract set to expire in September of 2016, securing a renewal was vital to Emergent's current and future revenues and profits.  Defendants were in close contact with the Government and thus would have had knowledge about the Company's ability to secure a renewal of the BioThrax Contract at significantly higher levels.

110.   Moreover, during the Class Period, in addition to its own close contact with the Government, the Company paid powerful lobbyists, including, *inter alia*, a former congressman, a retired general, and numerous former senior congressional staffers, millions of dollars to ensure that it received a renewal of the BioThrax Contract at the significantly increased levels.  These lobbyists were no doubt tasked with determining the Government's demand to obtain BioThrax for the strategic national stockpile.

111.   In addition, an inference of the Defendants' scienter is further shown because of the close temporal proximity between Defendants' false statements and material omissions and the revelation of the truth.  For example, on January 11, 2016, Defendants assured the public that the Government "is going to continue to purchase the capacity of that [B]uilding [55]," sending the message that the renewed BioThrax Contract would call for the delivery of 20 million doses

annually.  Likewise, Defendants represented to investors as late as May 2016 that Emergent was set to secure renewal of the BioThrax Contract that was "one big, beautiful package," calling for "significantly increased deliveries."  Yet, only months and weeks later, Defendants disclosed that the renewed BioThrax Contract called for drastically lower annual doses.

112.    Given the importance of the renewed BioThrax Contract to Emergent's very existence, the Company's long history negotiating procurement contracts with the Government, the millions of dollars the Company paid to its many lobbyists during the Class Period, and the proximity between Defendants' false statements and the disclosure of the previously concealed truth on June 22, 2016, it cannot reasonably be contested that Defendants knew or recklessly disregarded the fact that the renewed BioThrax Contract would be at drastically lower levels.

113.    Moreover, Defendants possessed substantial motives for misrepresenting the likelihood of securing the renewed BioThrax Contract at substantially higher levels.  Defendants El-Hibri, Abdun-Nabi, Kramer, and Havey, as well as other senior Company executives, in connection with the fraudulent scheme alleged herein, sold more than *$20 million* worth of Emergent Biosolutions common stock during the Class Period, while in possession of negative material non-public information, as set forth below:

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Defendant Abdun-Nabi | Chief Executive Officer | 4/18/2016 | 2,749 | $40.17 | $110,427 |
| | | 4/18/2016 | 3,580 | $40.17 | $143,809 |
| | | 4/18/2016 | 2,373 | $40.17 | $95,323 |
| | | 5/20/2016 | 8,701 | $42.00 | $365,442 |
| | | 6/1/2016 | 8,699 | $43.74 | $380,494 |
| | | | 26,102 | | $1,095,495 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Defendant El-Hibri | Chairman of the Board | 4/6/2016 | 25,000 | $38.50 | $962,500 |
| | | 4/6/2016 | 25,000 | $39.50 | $987,500 |
| | | 4/18/2016 | 20,791 | $40.50 | $842,036 |
| | | 4/22/2016 | 4,209 | $40.50 | $170,465 |
| | | 5/12/2016 | 25,000 | $38.71 | $967,750 |
| | | 5/23/2016 | 25,000 | $42.50 | $1,062,500 |
| | | 5/23/2016 | 20,000 | $42.76 | $855,200 |
| | | 5/24/2016 | 20,000 | $42.26 | $845,200 |
| | | 5/25/2016 | 20,000 | $42.57 | $851,400 |
| | | 5/26/2016 | 24,594 | $42.90 | $1,055,083 |
| | | 5/26/2016 | 15,165 | $43.50 | $659,678 |
| | | 5/27/2016 | 9,835 | $43.50 | $427,823 |
| | | | 234,594 | | $9,687,135 |
| Defendant Havey | Executive Vice President, Biologics Division | 3/11/2016 | 7,960 | $33.84 | $269,366 |
| | | 3/11/2016 | 3,152 | $33.84 | $106,664 |
| | | 3/14/2016 | 2,701 | $33.96 | $91,726 |
| | | 3/14/2016 | 1,658 | $33.96 | $56,306 |
| | | 3/30/2016 | | | |
| | | | 15,471 | | $524,062 |
| Defendant Kramer | Chief Financial Officer | 4/1/2016 | 445 | $35.93 | $15,989 |
| | | 4/1/2016 | 3,939 | $35.74 | $140,780 |
| | | 4/1/2016 | 1,855 | $35.80 | $66,409 |
| | | 4/1/2016 | 5,503 | $35.66 | $196,237 |
| | | 4/1/2016 | 2,945 | $35.73 | $105,225 |
| | | 4/1/2016 | 11,531 | $35.49 | $409,235 |
| | | 4/1/2016 | 17,354 | $35.48 | $615,720 |
| | | 4/4/2016 | 8,677 | $36.90 | $320,181 |
| | | 4/4/2016 | 1,970 | $36.90 | $72,693 |
| | | 4/4/2016 | 2,752 | $36.90 | $101,549 |
| | | 4/4/2016 | 2,623 | $36.90 | $96,789 |
| | | 4/4/2016 | 5,766 | $36.90 | $212,765 |
| | | 4/6/2016 | 1,970 | $38.90 | $76,633 |
| | | 4/6/2016 | 8,677 | $38.90 | $337,535 |
| | | 4/6/2016 | 2,751 | $38.90 | $107,014 |
| | | 4/6/2016 | 5,765 | $38.90 | $224,259 |
| | | 4/6/2016 | 2,623 | $38.90 | $102,035 |
| | | | 87,146 | | $3,201,048 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Zsolt Harsanyi | Director | 5/24/2016 | 7,200 | $42.26 | $304,272 |
| | | 5/24/2016 | 2,400 | $42.34 | $101,616 |
| | | 5/24/2016 | 7,200 | $42.26 | $304,272 |
| | | 5/25/2016 | 6,267 | $42.41 | $265,783 |
| | | 5/25/2016 | 4,800 | $42.41 | $203,568 |
| | | | 27,867 | | $1,179,511 |
| Jerome M. Hauer | Director | 3/14/2016 | 2,350 | $33.88 | $79,618 |
| | | 5/12/2016 | 4,700 | $38.50 | $180,950 |
| | | 5/19/2016 | 3,134 | $41.22 | $129,183 |
| | | | 10,184 | | $389,751 |
| George A. Joulwan | Director | 6/6/2016 | 4,700 | $44.12 | $207,364 |
| Louis W. Sullivan | Director | 3/10/2016 | 14,820 | $35.34 | $523,739 |
| | | 3/11/2016 | 14,879 | $34.03 | $506,332 |
| | | 5/11/2016 | 9,969 | $39.25 | $391,283 |
| | | 5/12/2016 | 300 | $39.00 | $11,700 |
| | | 5/13/2016 | 4,131 | $39.00 | $161,109 |
| | | 5/13/2016 | 21,600 | $39.28 | $848,448 |
| | | 5/13/2016 | 21,600 | $39.19 | $846,504 |
| | | | 87,299 | | $3,289,115 |
| Marvin L. White | Director | 3/7/2016 | 3,134 | $35.42 | $111,006 |
| | | 3/7/2016 | 7,200 | $35.42 | $255,024 |
| | | 3/7/2016 | 10,800 | $35.42 | $382,536 |
| | | 3/7/2016 | 7,200 | $35.42 | $255,024 |
| | | 3/7/2016 | 4,800 | $35.42 | $170,016 |
| | | | 33,134 | | $1,173,606 |
| **TOTAL:** | | | **526,497** | | **$20,747,085** |

114.     The timing of Emergent stock sales by the Individual Defendants was highly suspicious.   While investors and analysts covering the Company were led to believe that Emergent was going to secure a massive renewal of the BioThrax Contract, Defendants El-Hibri, Abdun-Nabi, Kramer, and Havey each sold significant amounts of Emergent stock shortly before

it was revealed that the Government only sought the procurement of a mere 29.4 million BioThrax doses over the following five year period.

115.    By way of example, immediately following the Company's May 5, 2016 description of the renewed BioThrax Contract as "requiring significant increased deliveries," and as "one big, beautiful package," as well as the reassurance to investors that the Company "do[es] not anticipate any slowdown on the manufacturing," Defendants Abdun-Nabi and El-Hibri began unloading their Emergent shares.  From May 12, 2016 through June 1, 2016, Defendants Abdun-Nabi and El-Hibri together sold 176,994 Emergent shares for proceeds of *$7.4 million*.

116.    Taken collectively, Defendants El-Hibri, Abdun-Nabi, Kramer, and Havey's Class Period Emergent stock sales support an inference of scienter because these sales were timed to capitalize on Emergent's inflated stock price before the news that the Government only sought the procurement of 29.4 million BioThrax doses was disclosed to investors.

## LOSS CAUSATION/ECONOMIC LOSS

117.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Emergent's common stock and operated as a fraud or deceit on Class Period purchasers of Emergent's common stock.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Emergent's common stock fell precipitously as the prior artificial inflation came out.   As a result of their purchases of Emergent's common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

118.    On June 22, 2016, before the market opened, Emergent disclosed that rather than the 5 year, 20 million doses per year renewed BioThrax Contract that Defendants had led the market to believe would likely be secured, the Government merely sought "the continued procurement of **29.4 million** doses of BioThrax" over a five-year period.   This number of BioThrax doses was far less than the 44.75 million doses called for by the expiring BioThrax Contract.   In fact, the new contract had the Government purchasing over 33% less BioThrax doses than the expiring contract.   The Company also disclosed that the Government sought the "procurement of up to 27 million dose regimens of a next generation anthrax vaccine."   The Government was placing the procurement bid for the next generation anthrax vaccine out for public bid, rather than "sole sourcing" it as had been done with respect to BioThrax.

119.    The market expressed disappointment and surprise.   On this news, on June 22, 2016, the price of Emergent common stock declined by approximately $8 per share, falling from its close of $39.32 per share on June 21, 2016 to a close of $31.33 per share on June 22, 2016, down almost **29%** from its Class Period high, on unusually high trading volume of more than 9.5 million shares traded, or 21 times the average daily trading volume over the preceding ten trading days.

120.    Moreover, on June 22, 2016, analysts at Cowen & Company in a report titled "Downgrade: New BioThrax Contract Falls Short," explicitly recognized the message Defendants had created in the market via their false and misleading statements, noting "***Emergent had guided investors to expect a new 5-year BioThrax contact to be issued that might be utilized for expanded capacity to deliver 20MM+ doses/yr to the U.S. government at a***

*moderately reduced price*." Cowen & Company then noted that the CDC contract for only 29.5 million doses over a five year period, "*is a major disappointment*."

121. Similarly, Laidlaw & Company issued a note that day stating, "EBS stock is lower today on news that the next US Government (USG) BioThrax procurement contract is likely in the 29.4M dose range, far lower than the current 44.8M dose contract, *and well below what we (and investors) had believed would be the award size*."

122. Also on that same day, JPMorgan issued a research note reacting to the Company's announcements, which stated, *inter alia*, "*[t]he 29mm BioThrax doses over 5 years is somewhat disappointing relative to our/Street expectations, and we are not surprised to see today's negative stock reaction*." The JPMorgan research note continued, "[b]igger picture, it appears the government wants to transition away from BioThrax to a next-gen vaccine (potentially NuThrax) sooner than we/the Street had expected (given our expectation for a large/long BioThrax contract, NuThrax is not in our model)." In addition, JPMorgan stated that "*today's news introduces incremental uncertainty on the near- and long-term revenue trajectory for the company*."

123. As a result of their purchases of Emergent common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Emergent common stock to trade at artificially inflated levels throughout the Class Period.

124. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Emergent's business and prospects. When the truth about the Company was revealed to the market, the price of Emergent's common stock fell precipitously.

These declines removed the inflation from the price of Emergent's common stock, causing real economic loss to investors who had purchased Emergent's common stock during the Class Period.

125.    The declines in the price of Emergent's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Emergent common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Emergent common stock and the subsequent significant decline in the value of Emergent common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

126.    At all relevant times, the market for Emergent common stock was an efficient market for the following reasons, among others:

(a)    Emergent's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Emergent filed periodic public reports with the SEC and the NYSE;

- 49 -

(c)     Emergent regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Emergent was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

127.    As a result of the foregoing, the market for Emergent common stock promptly digested current information regarding Emergent from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Emergent's common stock during the Class Period suffered similar injury through their purchase(s) of Emergent's common stock at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### *AFFILIATED UTE* DOCTRINE

128.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because Defendants' material omissions during the Class Period caused harm to Plaintiffs and the Class.  Because the Complaint alleges Defendants' failure to disclose material adverse information regarding the renewal of Emergent's BioThrax Contract – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

129.    Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## NO SAFE HARBOR

130.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Emergent who knew that those statements were false when made.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

131.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.    This Count is asserted against Emergent and the Individual Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

133.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

135.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Emergent common stock during the Class Period in an effort to maintain artificially high market prices for Emergent's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

136. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or a director of the Company were privy to and participated in the creation, development and reporting of the Company's financial results and guidance; (iii) each of the Individual Defendants was advised of and had access to other members of the Company's management team, internal reports and other data and information at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

137. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the true number of doses the renewed BioThrax Contract would call for and supporting the artificially inflated price of Emergent's common stock. As demonstrated by Defendants' misstatements regarding the renewal of the BioThrax Contract during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

138.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Emergent's common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Emergent's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Emergent common stock during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

139.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class, and the marketplace, known the truth regarding the renewal of the BioThrax Contract alleged herein, which was not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Emergent common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

140.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

141.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Emergent common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

142.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

143.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act.

144.    The Individual Defendants acted as controlling persons of Emergent within the meaning of Section 20(a) of the Exchange Act.

145.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

- 55 -

146.    As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Emergent common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  December 27, 2016                    */s/ Samuel H. Rudman*
                                                    ROBBINS GELLER RUDMAN
                                                      & DOWD LLP
                                                    SAMUEL H. RUDMAN (admitted *Pro Hac Vice*)
                                                    ROBERT D. GERSON
                                                    (upon *Pro Hac Vice* application)
                                                    58 South Service Road, Suite 200
                                                    Melville, NY  11747
                                                    Telephone:  631/367-7100
                                                    631/367-1173 (fax)
                                                    srudman@rgrdlaw.com
                                                    rgerson@rgrdlaw.com

                                                    ROBBINS GELLER RUDMAN
                                                      & DOWD LLP
                                                    JONAH H. GOLDSTEIN
                                                    (upon *Pro Hac Vice* application)
                                                    655 West Broadway, Suite 1900
                                                    San Diego, CA  92101
                                                    Telephone:  619/231-1058
                                                    619/231-7423 (fax)
                                                    jonahg@rgrdlaw.com

                                                    *Lead Counsel for Plaintiffs*

                                                    DANA W. McKEE (04447)
                                                    BROWN, GOLDSTEIN LEVY, LLP
                                                    120 E. Baltimore Street, Suite 1700
                                                    Baltimore, MD  21202
                                                    Telephone:  410/962-1030
                                                    410/385-0869 (fax)
                                                    dwm@browngold.com

                                                    *Local Counsel*

RICE PUGATCH ROBINSON STORFER
  & COHEN, PLLC
RONALD J. COHEN
RICHELLE B. LEVY
101 Northeast 3rd Avenue, Suite 1800
Fort Lauderdale, FL  33301
Telephone:  954/462-8000
954/462-4300 (fax)

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
ROBERT D. KLAUSNER
7080 Northwest 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)

*Additional Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Samuel H. Rudman, hereby certify that on December 27, 2016, I authorized a true and

correct copy of the attached:

Amended Complaint for Violations of the Federal Securities Laws

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such public filing to all counsel registered to receive such notice.

<div style="text-align:right">

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

</div>