UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| WILLIAM SPONN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EMERGENT BIOSOLUTIONS INC. FUAD EL-HIBRI, DANIEL J. ABDUN-NABI, ROBERT G. KRAMER, and ADAM R. HAVEY,<br><br>Defendants. | No. 8:16-cv-02625-RWT<br><br><u>Class Action</u><br><br><u>Oral Argument Requested</u> |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
<u>PLAINTIFFS' AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..............................................................................1

PLAINTIFFS' ALLEGATIONS ...........................................................................10

STANDARD.........................................................................................................11

ARGUMENT ........................................................................................................13

I.      PLAINTIFFS DO NOT ADEQUATELY PLEAD THAT ANY OF THE
        CHALLENGED STATEMENTS WERE FALSE. ......................................13

II.     EMERGENT DISCLOSED THE VERY RISK OF WHICH PLAINTIFFS
        COMPLAIN....................................................................................................16

III.    THE ALLEGED FALSE STATEMENTS ARE WITHIN THE PSLRA'S SAFE
        HARBOR. ........................................................................................................18

IV.     PLAINTIFFS' SCIENTER ALLEGATIONS ARE INSUFFICIENT. ...........................20

        A.      HIRING LOBBYISTS DOES NOT GIVE RISE TO AN INFERENCE OF
                KNOWLEDGE. ...........................................................................24

        B.      PLAINTIFFS' TRADES DO NOT SUPPORT AN INFERENCE OF
                SCIENTER. ................................................................................26

        C.      PLEADING A "CORE BUSINESS" THEORY IS ALSO
                INSUFFICIENT TO MEET THE REQUIREMENTS OF PLEADING
                SCIENTER. ................................................................................32

        D.      PLAINTIFFS IMPERMISSIBLY PLEAD FRAUD BY HINDSIGHT,
                WHICH IS INSUFFICIENT TO SUPPORT AN INFERENCE OF
                SCIENTER. ................................................................................34

        E.      THE NON-CULPABLE INFERENCE IS MORE COMPELLING. ...................35

V.      PLAINTIFFS FAIL TO ADEQUATELY ALLEGE LOSS CAUSATION.....................38

VI.     THE SECTION 20(A) CLAIM FAILS. ..........................................................40

CONCLUSION......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
597 F.3d 330 (5th Cir. 2010),
*vacated and remanded by Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011)..................................................................................39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................11

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ......................................................................28

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
442 F. App'x 672 (3d Cir. 2011) ................................................................35

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
2013 WL 3990798 (E.D. Wash. Aug. 5, 2013) ..........................................38

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ......................................................29

*Congregation of Exra Sholom v. Blockbuster, Inc.*,
504 F. Supp. 2d 151 (N.D. Tex. 2007) ........................................................28

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) ...............................................1, 12, 21, 40

*D.E. & J. Ltd. P'ship v. Conaway*,
133 F. App'x 994 (6th Cir. 2005) ...............................................................39

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).........................................................................11, 38, 39

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ......................................................................18

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
42 F.3d 204 (4th Cir. 1994) ........................................................................34

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005)........................................................12, 25

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
738 F. Supp. 2d 614 (D. Md. 2010)....................................................16, 19, 33

*In re Cree, Inc. Sec. Litig.*,
333 F. Supp. 2d 461 (M.D.N.C. 2004) ..................................................31, 38

# TABLE OF AUTHORITIES
## (CONT'D)

**Page(s)**

*In re Criimi Mae, Inc. Sec. Litig.*,
   94 F. Supp. 2d 652 (D. Md. 2000) ...........................................................1, 12, 23, 34

*In re E. Spire Commc'ns Inc. Sec. Litig.*,
   127 F. Supp. 2d 734 (D. Md. 2001) ........................................................................28

*In re Human Genome Scis. Inc. Sec. Litig.*,
   933 F. Supp. 2d 751 (D. Md. 2013) .............................................................2, 12, 21

*In re Humphrey Hosp. Trust, Inc. Sec. Litig.*,
   219 F. Supp. 2d 675 (D. Md. 2002) ..........................................................12, 13, 19, 26

*In re Manugistics Grp., Inc.*,
   1999 WL 1209509 (D. Md. Aug. 6, 1999) ...............................................................1

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................27, 32

*In re Neustar Sec Litig.*,
   83 F. Supp. 3d 671, 687 (E.D. Va. 2015) ...............................................................12

*In re Orbital Scis. Corp. Sec. Litig.*,
   58 F. Supp. 2d 682 (E.D. Va. 1999) ......................................................................31

*In re Pec Solutions Sec. Litig.*,
   418 F.3d 379 (4th Cir. 2005) ...............................................................12, 15, 32

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .................................................................................13

*In re Trex Co., Sec. Litig.*,
   454 F. Supp. 2d 560 (W.D. Va. 2006) ..................................................................30

*In re Visual Networks, Inc. Sec. Litig.*,
   217 F. Supp. 2d 662 (D. Md. 2002) ...........................................................23, 27, 28

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ..............................................................................28

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..................................................................................13

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ................................................................................39

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
   2016 WL 3981236 (D.S.C. July 25, 2016) ............................................................28

## TABLE OF AUTHORITIES
## (CONT'D)

**Page(s)**

*Keeney v. Larkin,*
306 F. Supp. 2d 522 (D. Md. 2003) ........................................................................1

*Kim v. Banctexas Group, Inc.,*
989 F.2d 1435 (5th Cir. 1993) ...............................................................................14

*Latham v. Matthews,*
662 F. Supp. 2d 441 (D.S.C. 2009) .........................................................................32

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,*
576 F.3d 172 (4th Cir. 2009) ...........................................................................12, 21

*Matrixx Initiatives, Inc. v. Siracusano,*
563 U.S. 27 (2011) ..................................................................................................20

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
540 F.3d 1049 (9th Cir. 2008) ...............................................................................28

*Nolte v. Capital One Fin. Corp.,*
390 F.3d 311 (4th Cir. 2004) .................................................................................12

*Ottmann v. Hanger Orthopedic Grp., Inc.,*
353 F.3d 338 (4th Cir. 2003) .............................................................1, 12, 23, 35

*Phillips v. LCI Int'l, Inc.,*
190 F.3d 609 (4th Cir. 1999) ...........................................................................16, 17

*Plumbers Local #200 Pension Fund v. Washington Post Co.,*
930 F. Supp. 2d 222 (D.D.C. 2013) ...............................................23, 24, 25, 35

*Proter v. Medifast, Inc.,*
2013 WL 1316034 (D. Md. Mar. 28, 2013).................................................29, 30, 35

*Pub. Emps' Ret. Ass'n v. Deloitte & Touche LLP,*
551 F.3d 305 (4th Cir. 2009) .................................................................................21

*Raab v. Gen. Physics Corp.,*
1993 WL 358450 (D. Md. Jan. 7, 1993).................................................................20

*Raab v. Gen. Physics Corp.,*
4 F.3d 286 (4th Cir. 1993) ......................................................................... *passim*

*Shah v. GenVec, Inc.,*
2013 WL 5348133 (D. Md. Sept. 20, 2013) .........................................................12

*Smith v. Circuit City Stores, Inc.,*
286 F. Supp. 2d 707 (E.D. Va. 2003) ....................................................................21

# TABLE OF AUTHORITIES
## (CONT'D)

**Page(s)**

*Svezzese v. Duratek, Inc.,*
   67 F. App'x 169 (4th Cir. 2003) ....................................................................38, 40

*Teachers' Ret. Sys. of La. v. Hunter,*
   477 F.3d 162 (4th Cir. 2007) ...................................................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007).................................................................................... *passim*

*Walker v. Glaxosmithkline,*
   2016 WL 4265341 (D. Md. Aug. 12, 2016) ...............................................11, 12

*Yates v. Mun. Mortg. & Equity, LLC,*
   744 F.3d 874 (4th Cir. 2014) ...................................................................... *passim*

**Statutes**

15 U.S.C. § 78j(b) ............................................................................................11

15 U.S.C. § 78t(a) ............................................................................................40

15 U.S.C. § 78u–5(c)(1) ...................................................................................19

15 U.S.C. § 78u-4(b)(1) .....................................................................................1

15 U.S.C. § 78u-4(b)(2) ...................................................................................13

15 U.S.C. § 78u-4(b)(2)(A) ..............................................................................20

**Rules**

Fed. R. Civ. P. 8(a) ..........................................................................................11

Fed. R. Civ. P. 9(b) ..........................................................................................12

**Regulations**

17 C.F.R. § 240.10b-5(b) ..................................................................................11

17 C.F.R. § 240.10b5-1(c) ..................................................................................9

17 C.F.R. § 240.10b5-1(c)(A)(3) ......................................................................29

17 C.F.R. § 240.10b5-1(c)(B)(1) ......................................................................29

48 C.F.R. § 2.101 ...............................................................................................5

48 C.F.R. § 3.104-3(a)(1) ...................................................................................5

48 C.F.R. § 3.104-4(a) ........................................................................................5

## TABLE OF AUTHORITIES
### (CONT'D)

**Page(s)**

48 C.F.R. § 3.104-8...................................................................................................5

**Other Authorities**

H.R. Conf. Rep. No. 104-369 (1995)........................................................................12

S. Rep. No. 104-98 (1995)..........................................................................................1

## PRELIMINARY STATEMENT

Securities fraud cannot be imposed based on "fraud by hindsight" because "corporate officials need not be clairvoyant."[1]  If liability were to be imposed by hindsight "any drop in the price of shares would result in lawsuits from disappointed investors."[2]  To curb frivolous suits that are fueled by nothing more than disappointed investors, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which requires securities fraud plaintiffs to plead with particularity specific details sufficient to give rise to an inference of fraud.[3]  The Fourth Circuit has stated that a securities fraud claim must meet the "most stringent pleading standard in the country," in order to survive a motion to dismiss.[4]  Indeed, the Fourth Circuit has characterized the pleading standard as "exacting," and has charged "courts to be vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation."[5]  Plaintiffs do not come close to meeting the applicable standard in the Fourth Circuit.

Emergent BioSolutions, Inc. ("Emergent" or the "Company") is the sole provider of an FDA-licensed anthrax vaccine—"BioThrax"—to the federal Government, under a five-year, sole-source procurement contract that expired on September 30, 2016 ("Original CDC Contract").  Emergent said that, based on letters received from the Centers for Disease Control

---

[1]  *Keeney v. Larkin*, 306 F. Supp. 2d 522, 534 (D. Md. 2003).  Unless otherwise indicated, all internal citations and quotation marks are omitted, and all emphasis is added.

[2]  *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993).

[3]  15 U.S.C. § 78u-4(b)(1); *see also In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 657 (D. Md. 2000) ("Particularity of pleading is required with regard to the time, place, speaker and contents of the allegedly false statement, as well as the manner in which the statements are false and the specific facts raising an inference of fraud;") *see also In re Manugistics Grp., Inc.*, 1999 WL 1209509, at *1 (D. Md. Aug. 6, 1999) (noting by enacting the PSLRA Congress chose "to tighten up pleading and practice in [securities fraud] suits, including . . . heightened standards of claim pleading, above and beyond the simple factual statement otherwise required by Civil Rule 8, and even the more specific allegations of fraud required to be pleaded under Rule 9.").

[4]  *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003) (citing S. Rep. No. 104-98, at 15 (1995)).

[5]  *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008).

("CDC), it expected the CDC to offer it a "new multi-year follow-on contract expected to be in place on October 1, 2016,"[6] as it remained the sole producer of an FDA-licensed anthrax vaccine.[7]  The Original CDC Contract was for procurement of **_up to_** 44.75 million BioThrax doses[8] for the Strategic National Stockpile ("SNS").  Throughout the "Class Period" (January 11, 2016 to June 21, 2016), Emergent told the public that the Government's stated goal was to stockpile 25 million regimens of anthrax vaccine, _i.e.,_ 75 million doses of BioThrax, which the Government has recently confirmed.[9]  Emergent explained that since one regimen of BioThrax requires three doses, the Government would need to have 75 million doses to meet its stated goal of stockpiling 25 million regimens, if it continued to envision meeting that goal using BioThrax, the only FDA-licensed anthrax vaccine.[10]  Emergent relayed to investors that the SNS only

---

[6]      Ex. 4, Emergent, U.S. Securities and Exchange Commission ("SEC") Form 8-K, May 5, 2015, p. 4 ("May Form 8-K"); (_see also_ Compl. ¶ 91.)  All exhibits referenced herein are indexed and certified by Counsel Matthew Solum.  In ruling on a motion to dismiss a securities fraud action, a court may properly "consider statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC Commission, analyst reports, documents upon which Plaintiffs relied in bringing suit, and matters of which the Court may take judicial notice."  _In re Human Genome Scis. Inc. Sec. Litig._, 933 F. Supp. 2d 751, 751 n.1 (D. Md. 2013) (quoting _Tellabs, Inc. v. Makor Issues & Rights, Ltd._, 551 U.S. 308, 310 (2007)).

[7]      Ex. 5, Needham Healthcare Conference Transcript, April 12, 2016, p. 13 ("Needham Conference").  Plaintiffs cite to the Needham Conference in the Complaint.  (_See_ Compl. ¶ 87.)

[8]      Even under the Original CDC Contract, at no point was the government even required to purchase the full 44.75 million doses, and indeed, chose not to exercise the full amount of the contract.

[9]      _See_ Ex. 6, Emergent, Press Release, April 18, 2016, p. 1 ("April Press Release").  On December 8, 2016, the HHS publicly announced the Biomedical Advanced Research and Development Authority's ("BARDA") intent to enter into a $100 million contract to procure BioThrax to help reach the Government's "current USG PEP requirement for anthrax vaccine [of] 25,000,000 regimens, which equates to 75,000,000 doses of the currently licensed vaccine, BioThrax."  Ex. 7, HHS Notice of Intent, December 8, 2016, p. 2.  Further, Plaintiffs do not dispute the Government's stated goal of 25 million regimens.  (_See_ Compl. ¶ 42.)

[10]     _See_ Ex. 8, Southwest IDEAs Investor Conference Transcript, November 19, 2015, p. 12 (the "Southwest Transcript").  Plaintiffs cite to the Southwest Transcript in the Complaint.  (_See_ Compl. ¶ 51.)  Plaintiffs do not dispute that the Government only maintained approximately 35 million doses, which was 40 million doses less than the Government's stated goal for the SNS.

contained approximately 35 million BioThrax doses, *i.e.*, the Government was seemingly 40 million doses short of its stated goal.[11]   Further, it was known amongst investors that given BioThrax's four-year shelf life, for the Government to meet its stated goals, some of the doses already in the SNS would need to be replaced.[12]   Moreover, in July 2010, BARDA awarded Emergent a six-year contract worth $104 million to support Emergent obtaining FDA licensure for a new manufacturing facility located within Building 55 (the "Building 55 Contract").[13]   An FDA-licensed Building 55 would have the capability of producing 20 million to 25 million BioThrax doses a year, whereas Emergent's then current manufacturing capability was only seven to nine million doses per year.[14]   Emergent explained to investors that Emergent could not meet the Government's goal of 25 million regimens for the SNS, using BioThrax, under its then current manufacturing capabilities.[15]

Emergent explained its projections regarding a potential, follow-on procurement contract were influenced by: (1) the Government's $104 million investment to license Building 55, which was "intended to increase the manufacturing capacity for BioThrax to an estimated 20 to 25 million doses annually;" and (2) "the U.S. Government's stated goal to stockpile 75 million doses of a licensed anthrax vaccine."[16]

---

(*See* Compl. ¶ 42); *see also* Ex. 7, HHS Notice of Intent, December 8, 2016, p. 2 (stating ongoing goal of stockpiling 25 million regimens).

[11]    *Id.*

[12]    *See* Ex. 9, Singular Research Report, March 27, 2016, p. 6 ("Singular Research Report"). Plaintiffs cite to the Singular Research Report in the Complaint.  (*See* Compl. ¶ 86.)  Plaintiffs do not dispute that some doses already in the SNS would need to be periodically replaced.  (*See* Compl. ¶ 42.)

[13]    Ex. 10, 2015 SEC Form 10-K, p. 17 ("2015 Form 10-K").

[14]    Ex. 10, 2015 Form 10-K at 25; (*see also* Compl. ¶ 44.)

[15]    *See* Ex. 8, Southwest Transcript at 12.

[16]    Ex. 11, Emergent Press Release, June 17, 2016, p. 1; (*see also* Compl. ¶ 104.)

Emergent, however, recognized that it was not clairvoyant as to what the CDC would ultimately do, and so it told investors that "[i]f the Government's demand for BioThrax is reduced, our business, financial condition, operating results and cash flow could be materially harmed"[17] and that "Government contracts customarily contain provisions that . . . allow the U.S. Government to decline, in whole or in part, to . . . renew a contract."[18]  In addition to specific risk disclosures, Emergent made it clear that all of its projections were just that: projections.  By way of example, Emergent told investors that: "[f]or the full year of 2016, the company *forecasts* total revenues of $600 to $630 million, driven by growth in BioThrax sales which are *anticipated* to be between $305 to $320 million"[19] and "we *anticipate* that a follow-on, multi-year contract will be put in place to ensure an uninterrupted supply of BioThrax through the SNS."[20]

While Emergent may have relayed its expectations for an anticipated follow-on contract, it never guaranteed dose quantity terms, let alone guaranteed revenue.  Indeed, when investors asked Emergent to go beyond future projections and disclose details of the contract discussions, Emergent repeatedly told investors it could not answer those questions.  For example, Emergent said, "we do not intend to disclose any specifics or details of our contract negotiations with the CDC, until such time as the contract has been completed."[21]  Moreover, Federal Acquisition Regulations ("FARs") prohibit Government employees with access to confidential information regarding the Government's source selection plans for procurement contracts from disclosing

---

[17]     Ex. 10, 2015 Form 10-K at 24.

[18]     *Id.* at 25.  Please see Ex. 2 for a full list of Emergent's risk disclosures.

[19]     (Compl. ¶ 73;) Ex. 12, Emergent Press Release, January 11, 2016, p. 1.

[20]     (Compl. ¶ 83;) Ex. 13, Emergent Earnings' Call Transcript, February 25, 2016, p. 4 ("February Earnings Call").

[21]     Ex. 13, February Earnings Call at 4.

such information to anyone, before making that information available to the general public.[22] Violation of the applicable FARs could result in criminal and civil liability.[23]

Additionally, on May 5, 2016, Emergent disclosed that, in a letter dated April 26, 2016, the CDC had informed Emergent that while the CDC planned to continue purchasing BioThrax under the Original CDC Contract for Q2 and Q3 of 2016, the CDC anticipated that the number of doses it would procure would be less than the remaining number of doses left on the Original CDC Contract.[24]   Emergent informed investors that it was suspending its 2016 guidance "[u]ntil such time as the Company can secure greater clarity on the number of BioThrax doses to be delivered in Q2 and Q3."[25]   Emergent also informed investors that, in a letter dated April 1, 2016, the CDC informed Emergent of its intent to award a follow-on procurement contract to "ensur[e] an uninterrupted supply of BioThrax into the Strategic National Stockpile."[26] Emergent told investors that, based on these letters, it was the Company's expectation that the slowdown in Q2 and Q3 was due to the CDC's likely intention to take advantage of Building 55 once it came online later in the year: "[t]he company believes these letters from the CDC reflect

---

[22]     *See* 48 C.F.R. § 3.104-3(a)(1) (prohibiting Government employees with access to "source selection information" from disclosing such information prior to an award of a "Federal agency procurement contract to which the information relates."); 48 C.F.R. § 3.104-4(a) ("Except as provided for in this subsection, no person or other entity may disclose . . . source selection information to any person other than a person authorized, in accordance with applicable agency regulations or procedures, by the agency head or the contracting officer to receive such information).  48 C.F.R. § 2.101 defines "source selection information" as "any of the following information that is prepared for use by an agency for the purpose of evaluating a bid or proposal to enter into an agency procurement contract, if that information has not been previously made available to the public or disclosed publicly" including, "Source selection plans."  The Federal Acquisition Regulations do not provide a definition for "source selection plans."

[23]     *See* 48 C.F.R. § 3.104-8.

[24]     Ex. 4, May Form 8-K at 4; Ex. 14, Emergent Earnings' Call Transcript, May 5, 2016, p. 2 ("May Earnings Call"); (*see also* Compl. ¶ 91.)

[25]     Ex. 4, May Form 8-K at 4.

[26]     *Id.*

their transition planning associated with procuring BioThrax manufactured from the Company's large-scale manufacturing facility, Building 55, under a new multi-year follow-on contract expected to be in place on October 1, 2016."[27]  Emergent, however, made it clear that such a contract was not a sure thing when it told investors that "the CDC stated that their acquisition planning process is ongoing."[28]

On June 21, 2016, the CDC issued an official solicitation notice indicating that it intended to renew its sole-source procurement contract for BioThrax, but for only 29.4 million doses (the "Sole-Source Notification")—less than the then current contract for up to 44.75 million doses and seemingly less than the number of doses necessary for the Government to reach its stated goal of 75 million doses for the SNS, if using BioThrax.[29]  The HHS also issued a request for a proposal for a next generation vaccine that could result in a five-year contract for the advanced development and procurement of up to 27 million doses (the "HHS' RFP"),[30] and in response, Emergent announced it would submit its next generation candidate, NuThrax.[31] Emergent announced the Sole-Source Notification the next morning, on June 22, 2016, before the market opened.  Although the Sole-Source Notification announced a lower than expected range of BioThrax doses to be procured, Emergent had repeatedly disclosed the possibility that

---

[27]     *Id*.

[28]     *Id.*

[29]     Ex. 15, Emergent, Press Release, June 22, 2016, p. 1 ("June 22 Press Release").

[30]     *Id.* at 2.

[31]     *Id*.  In addition to the Original CDC Contract and the Building 55 Contract, BARDA awarded Emergent a contract in March of 2015—valued at $31 million—to develop NuThrax, a next generation anthrax vaccine.  Ex. 10, 2015 Form 10-K at 11.  NuThrax is an anthrax vaccine based on BioThrax that requires two doses for immunization to be effective, instead of the three doses that BioThrax requires.  *Id*.  During the May Earnings Call, Mr. Abdun-Nabi told analysts that Emergent was "in advanced stages of development" of NuThrax, and that based on a recent request for information ("RFI") issued by the U.S. Government, Emergent told analysts that it believed "NuThrax [to be] the only viable candidate that should respond to [that RFI] and a follow-on RFP [Request for Proposal]."  Ex. 14, May Earnings Call at 12.

the Government could reduce or terminate its procurement of BioThrax and never guaranteed a follow-on contract, let alone one for a certain number of doses.  Additionally, the regimens of BioThrax to be procured under the Sole-Source Notification and NuThrax to be procured under the HHS' RFP were consistent with the Government's stated goal of stockpiling 25 million regimens.[32]  Instead, the combination of the Sole-Source Notification and the HHS' RFP contemplate using both a next generation vaccine and BioThrax, instead of just BioThrax, the only actual FDA-licensed anthrax vaccine.

Despite this repeated disclosure of the risk that the terms of a potential CDC follow-on contract were not as yet known, on July 19, 2016, Plaintiff William Sponn filed a class action complaint (the "Sponn Complaint") alleging that, during the Class Period, Emergent and certain Company executives and members of Emergent's Board of Directors (Defendants Fuad El-Hibri, Daniel J. Abdun-Nabi, Robert G. Kramer, and Adam Havey)[33] had issued materially false and misleading statements regarding the likely terms of a potential CDC follow-on contract and projected BioThrax sales revenue.[34]  On December 27, 2016, Plaintiffs filed their 58-page amended complaint (the "Complaint"), naming the same Defendants and making materially the

---

[32]     A procurement of 29.4 million doses of Biothrax is 9.8 million regimens as BioThrax has a three-dose regimen.  *See* Ex. 15, June 22 Press Release at 1.   Given NuThrax's two-dose regimen, a procurement request for 27 million doses of Nuthrax would yield 13.5 million regimens.  *Id.*  The Biothrax and NuThrax regimens total 23.3 million together, which is very close to the 25 million regimens that the Government has consistently identified as its goal.  *Id.*

[33]     "Defendants" means Emergent BioSolutions, Inc. and the "Individual Defendants": Fuad El-Hibri, Daniel J. Abdun-Nabi, Robert G. Kramer, and Adam R. Havey.

[34]     Please see infra p. 10-11 for a more detailed discussion of Plaintiffs' allegations.  The parties entered into a joint stipulation that was subsequently approved by the Court on August 9, 2016, whereby Defendants would not be required to respond to the Sponn Complaint until 60 days after a lead plaintiff was appointed and the lead plaintiff had either filed an amended complaint or deemed the Sponn Complaint to be the operative complaint in this action.  [Dkt. 15.]  On October 26, 2016, the Court granted a motion by Plaintiff City of Cape Coral Municipal Firefighters' Retirement Plan ("Cape Coral") and Plaintiff City of Sunrise Police Officers' Retirement Plan ("Sunrise Police") (each a "Plaintiff," and collectively "Plaintiffs") for appointment as lead Plaintiffs and approved selection of their counsel as lead counsel.  [Dkt. 29.]

same allegations as the Sponn Complaint.[35]   As described more fully below, there are five independent reasons why Plaintiffs fail to adequately plead their claims and the Complaint should be dismissed.

*First*, Plaintiffs fail to meet the requirements to plead that any of the statements made by Defendants are actionable.  The Complaint does not contain any facts to support the conclusory allegation that Defendants' statements were false when made.  Plaintiffs do not provide a single particularized allegation explaining why Defendants' statements were false in the period prior to the announcement of the Sole-Source Notification; instead, the Complaint relies on the conclusory allegation that because the Sole-Source Notification issued on June 21, 2016 did not seek to procure enough BioThrax to meet the Government's own stated goal for the SNS and to take advantage of Building 55's increased BioThrax manufacturing capacity, Defendants' statements must have been false.  Such allegations are insufficient to meet Plaintiffs' burden to allege that the statements were false when made.  (*See* Section I.)

*Second*, Emergent specifically disclosed the risks associated with Government contracting and consistently informed investors that discussions with the CDC were still preliminary and could result in the CDC choosing not to enter into a follow-on contract at all or to procure fewer doses of BioThrax than it had previously procured.  Defendants cannot be liable to disappointed investors when investors were repeatedly warned that a reduced contract was well within the realm of possibilities.  (*See* Section II.)

*Third*, the challenged statements are not actionable because they fall within the PSLRA's safe harbor for forward-looking statements and are accompanied by meaningful cautionary

---

[35]   Plaintiffs asserted the same two causes of action, one against all Defendants alleging violations of Section 10(b) of the Exchange Act, and another against the Individual Defendants alleging violations of Section 20(a) of the Exchange Act.  [Dkt. 23.]

language. Additionally, even if they were not accompanied by meaningful cautionary language, the PSLRA requires Plaintiffs to plead actual knowledge of every challenged forward-looking statements' falsity, and Plaintiffs fail to do so. (*See* Section III.)

**Fourth**, Plaintiffs fail to adequately plead scienter because the Complaint does not point to the who, what, where, and when to support a conclusion that Defendants knew or recklessly disregarded that the dosage in a follow-on contract would be less than the Original CDC Contract. Plaintiffs' remaining allegations of scienter, including that Defendants retained lobbyists and therefore must have known or recklessly disregarded the Government's intentions, are insufficient to meet Plaintiffs' burden to plead a strong inference of scienter, particularly in light of the FARs that criminalize any advance disclosure by an official or a person acting on behalf of the Government. Further, allegations that the Individual Defendants' trading during the Class Period was unusual and suspicious are similarly without merit given that all such challenged trades were made pursuant to written, non-discretionary stock trading plans (each a "Rule 10b5-1 plan") put in place to allow the Individual Defendants to trade in Emergent stock at set future times and in set amounts without the risk of later being charged with trading on the basis of later-learned insider information.[36] Plaintiffs' fleeting attempts to justify an inference of scienter based on the "core business" nature of BioThrax and the temporal proximity of the statements alleged to be misleading to the announcement of the Sole-Source Notification are similarly unavailing under well-settled Fourth Circuit law. The more compelling inference is that Defendants made the challenged statements with an abundance of caution as they did not

---

[36] *See* 17 C.F.R. § 240.10b5-1(c) ("a person's purchase or sale is not 'on the basis of' material nonpublic information if the person making the purchase or sale demonstrates that: (A) Before becoming aware of the information, the person had: . . . (3) adopted a written plan for trading securities" meeting certain criteria, including prohibiting "the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales.").

know, until the CDC issued the Sole-Source Notification, whether or not the CDC would renew its contract on favorable terms, and thus the Complaint's allegations fail to adequately plead an inference of scienter.  (*See* Section IV.)

*Fifth*, Plaintiffs have not—and cannot—adequately plead loss causation because Plaintiffs have not alleged with any specificity what facts Defendants concealed and were later revealed that caused a decrease in stock price.  Defendants never concealed the "truth" regarding a potential CDC follow-on contract because the CDC did not reveal its procurement needs via the Sole-Source Notification until June 21, 2016.  Emergent's June 22, 2016 announcement was not a correction of a previous falsehood, but rather Emergent disclosing the information it learned from the Sole-Source Notification, only announced one day prior.  (*See* Section V.)[37]

## PLAINTIFFS' ALLEGATIONS

As is typical whenever there is a significant drop in a public company's stock price, Plaintiffs filed the Complaint on December 27, 2016, asserting claims under Section 10(b) of the Exchange Act against all Defendants, and under Section 20(a) against the Individual Defendants. Plaintiffs allege fifteen supposedly false statements, which all boil down to an allegation that Emergent misled investors regarding anticipated BioThrax revenue by supposedly misrepresenting that Emergent anticipated the CDC would procure similar quantities of Biothrax under a follow-on contract, before the CDC announced the Sole-Source Notification.[38]  Yet, Plaintiffs never say what it was Emergent supposedly knew that would have caused the Company not to expect the CDC to continue procuring BioThrax in similar quantities as it had

---

[37]     Because Plaintiffs' securities fraud claims fail as a matter of law, Plaintiffs' § 20(a) claim, which requires an underlying primary securities law violation, necessarily fails and must also be dismissed.  (*See* Section VI.)

[38]     (Compl. ¶¶ 73-105.)   For ease of reference, Defendants have attached a list of the challenged statements as Ex. 1, and have assigned a number to each statement.

under the Original CDC Contract.  Instead, they ask this Court to infer that Emergent must have known or recklessly disregarded the "fact" that the CDC intended to reduce dosage in its renewed BioThrax contract before the CDC issued its Sole-Source Notification on June 21 because (1) the contract "relates to the core business of Emergent;"[39] (2) it "paid powerful lobbyists" and had "close contact with the Government;"[40] (3) the "truth" was revealed within "close temporal proximity" to the alleged "false statements;"[41] and (4) the Individual Defendants had "substantial motives."[42]  By asking the Court to make such attenuated inferences, without providing any details to support the inferences, Plaintiffs are trying to skip over their burden to plead securities fraud with the requisite particularity set forth below.

## **STANDARD**

To allege a Section 10(b) and Rule 10b-5 claim, a plaintiff must plead with particularity: (1) a misrepresentation or omission by the defendant; (2) that is material; (3) made with scienter; (4) in connection with the purchase or sale of a security; (5) upon which a reasonable investor would rely; and (6) which caused the investor economic loss.[43]

Under the regular pleading standard set forth in Fed. R. Civ. P. 8(a) ("FRCP"), if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed.[44]  A court should not accept: "(i) legal conclusion[s] couched as factual allegation[s]; (ii) conclusory allegations devoid of any reference

---

[39]     (*Id.* ¶ 109.)

[40]     (*Id.* ¶ 110.)

[41]     (*Id.* ¶ 111.)

[42]     (*Id.* ¶ 113.)

[43]     *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

[44]     *Walker v. Glaxosmithkline*, 2016 WL 4265341, at *2 (D. Md. Aug. 12, 2016) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

to actual events; or (iii) allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences."[45]   Additionally, claims that "alleg[e] fraud or mistake" are subject to FRCP 9(b), which provides that "a party must state with particularity the circumstances constituting fraud or mistake."[46]

Congress set the pleading bar for private securities fraud actions **even higher** in the PSLRA.[47]   The particularity requirement in "the PSLRA requires that . . . for each alleged misstatement or omission, plaintiffs must plead facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false.''[48]   Thus, "the complaint

---

[45]      *Walker*, 2016 WL 4265341 at *3.

[46]      *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 168 (4th Cir. 2007) (affirming the District Court's complaint dismissal, reasoning that when "[a]pplying the [PSLRA] and Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) to plaintiffs' complaint," that the "plaintiffs [were] complaining only about market risks, not particularized securities fraud.").

[47]      The PSLRA was enacted as "a check against abusive litigation by private parties…." *Tellabs*, 551 U.S. at 313; *see also Ottmann*, 353 F.3d at 344 ("Congress enacted this more stringent pleading standard 'to curtail the filing of meritless lawsuits' and to create a uniform pleading standard among the circuits." (citing H.R. Conf. Rep. No. 104-369, at 41 (1995)). Since its enactment, Courts in this circuit have routinely dismissed securities fraud complaints. *See, e.g.*, *Human Genome Scis.*, 933 F. Supp. 2d at 761 (affirming dismissal of securities class action complaint for failing to satisfy heightened pleading requirements of PSLRA); *In re Pec Solutions Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005) (same); *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004) (same); *In re Neustar Sec Litig.*, 83 F. Supp. 3d 671, 687 (E.D. Va. 2015) (same); *Shah v. GenVec, Inc.*, 2013 WL 5348133, at *14 (D. Md. Sept. 20, 2013) (same); *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (same); *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 196 (4th Cir. 2009) (same).

[48]      *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 575 (D. Md. 2005); *see also In re Humphrey Hosp. Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (holding that allegations that a report "must have indicated" that the company was not on target to reach its financial goals or that the defendants "must have known that their statements were misleading" were insufficient to show "what Defendants knew, when and how they knew it, and how their knowledge rendered particular statements false or misleading;") *see also Criimi Mae, Inc.*, 94 F. Supp. 2d 652, 657 (D. Md. 2000) ("Particularity of pleading is required with regard to the time,

must not only state the allegations with factual particularity, but must also describe the *sources* of information with particularity, providing the who, what, when, where and how of the sources . . . [and] the information those sources convey."[49]   Finally, the PSLRA requires dismissal if there is any inference that is more compelling than the inference that the defendant acted with the requisite scienter.[50]  "Pleading of scienter . . . may not rest on a bare inference that a defendant must have had knowledge of the facts . . . ."[51]

## **ARGUMENT**

**I.    PLAINTIFFS DO NOT ADEQUATELY PLEAD THAT ANY OF THE CHALLENGED STATEMENTS WERE FALSE.**

Under the securities laws, Plaintiffs must allege that the challenged statements were false at the time when made.[52]  Plaintiffs' falsity allegations are unsupported, conclusory, and do not meet the particularity requirements under FRCP 9(b) and the PSLRA.  As a threshold matter, Plaintiffs do not allege any misstatement of current fact.  By way of example, Plaintiffs allege the following is a false statement: "[f]or the full year of 2016, the company *forecasts* total revenues of $600 to $630 million, driven by growth in BioThrax sales which are *anticipated* to be between $305 to $320 million."[53]   Emergent's future projections are similar to those

---

place, speaker and contents of the allegedly false statement, as well as the manner in which the statements are false and the specific facts raising an inference of fraud.").

[49]     *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

[50]     *Tellabs*, 551 U.S. at 313, 324 (A plaintiff must allege facts supporting an "inference of scienter [that is] more than merely reasonable or permissible … [and instead must be] at least as compelling as any opposing inference." (citing 15 U.S.C. § 78u-4(b)(2)).

[51]     *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006), *abrogated on other grounds by Tellabs*, 551, U.S. at 322-23).

[52]     *See, Humphrey Hosp. Trust*, 219 F. Supp. 2d at 685 (granting motion to dismiss because plaintiffs "failed to allege facts sufficient to show that many or all of the statements were false.").

[53]     (Compl. ¶ 73.)

projections made in *Raab*.[54]   The defendant in *Raab* (General Physics) provided services to the Department of Energy ("DOE").[55]   The plaintiffs filed a complaint—prior to passage of the PSLRA—claiming securities fraud under Section 10(b), and that the following statement was false when made: "[r]egulatory changes [] combined with the rising importance of environmental restoration and waste management, have created a marketplace for the DOE Services Group with an expected annual growth rate of 10% to 30% over the next several years."[56]   The defendants moved to dismiss the complaint, and the District Court granted the dismissal.[57]

The Fourth Circuit upheld the District Court's decision because the plaintiffs did not plead "the specific facts required by Fed. R. Civ. P. 9(b)."[58]   First, the Court reasoned that because "projections of future performance not worded as guarantees are generally not actionable under the securities laws,"[59] General Physics' projections regarding its expected future growth were not actionable.[60]   The Court further noted that "predictions of future growth . . . will almost always prove to be wrong in hindsight" and "[i]mposing liability [for such future predictions] would put companies in a whipsaw, with a lawsuit almost certain[]."[61]

Here, the passage of the PSLRA has raised the pleading standard even higher, and yet, as in *Raab*, Emergent's expectations regarding a potential CDC follow-on BioThrax procurement contract and expected BioThrax revenue were nothing more than Emergent's "best guess as to

---

[54]   *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 287 (4th Cir. 1993).

[55]   *Id.*

[56]   *Id.* at 288.

[57]   *Id.* at 287.

[58]   *Id.* at 288.   The Fourth Circuit decided *Raab* in 1993, prior to Congress enacting the PSLRA.   Presumably, if the plaintiffs failed to meet their pleading burden under FRCP 9(b), the *Raab* plaintiffs would certainly not have met the PSLRA's more exacting pleading standard.

[59]   *Raab*, 4 F.3d at 290 (quoting *Kim v. Banctexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)).

[60]   *Raab*, 4 F.3d at 289-90.

[61]   *Id.* at 290.

how the future will play out."[62]   Moreover, Plaintiffs' Complaint does not even dispute the underlying facts that Defendants relayed to investors as the basis for their projections, such as: (1) the Government's stated goal for the SNS was (and continues to be) to stockpile 25 million regimens of anthrax vaccine;[63] (2) at all pertinent times, BioThrax was (and still is) the only FDA-licensed anthrax vaccine;[64] and (3) it was the Government itself that had just invested $104 million in licensing Building 55, which was intended to increase Emergent's BioThrax manufacturing capability.[65]   Indeed, if the Government procures the expected 23.3 million regimens of anthrax vaccine under both the Sole-Source Notification and the HHS' RFP, such procurement is consistent with the stated goal of stockpiling 25 million regimens.[66]

Plaintiffs do not plead a single fact and do not point to a single document or witness that suggests facts inconsistent with Defendants' underlying assumptions or that suggests that Defendants did not believe in their future projections at the time they were made.[67]  After each of the alleged false statements, Plaintiffs rely on the same boiler-plate, conclusory allegation that somehow Defendants knew the statements were supposedly false or misleading: "because the Government's demand for additional stockpiles of BioThrax had significantly declined."[68]  The Complaint provides nothing more beyond this conclusory statement.  Rather, Plaintiffs want this Court to infer that the alleged misrepresentations made between January 11 and June 21 were false because *after* those statements, the CDC revealed, on June 21, that it intended to enter into

---

[62]     *Id.*

[63]     *See* Ex. 4, May Form 8-K at 3; (*see also* Compl. ¶ 42.)

[64]     *See* Ex. 5, Needham Transcript at 3; (*see also* Comp. ¶ 2.)

[65]     *See* Ex. 4, May Form 8-K at 4; (*see also* Compl. ¶ 44.)

[66]     *See supra* n. 31.

[67]     *See PEC Sols.*, 418 F.3d at 389 (upholding a decision to grant a motion to dismiss because the pleadings did not suggest the appellees knew the facts that would have made their statements false or misleading at the time their statements were made).

[68]     (Compl. ¶¶ 75, 77, 82, 84, 88, 90, 92, 95, 97, 99, 101, 103, 105.)

a follow-on contract for only 29.4 million doses of BioThrax, and the HHS revealed its intent to acquire a next generation anthrax vaccine. In sum, Plaintiffs' allegations amount to nothing more than fraud by hindsight[69] and are not actionable under the federal securities laws.

## II.   EMERGENT DISCLOSED THE VERY RISK OF WHICH PLAINTIFFS COMPLAIN.

Even assuming *arguendo* that Plaintiffs had sufficiently alleged that any of the statements at issue were false or misleading, the Complaint fails for the independent reason that Emergent disclosed the very risk of which Plaintiffs complain.[70] Although Plaintiffs try to insinuate in the Complaint that Emergent promised a CDC, multi-year, follow-on contract for more than 29.4 million doses of vaccine, the Complaint does not actually cite to or quote from anyone at Emergent making such a promise. Rather, Emergent repeatedly warned investors that, for example, Emergent's "ability to obtain new BioThrax sales contracts" could cause Emergent's "actual results to differ materially" from Emergent's projections.[71] The challenged statements must be considered against these risk disclosures, as well as against all other publicly available information such as analyst reports.[72] Despite this requirement, Plaintiffs' Complaint

---

[69]   *Raab*, 4 F.3d at 291 ("[H]indsight does not establish fraud. If it did, any drop in the price of shares would result in lawsuits from disappointed investors. The market has risks; the securities laws do not serve as investment insurance. Every prediction of success that fails to materialize cannot create on that account an action for securities fraud.").

[70]   *See, e.g., In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 628 (D. Md. 2010) (plaintiffs failed to adequately allege a material misrepresentation or omission because defendants disclosed the risk).

[71]   *See* Ex. 2, Statement 2. For a full list of Emergent's disclosures, please see Ex. 2.

[72]   *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999) ("[T]he Supreme Court has repeatedly cautioned that allegedly fraudulent corporate statements must be examined in context and in light of the 'total mix' of information made available to investors. If what [defendants] actually said here is examined in the context of all the information publicly available, we believe that a reasonable fact finder could not conclude that the contested statement constitutes a material misrepresentation.").

conveniently ignores Emergent's thorough risk disclosures, which undermine any allegation that the challenged statements could have misled investors.[73]

In addition to Emergent's disclosure of the very risks that materialized, the risks associated with Government contracting were well known amongst the very analysts Plaintiffs rely on in their Complaint in a failed attempt to show that the statements at issue were material. Indeed, every analyst report Plaintiffs cite to that was issued during the Class Period contained language noting the risk of the Government's reduced demand for BioThrax in some form.  For example: "EBS derived 56% of 2015 revenues from sales of BioThrax to the U.S. Government . . . .  We think it highly likely that EBS will secure another multi-year BioThrax procurement contract, ***but there is no guarantee that funding will be made available or that procurement volume will be similar to the expiring contract***."[74]

Thus, throughout the Class Period, investors were well aware of the possibility that the CDC could choose not to grant Emergent a follow-on procurement contract equal to or greater than the current contract and that any such decision would materially affect Emergent's revenue. The market's knowledge of the risks associated with Emergent deriving the majority of its revenue from contracts with the Government is similar to the market's knowledge in *Raab*.[75]  In *Raab*, General Physics' future growth was premised on future contracts with a Government agency.[76]  The plaintiff alleged the following statement was false: first-quarter earnings were likely to be lower than expected because of "administrative delays in contract awards by

---

[73]     *See id.* at 615 ("The allegations that the stockholders make to support that claim . . . . avow exclusive reliance on the public record.  Unfortunately, perhaps because facts in the public record often undercut their fraud claim, they occasionally mischaracterize those facts.").

[74]     Ex. 9, Singular Research Report at 11.  Plaintiffs cite to the Singular Research Report. (Compl. ¶ 86.)  For a full list of disclosures made in analyst reports, please see Ex. 3.

[75]     4 F.3d at 290-91.  For a further discussion of *Raab*, please see supra p. 14-15.

[76]     *Id.* at 288.

[DOE]," but that it believed the slowdown would be "temporary" and that "results during the remainder of [the year] should be in line with analysts' current projections."[77]  Specifically, the plaintiff challenged General Physics' characterization of the delays as purely "temporary" and "administrative" and suggested General Physics knew the delays would continue into the future, and the results for the remainder of the year would not be in line with current projections.[78]

The Fourth Circuit upheld the District Court's decision to grant the defendant's motion to dismiss, reasoning that given "the well-known vagaries of Government contracting . . . the plaintiffs [had] not alleged sufficient non-conclusory facts under Rule 9(b) to show that the statements were false . . . ."[79]  Moreover, the Court reasoned that analysts and the markets were well aware that "Government contracting is frequently a cyclical enterprise" and that "General Physics had no duty to advise investors of what was already commonly known."[80]  Here, not only were the vagaries of Government contracting well-known, they were explicitly disclosed.

## III.   THE ALLEGED FALSE STATEMENTS ARE WITHIN THE PSLRA'S SAFE HARBOR.

Even if Plaintiffs adequately plead that some of the statements were false or misleading, every single alleged false statement is a qualifying forward-looking statement within the PSLRA's Safe Harbor provision, and thus, the statements are not actionable, because they are "identified as forward-looking and accompanied by meaningful cautionary language identifying

---

[77]   *Id.*

[78]   *Id.* at 290.

[79]   *Id.* at 290.  The Fourth Circuit decided *Raab* in 1993, prior to Congress enacting the PSLRA.  Presumably, if plaintiffs failed to meet their pleading burden under FRCP 9(b), the plaintiffs would certainly not have met the PSLRA's more exacting pleading standard.

[80]   *Id.* at 290-91 (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 505 (9th Cir. 1992)).

factors that could cause actual results to materially differ from those in the forward-looking statement."[81]

All of the allegedly false statements are forward looking, and thus, subject to the safe harbor because they describe the Company's "projections of revenues" and "plans and objectives"[82] and because they appear in documents that also contain cautionary language consistent with the PSLRA's requirements.[83]   Moreover, the cautionary language "include[s] . . . the very [risk which Plaintiffs] assert was responsible for" its loss.[84]  For example, Emergent warned investors that: "we cannot guarantee that any forward-looking statement will be accurate,"[85] and that factors that could cause actual results to differ materially include "our ability to obtain a follow-on BioThrax procurement contract with the CDC . . . ."[86]  Additionally,

---

[81]     15 U.S.C. § 78u–5(c)(1); *see also Constellation Energy Grp.,* 738 F. Supp. 2d at 625 (stating same); *see also Humphrey Hosp. Trust,* 219 F. Supp. 2d at 684 (holding Defendants' statements were "immune from liability under the Safe Harbor provision of the PSLRA because they [were] accompanied by cautionary statements.")  Similarly, before Congress even enacted the PSLRA, the Fourth Circuit had already recognized that predicative statements about a company's projected earnings, not worded as guarantees, were not actionable.  *See Raab,* 4 F.3d at 289 (noting "the market price of a share is not inflated by vague statements predicting growth.").

[82]     15 U.S.C. § 78u–5(c)(1).  By way of example, the Complaint challenges statements such as Statement 1 ("for the full year of 2016, the company forecasts total revenues of $600 to $630 million, driven by growth in BioThrax sales which are anticipated to be between $305 to $320 million") and Statement 8 ("[w]e anticipate this will be a multi-year contract requiring significantly increased deliveries in order to satisfy the U.S. Government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile"). (Compl. ¶¶ 73, 91.)  This list contains a representative sample, all the statements identified by Plaintiffs are forward-looking and can be found in Ex. 1.

[83]     *See Humphrey Hosp. Trust,* 219 F. Supp. 2d at 683-84 (defining meaningful cautionary language as language that "conveys substantive information about factors that realistically could cause results to differ materially from those projected in the forward looking statement.").

[84]     *Id.*

[85]     *See, e.g.,* Ex. 16, Emergent, SEC Form 8-K, January 11, 2016, p. 7.

[86]     *Id.*  Please see Ex. 2 for a full list of safe harbor statements, including those incorporating risks by reference.  *See Humphrey Hosp. Trust.*, 219 F. Supp. 2d at 684 ("SEC filings

even if the statements were not accompanied by meaningful cautionary language—which they were—the Safe Harbor would still apply unless Plaintiffs plead actual knowledge, and Plaintiffs fail to do so.[87]

Accordingly, the PSLRA requires Plaintiffs' Complaint be dismissed because the alleged false statements were forward-looking and accompanied by the appropriate cautionary language, or, in the alternative, were forward-looking and Plaintiffs fail to plead actual knowledge.  (*See* Section IV.)[88]

## IV.   PLAINTIFFS' SCIENTER ALLEGATIONS ARE INSUFFICIENT.

Even if Plaintiffs had adequately pled that at least some of the challenged statements were false and that the statements did not fall within the PSLRA's safe harbor, Plaintiffs' Complaint should still be dismissed as it does not plead scienter with the requisite particularity. As the Supreme Court recognized in *Tellabs*, the PSLRA "unequivocally raise[d] the bar" for pleading the mental state necessary to make out a federal securities fraud claim.[89]  It requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[90]  The Fourth Circuit has held that the required state of

---

incorporated by reference are adequate to invoke the Safe Harbor provision for forward-looking statements.").

[87]    *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 448 n.14 (2011) ("Under the PSLRA, if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.'").

[88]    Additionally, certain of Plaintiffs' alleged misstatements are opinion and puffery and thus immaterial.  For example, Plaintiff's repeatedly reference the statement by Mr. Abdun-Nabi that the follow-on contract was a part of "one big, beautiful package" (*See, e.g.,* Compl. ¶¶ 3, 56, 70.) Such a statement, and all the statements identified as puffery in Ex. 1, are not actionable under the securities laws.  *See Raab v. Gen. Physics Corp.*, 1993 WL 358450, at *2 (D. Md. Jan. 7, 1993) (finding statements about "an expected annual growth rate of from '10% to 30% over the next several years'" and being "poised [for] success . . . well into the future" were too "vague as to scope and time as to be no more than puffery.").

[89]    *Tellabs,* 551 U.S. at 317.

[90]    15 U.S.C. § 78u-4(b)(2)(A).

mind "embrac[es an] intent to deceive, manipulate, or defraud."[91]   Per the Supreme Court, "A complaint will survive . . . only if a reasonable person would deem the inference of scienter **cogent** and at least **as compelling as any opposing inference** one could draw from the facts alleged."[92]   Thus, not all inferences should be drawn in favor of the plaintiff; rather, the Court must balance the competing inferences, and should "only allow the complaint to survive a motion to dismiss if the malicious inferences [are] at least as compelling as any opposing innocent inferences."[93]

"Under Fourth Circuit law, negligence is not enough to prove scienter; a plaintiff must show either intentional misconduct or such severe recklessness that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'"[94]   A plaintiff cannot merely "[a]dd[] the words 'knowingly' or 'recklessly' to a factual statement" to satisfy this burden.[95]   Following the Supreme Court's decision in *Tellabs*, the Fourth Circuit has routinely affirmed dismissals of securities fraud complaints on the ground that the inference of scienter was neither "cogent" nor "at least as compelling as any opposing inference" of nonfraudulent intent.[96]

Here, Plaintiffs completely fail to allege any facts that create an inference of scienter that is either as "cogent" or "compelling" as the opposing inference.   Instead, Plaintiffs resort to

---

[91]     *Yates*, 744 F.3d at 884.

[92]     *Tellabs*, 551 U.S. at 324; *see, e.g., Human Genome Scis.*, 933 F. Supp. 2d at 761 (holding that the plaintiffs failed to adequately plead scienter regarding the results of clinical studies when it was just as plausible to infer that the executives omitted facts from their disclosures because the studies were ongoing as it was to infer they deliberately omitted the facts).

[93]     *Yates*, 744 F.3d at 885.

[94]     *Human Genome Scis.*, 933 F. Supp. 2d at 759 (quoting *Cozzarelli*, 549 F. 3d at 623).

[95]     *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 714 (E.D. Va. 2003).

[96]     *See, e.g., Cozzarelli*, 549 F.3d at 624; *Pub. Emps.' Ret. Ass'n v. Deloitte & Touche LLP,* 551 F.3d 305, 306 (4th Cir. 2009); *Matrix Capital Mgmt. Fund,* 576 F.3d at 182.

conclusory allegations: "Defendants possessed knowledge of facts or had access to information contradicting each of their public statements"[97] without pointing to any specifics that would give rise to a cogent inference that Defendants doubted the truth of the challenged statements.

Rather than meet their pleading requirements, Plaintiffs simply make the conclusory allegation that Defendants disregarded the "fact" that a potential CDC follow-on contract would not be in line with the Original CDC Contract because: (1) Defendants paid a number of lobbyist firms; (2) the Individual Defendants sold some Emergent stock; (3) Emergent's BioThrax contracts with the Government constitute Emergent's "core business"; and (4) Plaintiffs assert that the allegedly false statements and material omissions were temporally proximal to what they view as the revelation of the truth (*i.e.*, Emergent's June 22 press release announcing Emergent's learning of the CDC's Sole-Source Notification the night before).[98] Such conclusory allegations do not support any inference—let alone the strong one required to withstand a motion to

---

[97]     (Compl. ¶ 108.)

[98]     (*See* Compl. ¶¶ 68 ("The millions of dollars paid to these lobbyists ensured that the Company knew of the specific details regarding the renewal of the BioThrax Contract, which was the key to the Company's ability to meet its current and future revenue goals."); 70 ("The timing of Emergent stock sales by the Individual Defendants was highly suspicious."); 109 ("[T]he fraud alleged herein relates to the core business of Emergent so knowledge of the fraud may be imputed to Defendants."); 111 ("[A]n inference of the Defendants' scienter is further shown because of the close temporal proximity between Defendants' false statements and material omissions and the revelation of the truth.").)

dismiss—that Defendants had the requisite knowledge or recklessness with respect to the supposed falsity of the statements at issue at the time they were made.[99]

Indeed, the more compelling inference is that Emergent did not know the terms of a potential CDC follow-on contract prior to the issuance of the Sole-Source Notification. Emergent fully informed investors that it would not know the terms of a potential follow-on contract until the Government announced them.  While Defendants said they expected to receive a CDC follow-on contract that would ensure an uninterrupted supply of BioThrax into the SNS based on the CDC's $104 million funding for the licensing of a new production facility at Building 55, the Complaint's allegations are in no way sufficient to overcome the inference that Defendants believed that their statements were true when made.  Indeed, Plaintiffs ignore that FARs prevent CDC employees from disclosing its source selection plans prior to making that information publicly available, *i.e.*, the CDC could not have disclosed its desired dose quantity prior to revealing it to the public.[100]  Moreover, Plaintiffs' pleading deficiencies are not cured by pleading four inadequate allegations of fraud, none of which on its own is enough, and none of which collectively give rise to a strong inference of fraud.[101]

---

[99]      *See Plumbers Local #200 Pension Fund v. Washington Post Co.*, 930 F. Supp. 2d 222, 232 (D.D.C. 2013). (finding that lobbying efforts did not justify inference of scienter); *In re Visual Networks, Inc. Sec. Litig.*, 217 F. Supp. 2d 662, 668 (D. Md. 2002) ("the sale of merely some stock during the Class Period is not sufficient to give rise to an inference of fraudulent intent."); *Yates*, 744 F.3d at 890 ("[I]n accordance with several of our sister circuits, we reject plaintiffs' contention that the individual defendants must have acted intentionally or recklessly [] merely because . . . [the relevant business dealings] represented a core business of the Company. . . . [W]ithout additional detailed allegations establishing the defendants' actual exposure to [the conduct at issue], the complaint falls short of the PSLRA's particularity requirements."); *Criimi Mae, Inc.*, 94 F. Supp. 2d at 662  (holding that plaintiffs' allegations regarding the close timing between the alleged misstatements and the purported collective disclosures did not warrant an inference of scienter).

[100]      *See supra*, p. 4-5.

[101]      *See, e.g., Ottmann*, 353 F.3d at 352-53 ("In sum, Appellants' allegations fail to provide the strong inference of scienter required by the PSLRA.  Even when viewed collectively, these

A.     **HIRING LOBBYISTS DOES NOT GIVE RISE TO AN INFERENCE OF KNOWLEDGE.**

Plaintiffs allege that as Emergent "hired a phalanx of high-priced lobbyists to influence the decision-making process and gain insight into the scope of any renewal," Emergent must have had "insight into the Government's decision-making process and intentions" and had "sufficient information to determine that any renewal would be on vastly different terms than the Defendants had led the market to believe."[102]  Plaintiffs' argument seems to be that merely hiring lobbyists to advocate on one's behalf means that a company must know what the Government is going to do before it makes an announcement.  Plaintiffs do not consider that the hiring of lobbyists could merely constitute an attempt to "ha[ve] a voice in the discussion," rather than securing knowledge of the CDC's decisions before it announced those decisions or possibly even reached them.[103]  Indeed, these lobbying efforts are consistent with the Company's historical lobbying efforts and fail to support an inference of fraud, much less one that is ***more compelling*** than a non-fraudulent inference.[104]

Plaintiffs' allegations are similar to those found inadequate in a decision granting a motion to dismiss in *Plumbers Local #200*.[105]  In *Plumbers Local*, the plaintiff brought claims under Sections 10(b) and 20(a) against a parent corporation (and certain of its officers) of a for-

---

allegations tend to establish, at most, a pattern of negligent conduct by Appellees, rather than the reckless or intentional conduct required to support liability"); *Plumbers Local #200*, 930 F. Supp. 2d at 225 (referencing its prior ruling in the case where it found "[o]f the seven areas referenced above, the court found that only two plausibly raised an inference of scienter and that neither alone, nor collectively, did these allegations raise a strong inference" of scienter).

[102]     (Compl. ¶ 4.)

[103]     *Plumbers Local #200*, 930 F. Supp. 2d at 232.

[104]     For example, while Emergent spent $3,116,000 in 2016 on lobbying, it also spent a similar amount—$2,887,000 in 2015—on lobbying.  *See* Ex. 17, Emergent, 2016 Q1 and Q2 Lobbying Reports; Ex. 18, Emergent, 2015 Q1 and Q2 Lobbying Reports; *see also* Ex. 19, Emergent, 2010 Mid-Year Lobbying Reports ($2.2 million was spent on lobbying in 2010).

[105]     930 F. Supp. 2d 222.

profit college company (Kaplan Higher Education Corp. or "Kaplan") on the basis that the defendants failed to disclose that the growth of the company was built on actions of Kaplan that were later found to be illegal.[106]  The plaintiff alleged that lobbying efforts taken by the parent company to influence regulators considering additional restrictions on for-profit colleges conveyed "knowledge of [and] . . . familiarity with Kaplan's operations and, thus, the alleged fraud . . ."[107]  The Court granted the defendants' motion to dismiss, reasoning that hiring lobbyists does not justify an inference of scienter without any indication that the Government actually conveyed information to the lobbyists or defendants, and rather that the more compelling inference was that the parent company hired lobbyists merely to ensure it "had a voice in the discussion."[108]

Here, the decision to hire lobbyists merely indicates Emergent took steps to ensure that it "had a voice in the discussion" regarding the Government's ongoing procurement needs; the hiring in no way establishes that Emergent had knowledge of the CDC's intentions prior to the Government announcing the Sole-Source Notification.[109]

Moreover, the particularity requirement in the PSLRA "requires that . . . for each alleged misstatement or omission, plaintiffs must plead facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false."[110]  Plaintiffs cannot

---

[106]     *See id.* at 223-24.

[107]     *Id.* at 232.

[108]     *Id.*

[109]     *Id.*

[110]     *Acterna Corp*, 378 F. Supp. 2d at 575.

simply assert that because Emergent employed multiple lobbying firms,[111] *someone* at one of these firms must have told *someone* at Emergent, at *some point* prior to June 21, *something* about the CDC's intentions regarding demand for a follow-on contract.  Such an allegation tells this Court nothing about who had knowledge of a statement's falsity, the source of that knowledge, and whether it was obtained before the announcement of the Sole-Source Notification.[112] Furthermore, any such allegation would necessarily imply that a Government employee had violated the FARs that prohibits an employee with access to confidential source selection information from disclosing that information.[113]  Further, Plaintiffs do not even specify which Government employee would have been in violation of those regulations.  Accordingly, Plaintiffs do not meet their pleading burden under the PSLRA by alleging that Emergent hired lobbyists and thus, somehow knew that the Government would only require 29.4 million doses in a follow-on contract.

### B.   PLAINTIFFS' TRADES DO NOT SUPPORT AN INFERENCE OF SCIENTER.

Perhaps recognizing that their allegations that Emergent paid lobbyists does not give rise to the required strong inference of scienter, Plaintiffs assert that stock sales by the Individual Defendants during the Class Period were "highly suspicious" and "support an inference of scienter because these sales were timed to capitalize on Emergent's inflated stock price before the news that the Government only sought the procurement of 29.4 million BioThrax doses was

---

[111]     (Compl. ¶ 62.)  Plaintiffs also allege Emergent made internal lobbying payments.  (*Id.*)

[112]     *Humphrey Hosp. Trust.*, 219 F. Supp. 2d at 684 (holding that alleging that a report "must have indicated" the company was not on target to reach its financial goals or that the defendants "must have known' that their statements were misleading" were insufficient, under the PSLRA, to show "what Defendants knew, when and how they knew it, and how their knowledge rendered particular statements false or misleading.").

[113]     *See supra* p. 4-5.

disclosed to investors."[114]   Plaintiffs make this allegation by ignoring key information in the public filings which demonstrate that these trades were neither unusual nor suspicious.  In short, these trades do not give rise to a strong inference of scienter.

"Insider trading allegations will only support an inference of scienter 'if the timing and amount of a defendant's trading were unusual or suspicious.'"[115]   "[P]laintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter."[116]   "[T]he sale of merely some stock during the Class Period is not sufficient to give rise to an inference of fraudulent intent,"[117] and the Fourth Circuit has cited the Supreme Court's ruling in *Tellabs* as emphasizing that "the inferential weight that may be attributed to any claim of motive must be evaluated in context."[118]   "To determine whether an insider's sales were unusual in scope" courts should "consider factors such as 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.'"[119]

Plaintiffs fail to allege that the circumstances surrounding the Individual Defendants' sales warrant a strong inference of scienter because Plaintiffs fail to give any facts regarding the sales other than that they occurred.  Examining the full context of these sales demonstrates that they were neither unusual nor suspicious; context that the Complaint does not provide.  First, the

---

[114]      (Compl. ¶¶ 114, 116.)

[115]      *Yates*, 744 F.3d at 890.

[116]      *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643 (E.D. Va. 2000).

[117]      *Visual Networks, Inc.*, 217 F. Supp. 2d at 668.

[118]      *Yates*, 744 F.3d at 890 (citing *Tellabs*, 551 U.S. at 324 (2007); *see also Visual Networks, Inc.*, 217 F. Supp. 2d at 668 ("District courts in Maryland have required Plaintiffs alleging insider trading to do more than merely plead the allegation.  The mere pleading of insider trading without regard to either the context or the strength of the inferences to be drawn is not enough to support a strong inference of scienter.").

[119]      *Yates*, 744 F.3d at 890.

Complaint conveniently fails to mention that every single sale made by the Individual Defendants during the class period was executed pursuant to a non-discretionary Rule 10b5-1 plan.[120]   Second, Plaintiffs fail to allege the Individual Defendants' trades were a significant portion of the Defendants' overall holdings.   Finally, Plaintiffs fail to tie any trades to a previously made "false" statement to give rise to an inference of suspicious timing.

**First**, courts find that the inference of scienter is insufficient to withstand a motion to dismiss where the trading party traded shares under a non-discretionary Rule 10b5-1 plan.[121]   To comply with Rule 10b5-1, corporate insiders often create written plans in advance that "[s]pecif[y] the amount of securities to be purchased or sold and the price at which and the date

---

[120]      In addition to failing to mention the 10b5-1 plans, Plaintiffs also inaccurately allege that Individual Defendants collectively profited $14,507,740.   (*See* Compl. ¶ 113.)   Many of the sales Plaintiffs cite were made immediately following the exercise of options pursuant to option agreements, *i.e.*, Individual Defendants' proceeds should be calculated by subtracting the strike price from the sale price.   *In re E. Spire Commc'ns Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 741 (D. Md. 2001) (noting "shares of stock held plus exercisable stock options represent the owners' trading potential more accurately than stock shares alone"); *see also* Ex. 20 (a chart depicting both the options and sales by the Individual Defendants during the Class Period, aggregated from the Individual Defendant's Form 4s (Ex. 21 through 24)).   Plaintiffs' calculations fail to take this vesting option into account and inflate Individual Defendants' proceeds by 22%.   Plaintiffs also include in their allegations trades by non-defendants that are *de jure* irrelevant.   *See Visual Networks, Inc.*, 217 F. Supp. 2d at 669 (noting "Plaintiffs do not provide information regarding what percentage of his stock each of the other named individuals traded, but their trades are **irrelevant** because they are not named defendants).
[121]      *See Yates*, 744 F.3d. at 891 (acknowledging defendant's Rule 10b5-1 plan in finding that defendant's trading did not raise inference of scienter); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 554 n.4 (5th Cir. 2007) (explaining that a 10b5–1 trading plan can give rise to an inference that the sales were not suspicious); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1427–28 (9th Cir. 1994) (same); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (same); *Congregation of Exra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 165 (N.D. Tex. 2007) (same); *cf. KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *10 (D.S.C. July 25, 2016) (noting the defendants' trades did give rise to an inference of scienter because "unlike other cases in [the Fourth Circuit] that have failed to find an inference of scienter from insider trading, neither defendant sold their stock under a Rule 10b5-1 plan . . . .").

on which the securities were to be purchased or sold."[122]   Under Rule 10b5-1, "a person's purchase or sale is not 'on the basis of' material nonpublic information if the person making the purchase or sale demonstrates that [b]efore becoming aware of the information, the person had . . . [a]dopted a written plan for trading securities."[123]   A trade executed pursuant to such a plan negates an inference of scienter because "it strains credulity . . . that the Individual Defendants were engaging in a nefarious scheme to inflate the price of Company stock for their own benefit while simultaneously making a public disclosure of their intention to sell shares far in advance."[124]

Here, the Individual Defendants' sale of Emergent stock during the Class Period does not support an inference of scienter as all trades were executed pursuant to non-discretionary Rule 10b5-1 plans.   Misleadingly, the Complaint provides a chart displaying sales disclosed in the Individual Defendants' Form 4s filed with the SEC during the Class Period[125] that fails to mention that each of the Individual Defendants' Form 4s expressly disclosed that the sales were executed pursuant to Rule 10b5-1 plans.[126]   Because all of the trades cited by Plaintiffs were executed pursuant to Rule 10b5-1 plans, those trades do not support a strong inference of scienter.

---

[122]   17 C.F.R. § 240.10b5-1(c)(B)(1).

[123]   17 C.F.R. § 240.10b5-1(c)(A)(3).

[124]   *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *21 (D. Md. Mar. 28, 2013); *see also City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012) (finding when defendants sold their trades pursuant to a Rule 10b5-1 plan that "[t]his innocent, alternative explanation for the stock sales negate[d] an inference of scienter.").

[125]   The Individual Defendants publicly disclosed their stock trades by filing Form 4s with the SEC.

[126]   The charts in Ex. 25, list each trade that Plaintiffs allege gives rise to an inference of scienter (Compl. ¶ 113), but also includes the language from the relevant Form 4 that is omitted in the Complaint, whereby the Individual Defendants disclosed that their trades were made pursuant to Rule 10b5-1 plans.  *See* Ex. 25.

**Second**, "even large stock sales are not probative of scienter unless they are significant in comparison to the total number of shares an insider holds."[127]  The Fourth Circuit has found that even sales of "92%, 100%, and 82%" of defendants' stock during a class period were "unremarkable" in context, and did not raise an inference of scienter on a motion to dismiss.[128]

Each of the Individual Defendants maintained a substantial portion of their overall holdings at the end of the Class Period—selling only 3% (Mr. El-Hibri), 13% (Mr. Abdun-Nabi), 14% (Mr. Kramer), and 19% (Mr. Havey) of their holdings during the Class Period—and all trades were executed pursuant to Rule 10b5-1 plans, thus negating an inference of scienter.[129] Moreover, because at the end of the Class Period the lowest percentage any Individual Defendant held was still 81% of the shares they held as of the first sale that Plaintiffs attack, the $8 drop in stock price on June 22, 2016 caused the Individual Defendants substantial losses.  Indeed, accounting for the proceeds gained by sales during the Class Period, the Individual Defendants had a net, aggregate loss of $35,096,784.[130]  Such minimal sales over the class period cannot be sufficient, as a matter of law, to warrant a finding of a strong inference of scienter.[131]

Presumably, if Plaintiffs' theory were correct and the Individual Defendants engaged in a scheme to defraud the market by artificially inflating the stock price so as to profit personally,

---

[127]     *Proter*, 2013 WL 1316034, at *19.

[128]     *Teachers' Ret. Sys. of La.*, 477 F.3d at 185; *see also Yates*, 744 F.3d at 891 (finding no inference of scienter where defendants traded 37% and 28% of their total holdings during the relevant class period.); *see also In re Trex Co., Sec. Litig.*, 454 F. Supp. 2d 560, 586-87 (W.D. Va. 2006) (holding that even if the court took as true that the defendant sold 35.6% of his holdings, "the record demonstrates that [the defendant's] stock sales were not so substantial as to raise a strong inference of scienter.").

[129]     Please see Ex. 26 for a chart depicting the percentage of overall holdings still owned by each Individual Defendant on June 22.

[130]     Please see Ex. 27 for a chart depicting the net proceeds and losses for each Individual Defendant.

[131]     *See Teachers' Ret. Sys. of La.*, 477 F.3d at 185; *see also Yates*, 744 F.3d at 891; *see also In re Trex Co., Sec. Litig.*, 454 F. Supp. 2d 560, 586-87 (W.D. Va. 2006).

the Individual Defendants would have ensured they sold enough shares to actually profit.[132]  This lack of sales and losses supports the more compelling inference that the Individual Defendants held on to such a large percentage of shares because they believed in the truth of their statements and the future growth of Emergent.[133]  Finally, even if the Individual Defendants engaged in heavy trading or large profits, "[a]llegations of heavy trading or large profits, without further information do not satisfy the scienter requirement."[134]  Plaintiffs provide no additional information regarding the Individual Defendants' trades other than an inaccurate chart that shows that the trades occurred, which is insufficient under the PSLRA to infer scienter.

*Third*, the Complaint fails to sufficiently allege that the timing of any of the trades was suspicious so as to give rise to a strong inference that the sales were timed to profit from a supposed false statement.[135]  Plaintiffs' only attempt to tie any alleged false statements to specific trades relates to trades by Mr. Abdun-Nabi and Mr. El-Hibri that occurred a week after making allegedly misleading statements on May 5.[136]  But given those trades did not even begin until a week later, Plaintiffs' allegations are unlike those in which timing has been found

---

[132]     *Cf. In re Orbital Scis. Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 687 (E.D. Va. 1999) (finding defendants' sales suspicious on a motion to dismiss because if defendants believed their statements about the growth of the company "[t]hey almost certainly would have retained a significant percentage of their holdings").

[133]     *Id.*

[134]     *In re Coventry Healthcare, Inc. Sec. Litig.*, WL 1230998, at *9 (D. Md. Mar. 30, 2011); *see also In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 476 (M.D.N.C. 2004) (holding the trades were not enough to support a strong inference of scienter even assuming "the total profit and volume of trading are significant" because "the complaint does not provide enough factual information about the trades to show they are unusual or suspicious.").

[135]     *See Teachers' Ret. Sys. of La.*, 477 F.3d at 184  (finding no inference of scienter where the "complaint does not allege that defendants timed their sales to profit from any particular disclosures").

[136]     (Compl. ¶ 115.)

sufficient to support an inference of scienter.[137]   Moreover, every single trade made by the Individual Defendants in May was executed pursuant to a Rule 10b5-1 plan.[138]

Given the Individual Defendants only sold a small percentage of their overall holdings, the sales they did make were made exclusively pursuant to Rule 10b5-1 plans, and Plaintiffs have failed to meet the pleading standard for asserting that the timing of these sales was suspicious, these sales do not give rise to an inference of scienter.[139]

### C.   PLEADING A "CORE BUSINESS" THEORY IS ALSO INSUFFICIENT TO MEET THE REQUIREMENTS OF PLEADING SCIENTER.

Similar to Plaintiffs' stock trade allegations, their allegations that "knowledge of the fraud may be imputed to Defendants," because selling BioThrax to the Government was Emergent's "core business"[140] are also insufficient to meet Plaintiffs' high pleading burden. Courts in the Fourth Circuit have frequently found insufficient to support an inference of scienter a bare assertion that executives should have known facts based only on their relation to the core purpose of the business.[141]   As the Complaint lacks particularized knowledge allegations as to how Defendants could have known the terms of a potential CDC follow-on contract before the

---

[137]   *MicroStrategy, Inc.*, 115 F. Supp. 2d at 644 (finding inference of scienter when plaintiffs tied each of the sales at issue to an announcement that occurred within days of the trade).

[138]   *See* Ex. 25.

[139]   *See PEC Sols.*, 418 F.3d at 390.  Plaintiffs also fail to provide the Individual Defendants' trading patterns outside the class period "to permit comparison with their trades within the class period," which further weighs against an inference of scienter.  *Teachers' Ret. Sys. of La.*, 477 F.3d at 185.

[140]   (Compl. ¶ 109.)

[141]   *See, e.g.*, *Yates*, 744 F.3d at 890 ("[I]n accordance with several of our sister circuits, we reject plaintiffs' contention that the individual defendants must have acted intentionally or reckless[] . . . merely because . . . [the relevant business dealings] represented a core business of the Company. . . . [W]ithout additional detailed allegations establishing the defendants' actual exposure to [the conduct at issue], the complaint falls short of the PSLRA's particularity requirements."); *Latham v. Matthews*, 662 F. Supp. 2d 441, 468 (D.S.C. 2009) ("mere allegations that an executive 'should' have information about a fact [are in]sufficient, without more specific statements as to how or why they also would know these facts.").

CDC revealed its intentions on June 21, the allegation that sales of BioThrax to the Government was a "core business" of Emergent is insufficient to support an inference of scienter.

The facts alleged by Plaintiffs are similar to those found insufficient by the Court in *Constellation Energy Grp.*[142]   There, the plaintiffs alleged that because overall liquidity was highly important to Constellation Energy Group, the executives of the company could be charged with knowledge of miscalculations of the company's collateral obligations, conducted by an automated program, which the company would incur if it suffered a downgrade in its credit rating.[143]   The Court granted the defendants' motion to dismiss Section 10(b) and 20(a) claims[144] and stated that "a general level of importance simply does not 'warrant imputing to the defendants knowledge of [the] subtleties' of an automated program," concluding that "[w]ithout additional factual allegations that the defendants were somehow aware that the downgrade collateral requirements were miscalculated, or that there was a problem with the automated system, neither Constellation, nor its officers, can be presumed to have known of a faulty computer calculation."[145]

Here, Plaintiffs only allege that selling BioThrax to the Government was Emergent's core business and "Defendants were in close contact with the Government and thus would have had knowledge about the Company's ability to secure a renewal of the BioThrax Contract at significantly higher levels."[146]   This conclusory allegation is not supported by any detail as to how the "core business" nature of Emergent's business would have meant they were in "close

---

[142]     738 F. Supp. 2d at 614.

[143]     *See id.* at 635.

[144]     *Id.* at 640 (granting the defendants' motion to dismiss with respect to the 10(b) and 20(a) claims but granting the plaintiff leave to amend its Section 12 claim).

[145]     *Id.* at 635-36.

[146]     (Compl. ¶ 109.)

contact with the Government," nor do Plaintiffs' include any allegations as to which Defendants supposedly had contact with the CDC, where and when that contact occurred, or why that contact would suggest that Defendants had knowledge of the terms of a potential follow-on contract.  Without more particularized knowledge allegations, Plaintiffs' theory that as BioThrax sales to the Government was Emergent's "core business," and that Defendants must have been in close contact with the Government and had knowledge of the terms of the Follow-on Contract before June 21, 2016, is insufficient to warrant a strong inference of scienter.[147]

### D.     PLAINTIFFS IMPERMISSIBLY PLEAD FRAUD BY HINDSIGHT, WHICH IS INSUFFICIENT TO SUPPORT AN INFERENCE OF SCIENTER.

Finally, Plaintiffs' allegations that "an inference of the Defendants' scienter is further shown because of the close temporal proximity between Defendants' false statements and material omissions and the revelation of the truth,"[148] do not fare any better.  The Fourth Circuit has stated that "it seems clear that an inference from timing alone is not sufficient, without additional supporting facts and circumstances . . . ."[149]  Further, it is well established in the Fourth Circuit that "[p]laintiffs may not rely simply on the discrepancy between a company's optimistic outlook and subsequent disappointing results to support a claim of fraud.  Such allegations of 'fraud by hindsight' do not satisfy the stringent requirements of the PSLRA."[150] "To hold otherwise would allow a plaintiff to simply contrast a defendant's past optimism with less favorable actual results, and then contend that the differences must be attributable to fraud.

---

[147]     *Yates*, 744 F.3d at 890.

[148]     (Compl. ¶ 111.)

[149]     *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 215 (4th Cir. 1994) (affirming dismissal of shareholder suit alleging securities fraud) (collecting cases).

[150]     *Criimi Mae, Inc.*, 94 F. Supp. 2d at 662.

The pleading standard demands more."[151]   Under Fourth Circuit law, Plaintiffs' allegations regarding the timing of the alleged misstatements and supposed disclosures is insufficient to warrant an inference of scienter.[152]

Plaintiffs' pleading deficiencies are not cured by pleading four inadequate allegations of scienter, none of which individually is legally sufficient to justify such an inference.  Courts have frequently found that individually insufficient allegations cannot collectively give rise to an inference of scienter.[153]   Plaintiffs' allegations here similarly fail, as when examining the value of the Complain's collective scienter allegations, "zero plus zero equals zero."[154]

### E.  THE NON-CULPABLE INFERENCE IS MORE COMPELLING.

As the Supreme Court has held, if the more compelling inference raised by a plaintiff's scienter allegations is a non-culpable one, then a court should grant a defendant's motion to dismiss.[155]   Here, the more compelling inference is the non-culpable one:  the Individual Defendants believed that their statements were true when made and disclosed the attendant uncertainties that necessarily accompany any Government contract.   As explained above, BARDA awarded Emergent the Building 55 Contract worth $104 million to build a new production line at Building 55 that would enable Emergent to significantly increase its

---

[151]     *Proter*, 2013 WL 1316034, at *17.

[152]     *See id.*

[153]     *See, e.g.*, *Ottmann*, 353 F.3d at 352-53 ("Appellants' allegations fail to provide the strong inference of scienter required by the PSLRA.  Even when viewed collectively, these allegations tend to establish, at most, a pattern of negligent conduct by Appellees, rather than the reckless or intentional conduct required to support liability."); *Plumbers Local #200 Pension Fund*, 930 F. Supp. 2d at 225 (referencing its prior ruling in the case where it found "[o]f the seven areas referenced above, the court found that only two plausibly raised an inference" of scienter and that neither alone, nor collectively, did these allegations raise a strong inference of scienter).

[154]     *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011).

[155]     *Tellabs*, 551 U.S. at 313, 331 (holding that a plaintiff must allege facts supporting an "inference of scienter [that is] more than merely reasonable or permissible . . . [and instead must be] at least as compelling as any opposing inference" to survive a motion to dismiss).

production capabilities from a range of seven to nine million doses annually to a much higher level of 20 to 25 million doses annually.[156]  In addition to the Original CDC Contract and the Building 55 Contract, in March 2015, BARDA awarded Emergent a contract valued at $31 million to develop a next generation anthrax vaccine, NuThrax, demonstrating the Government's commitment to continued investment in, and procurement of, anthrax vaccine from Emergent.[157] Additionally, the Government had indicated its intention to stockpile 25 million regimens of anthrax vaccine, *i.e.* 75 million doses of BioThrax, which Emergent relayed to its investors.[158] And it would have been illegal for a Government employee to disclose the expected dosage procurement amount to any of the Defendants.[159]  These investments in Emergent's anthrax vaccine manufacturing capabilities, the Government's statements that it intended to stockpile 25 million regimens, and the fact that BioThrax was and is the only FDA-licensed anthrax vaccine support the more compelling inference that Defendants believed their statements regarding the expected terms of a potential CDC follow-on contract were true.

Defendants' repeated disclosure of the potential risks that any follow-on contract may not be on the same terms as the Original Contract further supports an inference that Defendants believed their statements to be true, and in any event, warned the public that they did not know what the Government would do before the announcement of the Sole-Source Notification.[160]

---

[156]     Ex. 10, 2015 Form 10-K at 17; (s*ee also* Compl. ¶¶ 65, 75.)

[157]     Ex. 10, 2015 Form 10-K at 11.

[158]     *See, e.g.*, Ex. 4, May Form 8-K at 3 ("We are extremely pleased that the CDC has now confirmed its intention to award a follow-on BioThrax procurement contract on October 1, 2016. With our large-scale manufacturing facility coming online, we anticipate this will be a multi-year contract requiring significantly increased deliveries in order to satisfy the U.S. Government's stated requirement for a licensed anthrax vaccine in the Strategic National Stockpile"); (*see also* Compl. ¶¶ 76, 89, 104.)

[159]     *See supra* p. 4-5.

[160]     *See* Section II.

Defendants' cautious actions further support their disclosures.  In a May 5, 2016 press release, Emergent acknowledged that it had received two letters from the CDC, dated April 1 and April 26, 2016.[161]  In the April 1 letter, the CDC informed Emergent of its intent to award a follow-on contract.[162]  In another letter dated April 26, 2016, the CDC stated that it anticipated that the quantity of doses of BioThrax that it would order in the third and fourth quarters of 2016 would "be less than the total remaining doses available to be purchased under the [then] current contract."[163]  Emergent stated that it "believe[d] these letters from the CDC reflect their transition planning associated with procuring BioThrax manufactured from the Company's large-scale manufacturing facility, Building 55, under a new multi-year follow-on contract expected to be in place on October 1, 2016."[164]  In other words, Emergent stated that it believed the CDC would taper its orders in the second half of 2016 so as to take advantage of Building 55's increased manufacturing capability in the time period covered by the follow-on contract.  Yet, rather than rely on that assumption, Emergent stated that "[u]ntil such time as the Company can secure greater clarity on the number of BioThrax doses to be delivered in Q2 and Q3 . . . the Company believes it is prudent to temporarily postpone its financial guidance for 2016."[165]  That cautious action, whereby Defendants notified the public of their uncertainty with regard to the CDC's future plans, further supports the compelling inference that Defendants believed their statements to be true, as it belies logic that the Individual Defendants would take such action while simultaneously attempting to take advantage of the public through insider sales.

---

[161]     (Compl. ¶ 91.)

[162]     (*See id.*)

[163]     (*Id.*)

[164]     (*Id.*)

[165]     (*Id.*)

Plaintiffs also have not identified a single contemporaneous internal document to support their allegations so as to give rise to an inference of scienter.  Courts have found that the failure to identify "a single document, e-mail, meeting, conversation, or statement of any kind that supports the complaint's allegations" tends to negate an inference of scienter.[166]  Similarly, Plaintiffs do not allege, nor could they, that Emergent was forced to restate its financial statements, another factor that tends to negate any inference of scienter.[167]

For all of these reasons, the more compelling inference is that Defendants' actions were not culpable, and the Complaint's scienter allegations should fail as a matter of law.[168]

## V.     PLAINTIFFS FAIL TO ADEQUATELY ALLEGE LOSS CAUSATION.

Even if Plaintiffs had sufficiently alleged an actionable misstatement or omission and even if Plaintiffs had adequately pled scienter under the PSLRA—and they have done neither— Plaintiffs' Complaint fails to state a securities fraud claim for the independent reason that it cannot allege that any of the alleged misrepresentations proximately caused Plaintiffs' economic loss.[169]  To plead loss causation, a plaintiff must plead with "sufficient specificity" that the "material misrepresentations or omissions alleged actually caused the loss for which the plaintiff

---

[166]     *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 2013 WL 3990798, at *42 (E.D. Wash. Aug. 5, 2013).

[167]     *See id.*

[168]     Plaintiff does not separately allege scienter with respect to the Company, and instead, presumably intends to allege corporate scienter via a collective scienter theory based on the Individual Defendants' state of mind; this theory has been rejected by courts in the Fourth Circuit.  *See Cree, Inc.*, 333 F. Supp. 2d at 475 ("Plaintiffs cannot show scienter by alleging that the misstatements at issue were the collective actions of the individual Defendants directly involved in the daily business. . . .[T]his practice is inconsistent with the particularity requirements of the PSLRA, and in the Fourth Circuit such pleading practice is insufficient . . . . The burden rests on plaintiffs to enable a particular defendant to determine with what it is charged").  Because Plaintiffs fail to specifically allege corporate scienter, the Court should dismiss Plaintiffs' Section 20(a) claim outright.  *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003) (A "claim for controlling person liability under section 20(a) must be based upon a primary violation of the securities laws.").

[169]     *Dura*, 544 U.S. at 346.

seeks damages . . . to enable the court to evaluate whether the necessary causal link exists."[170] This requirement—"as with the foreseeability limitation in tort—is intended to fix a legal limit on a person's responsibility, even for wrongful acts."[171]

Here, on June 22, Emergent did not reveal a previously omitted "truth" that served to correct an artificially inflated stock price. Plaintiff relies on the generic allegation that "[w]hen Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Emergent's common stock fell precipitously as the prior artificial inflation came out."[172] But Plaintiff has not—and cannot—allege what specific facts were "revealed" because all that was revealed on June 22 was that the CDC was pursuing a follow-on contract on different terms than Emergent had previously expected, a risk about which the Company repeatedly warned investors.[173]

As the Supreme Court has recognized, the securities laws exist, "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations *actually cause*."[174] Plaintiff has failed to state a claim for the additional reason that it has not—and cannot—allege that Defendants' conduct actually caused its loss.

---

[170]     *Teachers' Ret. Sys. of La.*, 477 F.3d at 186.

[171]     *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011).

[172]     (Compl. ¶ 117.)

[173]     *See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010), *vacated and remanded by Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S. Ct. 2179, 180 (2011) ("[I]t is not enough merely to show that the market declined after a statement reporting negative news …. Unless actionable statements, which were later corrected, are identified, Plaintiffs cannot establish loss causation."); *D.E. & J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 1000–01 (6th Cir. 2005) (holding that allegations of stock price drop following a disclosure of bankruptcy filing failed to plead loss causation because announcement did not disclose any prior misrepresentation to the market).

[174]     *Dura*, 544 U.S. at 345.

## VI.     THE SECTION 20(A) CLAIM FAILS.

Count II of the Complaint asserts a claim against the Individual Defendants as "controlling persons of Emergent within the meaning of Section 20(a) of the Exchange Act."[175] Section 20(a) imposes liability on persons who "control[] any person liable under any provision of this chapter." [176]  A "claim for controlling person liability under section 20(a) must be based upon a primary violation of the securities laws."[177]  Because Plaintiffs have failed to establish a predicate violation of Section 10(b), Plaintiffs' Section 20(a) claims against the Individual Defendants should be dismissed.[178]

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: February 27, 2017
New York, New York

Respectfully submitted,

/s/ *Yosef J. Riemer*
Yosef J. Riemer, P.C.
Matthew Solum
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460

*Counsel for Defendants Emergent Biosolutions Inc.,*
*Fuad El-Hibri, Daniel J. Abdun-Nabi, Robert G.*
*Kramer, and Adam R. Havey.*

---

[175]     (Compl. ¶ 144.)

[176]     15 U.S.C. § 78t(a).

[177]     *Svezzese*, 67 F. App'x at 174.

[178]     *See Cozzarelli*, 549 F.3d at 628 ("Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act are derivative of their Section 10(b) and Rule 10b–5 claims, so the 20(a) and 20A claims were properly dismissed as well.").