# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **CITY OF CAPE CORAL MUNICIPAL** | * | |
| **FIREFIGHTERS' RETIREMENT** | * | |
| **PLAN, *ET AL.*,** | * | |
| | * | |
| *Plaintiffs,* | * | |
| | * | |
| **v.** | * | **Case No. RWT 16-cv-2625** |
| | * | |
| **EMERGENT BIOSOLUTIONS,** | * | |
| **INC., HQ, *ET AL.*,** | * | |
| | * | |
| *Defendants.* | * | |
| | * | |

## <u>MEMORANDUM OPINION</u>

This case involves alleged violations of federal securities laws by Defendant Emergent Biosolutions, Inc., HQ ("Emergent") and a number of Emergent executives, including Defendants Fuad El-Hibri, Daniel J. Abdun-Nabi ("Abdun-Nabi"), Robert G. Kramer, and Adam R. Havey ("Individual Defendants") (collectively, "Defendants"). Emergent is a specialty biopharmaceutical company and sole provider of the only U.S. Food and Drug Administration-licensed anthrax vaccine, BioThrax. Am. Compl. ¶¶ 34–35, ECF No. 23. The primary purchaser of BioThrax has been the United States Government via the Center for Disease Control and Prevention ("CDC"). *Id.* ¶ 35. In July 2010, the U.S. Biomedical Advanced Research and Development Authority awarded a six-year contract to Emergent to expand its BioThrax manufacturing capabilities at a new facility, Building 55. *Id.* ¶ 44.

In 2011, Emergent obtained a five-year BioThrax procurement contract from the CDC for Emergent to supply up to 44.75 million doses of BioThrax for the Strategic National Stockpile ("SNS"). *Id.* ¶ 41. This contract was set to expire on September 30, 2016. *Id.* In August 2015,

Defendants began discussions with the CDC about the renewal of the BioThrax contract. *Id.* ¶ 46.

Plaintiffs allege that beginning on January 11, 2016, Defendants made material misrepresentations and omissions that made investors believe that the Government intended to purchase Emergent's newly increased production capacity. *Id.* ¶¶ 54–57. On May 5, 2016, in a press release filed with the U.S. Securities and Exchange Commission, Emergent confirmed that the Government would award it a renewed BioThrax contract and described the new contract as requiring "significantly increased deliveries in order to satisfy the U.S. government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile" as well as making other related statements. *Id.* ¶¶ 55, 91. On a company conference call with investors on that same day, Abdun-Nabi, President and C.E.O. of Emergent, called the anticipated follow-on contract "one big, beautiful package." *Id.* ¶ 93.

From May 5, 2016 to June 1, 2016, the price of Emergent's Common Stock, which is traded on the New York Stock Exchange ("NYSE"), increased nearly fifteen percent, from $37.85 per share on May 5, 2016 to $43.49 per share on June 1, 2016. *Id.* ¶¶ 6, 15. On June 22, 2016, Emergent disclosed that the Government sought "the continued procurement of 29.4 million doses of BioThrax" over a five-year period, which was less than the expiring contract that called for 44.75 million. *Id.* ¶ 118. The same day, the price of Emergent Common Stock "declined by approximately $8 per share, falling from its close of $39.32 per share on June 21, 2016 to a close of $31.33 per share on June 22, 2016 . . . on unusually high trading volume of more than 9.5 million shares traded, or 21 times the average daily trading volume over the preceding ten trading days." *Id.* ¶ 119.

On July 19, 2016, Plaintiff William Sponn ("Sponn"), individually and on behalf of all others similarly situated, initiated this lawsuit against Defendants, alleging violations of federal securities laws. Compl., ECF No. 1. On October 26, 2016, the Court granted Plaintiffs' Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (ECF No. 16), appointing Plaintiffs City of Cape Coral Municipal Firefighters' Retirement Plan ("Cape Coral Fire") and City of Sunrise Police Officers' Retirement Plan ("Sunrise Police") as Lead Plaintiffs and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Lead Counsel pursuant to the Private Securities Litigation Reform Act (PSLRA) of 1995, 15 U.S.C. § 78u-4 (2012). ECF No. 22. On December 27, 2016, Lead Plaintiffs filed an Amended Complaint, asserting claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against all Defendants and claims under Section 20(a) of the Exchange Act against the Individual Defendants. ECF No. 23. On February 27, 2017, Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint ("Motion to Dismiss"). ECF No. 36. After a hearing, the Court denied the Motion to Dismiss by order on July 7, 2017. ECF No. 46.

Having prevailed on the Motion to Dismiss, Lead Plaintiffs returned with a Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed on November 29, 2017. ECF No. 60. On December 20, 2017, Lead Plaintiffs filed an Amended Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Amended Motion for Class Certification"), seeking to appoint Geoffrey L. Flagstad

("Flagstad") instead of Sponn, in addition to Lead Plaintiffs, as Class Representative.[1] ECF No. 68. Defendants oppose class certification and ask the Court to strike the opinions in the Report on Market Efficiency of Lead Plaintiffs' expert. Defs.' Mot. to Exclude Expert Op., ECF No. 81. Having conducted a hearing on the pending motions, the Court will, for the reasons discussed below, certify the proposed Class based on a shortened Class Period.

### 1. The Proposed Class

In their Amended Motion, Lead Plaintiffs seek certification of a plaintiff class, pursuant to Federal Rule of Civil Procedure 23, consisting of:

> All persons or entities who, between January 11, 2016 and June 21, 2016 (the "Class Period"), purchased or otherwise acquired Emergent BioSolutions Inc. publicly traded common stock listed on the New York Stock Exchange ("NYSE"), Inc. and who were damaged thereby.

ECF No. 69 at 2 (footnotes omitted). They seek to appoint themselves and Flagstad as Class Representatives. ECF No. 69 at 8. Cape Coral Fire and Sunrise Police are benefit pension plans that acquired 7,900 and 7,800 shares, respectively, of Emergent Common Stock during the proposed Class Period, but before May 5, 2016. *Id.* at 9. Flagstad is an individual who acquired 165 shares of Emergent Common Stock during the proposed Class Period, after May 5, 2016. *Id.* Finally, Lead Plaintiffs seek to appoint Robbins Geller, a law firm specializing in complex civil litigation cases and the current Lead Counsel, as Class Counsel. *Id.* at 1.

### 2. Legal Standard Under Rule 23

To maintain a class action, a party moving for class certification bears the burden of demonstrating that the proposed class meets the two-step inquiry outlined in Federal Rule of

---

[1] As discussed later on, Defendants argue that should the proposed Class be certified, it should only be done so for the period of May 5, 2016 through June 21, 2016. Because Lead Plaintiffs and Sponn all purchased their shares of Emergent Common Stock before May 5, 2016, the addition of Flagstad, who purchased his shares after May 5, would ensure that a proposed Class Representative met all of the class certification requirements should the Class be certified based on the shortened period.

Civil Procedure 23. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003).

First, the movant must show that the proposed class meets the four prerequisites set forth in

Rule 23(a):

    (1) <u>Numerosity</u>: "the class is so numerous that joinder of all members is impracticable";
    (2) <u>Commonality</u>: "there are questions of law or fact common to the class";
    (3) <u>Typicality</u>: "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and
    (4) <u>Adequacy</u>: "the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4); *Gunnells*, 348 F.3d at 423. Second, the court must determine if the

proposed class meets one of the three requirements set forth in Rule 23(b). *Gunnells*,

348 F.3d at 423. Here, Lead Plaintiffs seek to proceed under Rule 23(b)(3), which requires that

"the questions of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Gunnells*,

348 F.3d at 423; *see* ECF No. 69 at 18. District courts have wide discretion in deciding whether

to certify a class and should liberally construe Rule 23. *Gunnells*, 348 F.3d at 424.

### 3. The Proposed Class Meets the Rule 23 Standard

#### A. The Class Period

As a preliminary matter, the parties dispute the appropriate timeframe of the Class

Period, assuming the Class is certified. Lead Plaintiffs propose that the Class Period should be

from January 11, 2016, the date Lead Plaintiffs claim the alleged material misstatements about

the follow-on contract began, through June 21, 2016, the day before the alleged "corrective"

disclosure. ECF No. 69 at 2. Defendants argue that the Class Period should only begin on

May 5, 2016, the date they assert the first actionable statement under the PSLRA was made, to

June 21, 2016. Defs.' Opp'n to Lead Pls.' Am. Mot. for Class Certification 16, ECF No. 78.

Although the Court has not made any *final determinations* regarding the materiality and actionability of any of the specifically alleged misstatements, it does recognize, as it did at the July 6, 2017 hearing on Defendants' Motion to Dismiss, that the May 5, 2016 statement by Abdun-Nabi calling the anticipated follow-on contract "one big, beautiful package," at this stage in the litigation "is where this case goes from puffery to fraud." Mots. Hr'g Tr. 97:20–21, ECF No. 79-3. Because the Court is required at the class certification stage to limit the proposed Class based on the alleged misrepresentations found to be actionable, the Court will at this time certify the proposed Class based on the shortened Class Period of May 5, 2016 to June 21, 2016 ("shortened Class Period"). *See Malone v. Microdyne Corp.*, 26 F.3d 471, 480 (4th Cir. 1994) (remanding case to district court to narrow and recertify the plaintiff class consistent with actionable statements).

Certification of the Class for the shortened Class Period necessarily results in the Court finding that Lead Plaintiffs cannot be appointed Class Representatives at this time because they do not meet the adequacy requirement under Rule 23(a)(4). Accordingly, only Flagstad is eligible to be appointed Class Representative. It does not result, however, in any impact on Lead Plaintiffs' ability to continue to serve and fulfill their duties as Lead Plaintiffs. Lead Plaintiffs may remain in the case and retain their obligations under the PSLRA and Rule 23 even when they are not appointed class representatives. *See, e.g.*, *Lumen v. Anderson*, No. 08-0514-CV-W-HFS, 2011 WL 3794144, at *2 (W.D. Mo. Aug. 24, 2011); *In re Oxford Health Plans Sec. Litig.*, 191 F.R.D. 369, 378–79 (S.D.N.Y 2000). Moreover, certification based on the shortened Class Period does not mean that the parties cannot at a later date move this Court to expand the Class Period to include statements made between January 11, 2016 and May 5, 2016, should they later be found to be actionable based on information obtained in discovery. This Court "remains free

to modify [a certification order] in the light of subsequent developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *see* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

## B. The Proposed Class Satisfies Rule 23(a)

The proposed Class, based on the shortened Class Period, meets all four Rule 23(a) prerequisites. The first three prerequisites are easily met in this case and are undisputed by Defendants. For the sake of brevity, the Court will dispense with an in depth analysis and will find that the numerosity, commonality, and typicality prerequisites are satisfied.

The parties' dispute centers on the adequacy prerequisite. This prerequisite has two components: "1) the interests of the plaintiff and other members of the class must coincide; and 2) it must appear that plaintiff and his attorney will vigorously prosecute the action." *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 79 (D. Md. 1991) (citing *Disabled in Action v. Bridwell*, 593 F. Supp. 1241, 1245 (D. Md. 1984)). Defendants argue that Flagstad is inadequate under Rule 23(a)(4) because he lacks sufficient factual knowledge and control over the case and is not a lead plaintiff. *See* ECF No. 78 at 18. These arguments fail as a matter of law.[2]

The Fourth Circuit has made clear that

> [i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.

*Gunnells*, 348 F.3d at 430 (citation omitted); *see also Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 WL 6600509, at *11 (D. Md. Nov. 8, 2016) ("Rule 23 does not require the representative plaintiffs to have extensive knowledge of the intricacies of litigation, rather, the

---

[2] Aside from the disqualifying fact that Lead Plaintiffs purchased their shares of Emergent Common Stock before the start of the shortened Class Period, the Court would find that Lead Plaintiffs meet the adequacy requirement under Rule 23(a)(4) for the same reasons it finds that Flagstad is an adequate representative.

named plaintiffs must have a general knowledge of what the action involves and a desire to prosecute the action vigorously.") (quoting *Benway v. Res. Real Estate Servs., LLC*, 239 F.R.D. 419, 425–26 (D. Md. 2006)). Securities fraud cases are examples of such complex lawsuits. Moreover, control over litigation need not be absolute, and deference to legal counsel on details of the litigation is permissible and does not undermine the plaintiff's adequacy, especially in complex cases. *See, e.g.*, *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2012 WL 1071281, at *38–39 (M.D. Tenn. Mar. 29, 2012) (rejecting claim of inadequacy based on lack of control over litigation where plaintiff received reports on litigation from counsel); *City of Anne Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 253 (D.S.C. 2010) (finding plaintiff adequate despite plaintiff's lack of participation in drafting complaint).

Notwithstanding the above, Defendants urge the Court to adopt a more searching inquiry into Flagstad's knowledge and control of the case, similar to that done by the District Court in *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307 (E.D. Va. 2007). ECF No. 78 at 18–22. In *Shiring*, the court held that a plaintiff must demonstrate that he or she has sufficient knowledge and control of the litigation, and that this requirement "is satisfied only where plaintiff demonstrates that he understands the action in which he is involved and, notably that this 'understanding [is] not . . . limited to derivative knowledge acquired solely from counsel.'" *Id.* at 315–16 (quoting *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 483 n.18 (5th Cir. 2001)). "[I]n the securities fraud context," the court explained, "the adequacy inquiry must be particularly searching[] . . . because the PSLRA was 'intended to empower investors so that they, not their lawyers, control securities litigation . . . .'" *Id.* (citation omitted).

In *Shiring*, the court found that the plaintiff was an inadequate class representative because the record showed that he pursued litigation only after being prompted by counsel, took no significant steps to supervise the action, did not participate in drafting the complaint, and demonstrated a lack of knowledge regarding the allegations, including the positions held by the named defendants and why they were selected as defendants in the first place. *Shiring*, 244 F.R.D. at 315–16. Additionally, the plaintiff stated that he deferred to counsel regarding the decisions in the lawsuit and relied on information and communications with counsel to monitor and manage the litigation. *Id.* Defendants argue that Flagstad displays the same lack of knowledge and level of deference to counsel as the plaintiff in *Shiring*, and therefore this Court should also find him inadequate. The Court disagrees and instead applies the more lenient standard articulated by the Fourth Circuit in its binding decision in *Gunnells*.

Although *Shiring* was decided after *Gunnells* and was a securities fraud case, decisions in this District have not required the heightened level of knowledge and control advocated for by Defendants. In *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 WL 6600509, at *11 (D. Md. Nov. 8, 2016), a mortgage fraud case, the Court found that the plaintiff was an adequate representative, despite indications that she relied heavily on her attorneys in pursuing her claims, because she demonstrated sufficient *general* knowledge of the action and a desire to prosecute the action vigorously. In *Lloyd v. General Motors Corp.*, 266 F.R.D. 98, 104 (D. Md. 2010), a products liability case, this Court applied the more lenient standard, concluding that the plaintiffs need not have "extensive knowledge of the facts of the case in order to serve as adequate representatives" and finding the plaintiffs sufficiently adequate despite defendants' contentions that the litigation was driven by the lawyers, the plaintiffs had only met their counsel for the first

time at their deposition, and the plaintiffs knew little about the case beyond their interest in obtaining a new car.

Examining the record here, it is clear that Flagstad does not have extensive knowledge of Emergent and its business beyond what is included in the Amended Complaint, the positions held by the individual Defendants, or the full procedural history of the case, and he has not demonstrated direct involvement in the drafting of the operative Amended Complaint or other filings. *See* ECF No. 78 at 18–22. He has, however, demonstrated that he has reviewed the Amended Complaint when it was filed and was familiar with its contents, has a general idea of the alleged misconduct and the legal basis for the lawsuit, and receives regular reports and communications from counsel regarding the progress of the case. Lead Pls.' Reply 3–10, ECF No. 87. He has also declared that he is committed to actively participating in and directing the litigation, including attending hearings, depositions, trial, and overseeing the preparation and filing of pleadings as well as to obtaining the largest recovery for the Class. Flagstad Decl., ECF No. 74; *see Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 296 (E.D. Va. 2004) (finding plaintiff to be a sufficiently adequate representative because he indicated he had seen the complaint, was able to describe it, knew his claims were being asserted in the form of a class action, understood his duty to vigorously pursue litigation on the class's behalf, knew about the counterclaim and motion to dismiss, and made decisions with advice of counsel). Moreover, Defendants have not raised any challenges directed at Flagstad's credibility. In *Shiring*, the court found the plaintiff to be inadequate because, among others, he was not credible. 244 F.R.D. at 316–17. Such a finding has not and will not be made in this case.

Flagstad, furthermore, need not be a lead plaintiff to qualify and be appointed as a class representative under Rule 23. Nothing in the PSLRA prohibits the appointment of a class

representative who has not been previously appointed as a lead plaintiff. *See* 15 U.S.C. § 78u-4 (2012). Other jurisdictions have explicitly recognized that Rule 23 affirmatively permits the appointment of class representatives who were not named in the complaint. *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 345–46 (S.D.N.Y. 2015); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, No. 04C1107, 2005 WL 61480, at *7–8 (N.D. Ill. Jan. 10, 2005) (distinguishing between adequate lead plaintiffs appointed pursuant to the PSLRA and adequate class representatives appointed pursuant to Rule 23). Moreover, Defendants cannot show that the appointment of Flagstad as Class Representative as this point would be prejudicial. Discovery is still ongoing, Flagstad has already been deposed, and his addition does not inject a new set of facts requiring extensive investigation in addition to what has already been completed.

Because Flagstad has demonstrated an understanding of his obligation to vigorously pursue litigation on behalf of the Class, is sufficiently informed about the facts of the case, receives regular reports and communications from counsel regarding the action, and shares the same interests as the other Class Members, the Court finds him to be an adequate class representative and thus the adequacy prerequisite of Rule 23(a) has been met, in addition to the other three prerequisites of the Rule.

### C. The Proposed Class Satisfies Rule 23(b)(3)

Under Federal Rule of Civil Procedure 23(b)(3), class certification is proper only if (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The "predominance" inquiry,

the only element contested by Defendants in this case,[3] "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," and is "far more demanding" than the commonality prerequisite under Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997). Courts focus on the issue of liability to determine whether a proposed class meets the predominance prong: "[i]f the liability issue is common to the class, common questions are held to predominate over individual ones." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997); *see also In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 408 (E.D. Va. 2015). Securities fraud cases are thought to be particularly appropriate for treatment under Rule 23(b)(3) because the elements of the claim tend to relate to the conduct of the defendants, not to the individual plaintiffs. *See In re NII Holdings*, 311 F.R.D. at 408. Although the issue of liability may present common questions of law and fact among all proposed class members, class certification can be denied if the calculation of damages requires individual computation. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *Hewlett*, 185 F.R.D. at 220. However, "courts generally find the predominance standard of Rule 23(b)(3) to be satisfied," even when individualized damages determinations are required, if common questions still predominate as to liability. *See Gunnells*, 348 F.3d at 427–28.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)). To prevail on a securities fraud claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must prove by a preponderance of the evidence "(1) a

---

[3] Defendants do not contest that the proposed Class meets the "superiority" inquiry under Rule 23(b)(3). Because securities fraud cases are favorably adjudicated through class actions, the Court finds the superiority element satisfied. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006) ("Securities fraud cases are particularly appropriate candidates for treatment under Rule 23(b)(3) . . . .") (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss [damages]; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*, 134 S. Ct. 2398, 2407 (2014) (internal quotations omitted).

Here, Defendants argue that individual inquiry is required to prove the fourth and fifth elements—reliance and damages—of the proposed Class's claims. *See* ECF No. 69 at 18–26. Specifically, Defendants assert that individual issues will predominate because (1) the proposed Class is not entitled to the presumption of reliance under the fraud-on-the-market theory of liability to show classwide reliance, and (2) Lead Plaintiffs have not shown that damages can be calculated on a classwide basis. The Court disagrees with both contentions.

### 1. The Fraud-on-the-Market Presumption of Reliance Applies

Although proof of reliance is generally individualized, "[r]eliance can . . . be treated as a common issue if it is *presumed* under the theory that the defendants defrauded the market—not the individual plaintiffs—so long as the plaintiffs purchased their stock in an efficient market." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 363 (4th Cir. 2004). This "fraud-on-the-market" theory for litigating securities cases was recognized by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and reaffirmed in *Halliburton II*. To invoke the fraud-on-the-market presumption of reliance in Rule 10b-5 cases, a plaintiff must prove "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2408 (citing *Basic*, 485 U.S. at 248 n.27; *Halliburton I*, 563 U.S. at 810).

The presumption of reliance can be rebutted at the class certification stage, however, if Defendants can show "that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton II*, 134 S. Ct. at 2414–16 ("[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . will be sufficient to rebut the presumption of reliance") (quoting *Basic*, 485 U.S. at 248). To do this, Defendants must show by a preponderance of the evidence that the alleged misstatements caused *no* price impact whatsoever. *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485 (2d Cir. 2018); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-2393-MGL, 2017 WL 4297450, at *8 (D.S.C. Sept. 28, 2017).

Defendants contend that the proposed Class cannot avail itself of the fraud-on-the-market presumption of reliance in this case because Lead Plaintiffs have failed to show that the shares of Emergent Common Stock were traded in an efficient market, and, regardless, there was no price impact. ECF No. 78 at 30–34.

### a. Lead Plaintiffs Sufficiently Show Market Efficiency

An efficient market includes "[l]arge numbers of rational and intelligent investors,' and '[i]mportant current information' that is 'almost freely available to all participants.'" *Strougo v. Barclays PLC*, 312 F.R.D. 307, 315 (S.D.N.Y 2016) (quoting Paolo Cioppa, *The Efficient Capital Market Hypothesis Revisited: Implications of the Economic Model for the United States Regulator*, 5 Global Jurist Advances 1, 5–6 (2005)). Because these requirements are difficult to measure, courts use a variety of factors to determine whether a market is sufficiently efficient to apply the fraud-on-the-market presumption of reliance. *Id.*

To determine whether a security is traded in an efficient market, the Fourth Circuit has held that courts should consider "factors such as, among others, whether the security is actively

traded, the volume of trades, and the extent to which it is followed by market professionals." *Gariety*, 368 F.3d at 368. The court cited to the widely-applied factors set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989), as instructive in this inquiry: (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes. *Gariety*, 368 F.3d at 368. "[N]o one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient." *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 409 (E.D. Va. 2015); *see also Gariety*, 368 F.3d at 368.

Relying on the opinions of their expert, Daniel S. Bettencourt ("Bettencourt"), Vice President of Crowninshield Financial Research, Inc., as set forth in his Report on Market Efficiency (ECF No. 70-1), Lead Plaintiffs assert that Emergent's Common Stock traded in an efficient market because all five *Cammer* factors are met as are the three factors articulated in the other widely-applied case of *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001): "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')." ECF No. 70-1 at 11–43.

Defendants' only challenge Lead Plaintiffs' conclusion that the fifth, empirical *Cammer* factor cuts in favor of market efficiency in this case. ECF No. 78 at 32–33. Bettencourt performed two empirical tests from which he concluded that there was a cause and effect relationship between the announcement of the follow-on contract on June 22, 2016 and the subsequent fall in price of the Emergent Common Stock later that day. ECF No. 70-1 at 26–43. Defendants submit, relying on a report from their own expert, Rene Stulz, Professor at The Ohio

State University, that the empirical tests Bettencourt performed were unreliable and accordingly inadmissible under Federal Rule of Evidence 702 and *Daubert*. ECF No. 78 at 32–33; *see* ECF No. 81. Thus, Defendants contend, market efficiency, cannot be established. ECF No. 78 at 32; Stulz Report 10, ECF No. 79-2. The Court disagrees.

Notwithstanding Defendants' contentions to the contrary, Lead Plaintiffs have sufficiently shown that Bettencourt's empirical tests are reliable, and are thus admissible. Bettencourt performed an event study on June 22, 2016 to test the impact of the corrective disclosure of the follow-on contract as well as two collective tests on the six earnings and guidance dates issued by Emergent to determine whether the dispersion of the residual price movements of Emergent's stock on those dates was significantly greater than the dispersion of residual price movements on all other dates during the purported Class Period. ECF No. 70-2 at 26, 35. An event study is the typical tool used by experts to directly show market efficiency. *Strougo*, 312 F.R.D. at 320–21 (citing Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 Am. L. & Econ. Rev. 141, 142 (2002)). Additionally, experts routinely use, and courts accept, collective tests on the earnings and guidance dates like the one utilized by Bettencourt. *See In re NII Holdings*, 311 F.R.D. at 412 (finding expert's collective test of company's earnings announcements objective and reliable).

Defendants do not take issue with Bettencourt's use of an event study to test for market efficiency; they only take issue with *how* Bettencourt performed the study, specifically accusing Bettencourt of selection bias in using June 22, 2016 as the date to study and for not performing additional analysis regarding the potential impact of other news and information disseminated during the purported Class Period. *See* ECF No. 79-2 at 32–35. Defendants do not, however, submit their own rebuttal event study, and so they neither provide a contrary conclusion on

market efficiency nor an example of the "proper" methodology that should have been deployed in this case. Without more, Defendants' critiques go only to the credibility and weight of Bettencourt's opinions, not their admissibility. *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011) (finding that expert's survey of allegedly wrong universe impacted the "weight accorded to the survey, not to its admissibility").

Defendants further argue that Bettencourt failed to show that the collective tests are accepted in the field to demonstrate that a security traded in an efficient market. *Id.* Putting aside the fact that other courts have accepted these types of tests on the earnings and guidance dates, *see, e.g.*, *In re NII Holdings*, 311 F.R.D. at 412, this critique, as Lead Plaintiffs point out, is only valid if Bettencourt was testing "fundamental efficiency." Bettencourt Rebuttal Report 22–23, ECF No. 90-1. Because he is testing "informational efficiency," however, which is the efficiency standard of greatest concern to courts, the critique fails to undermine the reliability of Bettencourt's analysis. *Id.* at 23 (citing *Halliburton II*, 134 S. Ct. at 2407, 2410 (the presumption of reliance is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices'"); *In Re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 272 (D. Mass. 2006) (holding that market efficiency "requires only that a market be information efficient, not fundamental value efficient," although fundamental value efficiency may still be relevant).

At bottom, Bettencourt's empirical tests meet the reliability and relevancy standards under *Daubert* and Rule 702. Bettencourt comes forth with sufficient evidence to show that both the event study and collective tests performed are accepted methods to test market efficiency and were reliably applied to the facts and theories of this case. Any dispute as to the specific

application of these tests in this case goes not to admissibility, but only to the expert's credibility and the weight to be given to his opinions.

The remainder of Defendants' argument against the admissibility of Bettencourt's opinions is that Bettencourt is unqualified to be an expert witness. Defs.' Mem. in Support of Mot. to Exclude Expert Op. 4–9, ECF No. 82. Defendants' attempt to discredit Bettencourt's testimony by attacking his experience, however, is unconvincing. Bettencourt's education and experience are sufficient to qualify him as an expert under Rule 702. *See* ECF 70-1 at 2–3 (listing Bettencourt's qualifications). Bettencourt has more than eight years of experience in applying economic, financial, and econometric analyses arising in securities and complex business litigation, and has worked on the expert opinions in a number of cases. ECF No. 70-1 at 2–3 (listing cases for which Bettencourt assisted in admitted expert testimony). The fact that his Report in this case is his first opinion as the lead expert is not fatal to the sufficiency of his credentials, nor does the fact that Defendants present a rebuttal expert who arguably has more impressive credentials. *See Thomas J. Kline, Inc. v. Lorrilard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("[T]he test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered."). The difference in qualifications and experience between the experts only impacts the weight and credibility of Bettencourt's opinions, not their admissibility.

Even if the Court were to find Bettencourt's opinion regarding the fifth, empirical *Cammer* factor inadmissible, the Court would still find that Emergent's stock was traded in an efficient market. First, Emergent's stock traded on the NYSE, which creates a presumption of market efficiency. *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455

(2013) (a listing "on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency"); *Lumen v. Anderson*, 280 F.R.D. 451, 459–60 (W.D. Mo. 2012) (cases "too numerous to cite" "establish the NYSE . . . [is] at least entitled to a *presumption* of efficiency" that Defendants have the burden of rebutting).

Defendants fail to rebut this presumption, even if the Court disregards Bettencourt's empirical tests. As Bettencourt's Report shows, and which Defendants do not challenge, the other four *Cammer* factors are met, which is enough for the Court to conclude that the Emergent stock traded in an efficient market. *See* ECF No. 70-1 at 15–24; ECF No. 82 at 18–22. Courts have routinely found a market efficient based on a showing that the first four *Cammer* factors only are met. *See, e.g.*, *Strougo*, 312 F.R.D. at 321–22 (finding market efficiency based on the first four *Cammer* factors only because event studies test "for a degree that may not be required under *Halliburton*"); *In re Comp. Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 120 (E.D. Va. 2012) ("Fourth Circuit precedent does not require that the efficiency of the market be proved using an event study to show a cause and effect relationship between company announcements and changes in the company's stock price.").

Because the first four *Cammer* factors are met in this case, in addition to the *Krogman* factors, *see* ECF No. 70-1 at 15–21, which combined cover the three factors articulated in *Gariety v. Grant Thornton, LLP*, the Court concludes that Emergent's stock was traded in an efficient market.

### b. Lead Plaintiffs Show Price Impact

Even if Emergent's stock traded in an efficient market, Defendants argue, Lead Plaintiffs nevertheless fail to show price impact, thereby rebutting the presumption of reliance, because they have not shown a significant impact on the stock price after any of the alleged

misstatements. ECF No. 78 at 34. This argument, however, ignores the fact that Lead Plaintiffs' contention is premised on their allegation that because Defendants failed to disclose the truth about the follow-on contract during the proposed Class Period, Emergent's stock "traded at artificially inflated prices," and thus the decline of approximately $8 per share in Emergent's Common Stock price from June 21, 2016 to June 22, 2016 is an appropriate measure of price impact. *See* ECF No. 87 at 16.

The Supreme Court in *Halliburton II* made clear that a corrective disclosure is an appropriate landmark from which to determine price impact. 134 S. Ct. at 2414. The court in *In re Computer Science Corp. Securities Litigation*, 288 F.R.D. 112, 120–21 (E.D. Va. 2012), rejected a similar attempt by defendants to ignore plaintiffs' allegations of market inflation and conflate the consistency of the inflation with a lack of price impact.

> [T]he argument that there would be a positive impact on stock price from each of the allegedly false statements misstates [plaintiffs'] argument by suggesting that [the plaintiffs] [are] implying that the price of the stock rose as a result of the announcements, rather than simply remaining inflated because of these announcements. Additionally, this theory is not in keeping with the key principle underlying the efficient market theory, namely that in an efficient market **material, unexpected** information will be timely reflected in the stock price.

*In re Comp. Sci. Corp. Sec. Litig.*, 288 F.R.D. at 120 (emphasis in original). By logic, if a company persists in withholding material information for a given time, thus artificially inflating the stock price, it would be reasonable to conclude that a significant change in price would only occur when the truth was revealed and not necessarily when additional misrepresentations are made. *See id*; *see also Strougo*, 312 F.R.D. at 325 ("[A] misstatement can impact a stock's value . . . by improperly maintaining the existing stock price."). Moreover, Defendants' expert in fact does acknowledge that there was at least *some* price impact, stating that the news

disclosed on June 22, 2016 "had an adverse impact on the stock price."[4]  Stulz Dep. Tr. 81:17–19, ECF No. 88-10.

Based on the foregoing, therefore, the Court concludes that Defendants have failed to rebut the presumption of reliance by showing that there was no price impact caused by the alleged misstatements. *Ark. Teachers Ret. Sys.*, 879 F.3d at 485.  Accordingly, the fraud-on-the-market presumption of reliance applies in this case.

### 2. Lead Plaintiffs Sufficiently Show that Damages Can Be Calculated on a Classwide Basis

Lead Plaintiffs assert, supported by Bettencourt's Report, that damages can be calculated on a classwide basis by using the standard measure of damages in Section 10(b) securities cases: the out-of-pocket per share or event study damages.  ECF No. 70-1 at 44.  Out-of-pocket damages "can be measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale taking into account formulaic prescriptions in relevant case law and statutes." *Id.*  In his Report, Bettencourt explains how the per share damages for each investor can be measured. *See id.* at 45–47.

Defendants argue that Lead Plaintiffs fail to meet their burden based on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and two related Southern District of Texas cases applying *Comcast*.  ECF No. 78 at 27.  In *Comcast*, the Supreme Court held that in order for a proposed damages calculation method to meet the Rule 23(b)(3) standard—that it be capable of classwide measurement—the model must attribute the damages to the theory of liability relied upon in the

---

[4]  At oral argument, Defendants also argued that Lead Plaintiffs fail to show price impact because the price of Emergent's Common Stock, although initially declining after the June 22, 2016 corrective disclosure, ultimately made a "full rebound . . . following the announcement of the NuThrax and BioThrax contracts (on September 30 and December 8, 2016, respectively)."  ECF No. 95.  Defendants do not, however, provide any authority in support of the proposition that this Court should look so far beyond the identified corrective disclosure to determine whether Lead Plaintiffs meet their burden to show price impact.  The Court concludes that it need not do so at this stage and finds that a demonstration of price impact after the corrective disclosure, as the Supreme Court explained in *Halliburton II*, is sufficient.

case. *Comcast*, 569 U.S. at 35. In *In re BP p.l.c. Securities Litigation (BP I)*, No. 10-MD-2185, 2013 WL 6388408, at \*16–17 (S.D. Tex. Dec. 6, 2013), the court rejected the plaintiffs' first proposed damages model for failing (1) to provide sufficient explanation of how an event study would be used to calculate damages in that case, and (2) to sufficiently track the plaintiffs' theories of liability. In *In re BP p.l.c Securities Litigation (BP II)*, No. 10-MD-2185, 2014 WL 2112823, at \*10–12 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), the court considered plaintiffs' revised damages model. The court rejected the proposed model for the pre-explosion subclass because the calculation of the plaintiffs' damages for their post-explosion investment would require individual inquiries based on the plaintiffs' theory of liability that the defendants' process safety misstatements were a proximate cause of all their post-explosion investment losses. *Id.* This theory would require individual assessment because it was premised on each investor's individual determination of the risk they were willing to bear. *Id.* The court stated explicitly that the plaintiffs' model, which was different from an out-of-pocket damages measurement, was "antithetical to the 'fraud-on-the-market' theory which enables the classwide resolution of their claims." *Id.* at \*12. Because the plaintiffs' model implied that investors were not relying on the integrity of the market price but instead on their own risk thresholds, their proposed model could not be "deployed without an individualized inquiry into each investor's subjective motivations." *Id.*

Defendants first argue that Lead Plaintiffs, similar to the plaintiffs in *BP I*, "provide no 'specifics of their proposed methodology,' as required by law," and on those grounds fail to meet Rule 23(b)(3). ECF No. 78 at 27 (quoting *BP I*, 2013 WL 6388408, at \*17). This argument lacks merit. Bettencourt's Report goes into detail on how the out-of-pocket damages would be calculated, certainly more than a mere statement that an event study would be used. Bettencourt

discloses that the exact calculations cannot be done until the close of discovery, but exact calculations are not necessary at this stage. *Comcast*, 569 U.S. at 35.

Defendants next argue that this case, "rather than being a typical stock-drop case (e.g., involving issues of accounting fraud), is akin to *BP II* . . . ." because Lead Plaintiffs are asserting liability based on materialization of an understated risk, similar to the plaintiffs in *BP II*. ECF No. 78 at 28 (citing *BP II*, 2014 WL 2112823, at *10–12). Accordingly, they argue, Lead Plaintiffs' proposed method for calculating damages—out-of-pocket per share damages—should similarly fail because the proposed method fails to account for the risk that existed at every point in time during the proposed Class Period due to the well-established uncertain nature of Government contracts. *Id.* at 29. Defendants argue, moreover, that the proposed method here fails to provide any reliable methodology "for how the market would have priced a more 'adequate' risk disclosure, given individual issues of risk threshold." *Id.* at 30.

Defendants' second argument also lacks merit. Defendants attempt to broaden *Comcast* beyond its plain meaning. *Comcast* was an antitrust case, and so it in no way announced a rule that plaintiffs in a securities fraud case must put forth any particular damages calculation methodology. *Comcast*, therefore is of no use in critiquing Lead Plaintiffs' proposal that classwide calculation of out-of-pocket damages is possible and appropriate in this specific case.

Defendants do not cite to a single Rule 10(b)-5 securities fraud case, and the Court could not find one, in which the court did not certify the proposed class based on the class's proposal of a sufficiently explained out-of-pocket damages model when the plaintiffs relied on a fraud-on-the-market theory of liability, which Lead Plaintiffs do here. *See* ECF No. 69 at 20–25; ECF No. 87 at 13–19. On the contrary, out-of-pocket damages calculations through an event study analysis as outlined in Bettencourt's Report have been recognized by courts as an accepted

method for the evaluation of damages in securities fraud cases based on allegations similar to those made in this case. *See, e.g.*, *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226 YGR, 2016 WL 1042502, at \*8–9 (N.D. Cal. Mar. 16, 2016).

The Court agrees with Lead Plaintiffs that Defendants mischaracterize their theory of liability as "materialization of the risk." *See* ECF No. 87 at 17–18. Lead Plaintiffs make clear that they are alleging that because of Defendants' misrepresentations Emergent's stock was artificially inflated, and, as a result, investors suffered losses when the truth was revealed by the June 22, 2016 corrective disclosure. ECF No. 87 at 18. The amount of inflation resulting from the misrepresentations, therefore, would be same for each investor; regardless of their individual threshold for risk.

A number of courts have rejected similar attempts by defendants to reframe plaintiffs' theory of liability in order to prevent class certification in Rule 10(b)-5 securities fraud cases relying on the fraud-on-the-market theory of liability. *See, e.g.*, *Baker v. SeaWorld Entm't, Inc.*, No. 14cv2129-MMA (AGS), 2017 WL 5885542, at \*14 (S.D. Cal. Nov. 29, 2017) (rejecting claim that plaintiffs' asserted a materialization of the risk theory and finding that out-of-pocket damages methodology sufficiently linked to theory of liability).

For example, in *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226 YGR, 2016 WL 1042502, at \*9 (N.D. Cal. Mar. 16, 2016),[5] the court rejected the defendants' argument that the plaintiffs' proposed methodology of out-of-pocket damages calculation in their securities fraud case "is too crude to account for the complex theories of liability at issue." The defendants

---

[5] The Court notes that a number of the cited cases in this section are from the Ninth Circuit. In 2013, the Ninth Circuit addressed *Comcast* and narrowly construed its holding "to demand only that plaintiffs 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Hayes v. MagnaChip v. Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at \*9 (N.D. Cal. Dec. 22, 2016) (quoting *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013)). The Fourth Circuit has not yet had the opportunity to consider the scope of *Comcast*, but this Court submits that *Comcast*, as least as it applies to this case, is limited in its applicability and the cases applying it in other jurisdictions are persuasive as discussed.

had argued that by merely evoking an event study methodology, plaintiffs failed to show that the methodology proposed could track the plaintiffs' theories of liability as required by *Comcast*. *Hatamian*, 2016 WL 1042502, at *9. The court, however, distinguished the securities fraud case before it from that in *BP I* and *BP II* because, unlike the plaintiffs in those cases, the plaintiffs in *Hamatian* based their theory of liability on a fraud-on-the-market theory, for which an event study methodology was the proper type of classwide calculation.[6] *Id.*

In *Howard v. Liquidity Services*, 322 F.R.D. 103, 139 (D.D.C. 2017), the court rejected the defendants' argument that the plaintiffs' expert testimony proposing an out-of-pocket damages model was insufficient under *Comcast* because the expert only said he "might" use an event study sometime in the future to calculate damages and did not explain why the particular method was consistent with plaintiffs' theory of liability. The defendants there also relied on *BP I* and *BP II*. *Howard*, 322 F.R.D. at 139. The court, however, concluded that the *BP* cases were distinguishable because "the proffered event study [in those cases] did not allow a determination as to whether a particular class member suffered an injury in fact." *Id.* at 139–40. In *Howard*, however, the court found that because the plaintiffs premised their theory of liability on fraud-on-the-market, the proposed out-of-pocket damages methodology sufficiently tracked the theory of liability in that case. *Id.* at 140.

The Court similarly finds that Lead Plaintiffs' proposal of an event study to measure out-of-pocket per share damages meets their burden to show that damages can be calculated on a classwide basis. Because Lead Plaintiffs additionally have shown that the fraud-on-the-market presumption of reliance applies, the Court finds that the predominance prong of Rule 23(b)(3) is

---

[6] To be clear, the plaintiffs' original claim in *BP I* was premised on the fraud-on-the-market presumption, but the court held that the plaintiffs could not invoke the presumption because they failed to show that the alleged misstatements met the publicity requirement. *In re BP p.l.c. Securities Litigation*, No. 10-MD-2185, 2013 WL 6388408, at *15 (S.D. Tex. Dec. 6, 2013).

met. Accordingly, based on the foregoing, the Court finds that the proposed Class meets the predominance and superiority requirements under Rule 23(b)(3).

### 4. Class Counsel

The parties do not dispute that Robins Geller meets all of the requirements under Federal Rule of Civil Procedure 23(g)(1)(A) to serve as Class Counsel. Robbins Geller has been appointed class counsel in hundreds of securities class actions and has competently met its obligations under Rule 23 in those cases. The Court has no doubt that Robbins Geller will meet its obligation here to vigorously pursue this litigation. Accordingly, the Court will appoint Robbins Geller as Class Counsel.

### 5. Conclusion

Based on the foregoing, the Court will grant Lead Plaintiff's Amended Motion for Class Certification [ECF No. 68] and will certify the proposed Class based on the shortened Class Period, appoint Flagstad as Class Representative, and appoint Robbins Geller as Class Counsel. A separate order will follow.


Date: June 8, 2018               _____/s/_____
                                   ROGER W. TITUS
                                   UNITED STATES DISTRICT JUDGE