UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| WILLIAM SPONN, Individually and on Behalf of All Others Similarly Situated, | ) | No. 8:16-cv-02625-RWT |
| | ) | |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| EMERGENT BIOSOLUTIONS INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF JONAH H. GOLDSTEIN IN SUPPORT OF PLAINTIFFS' MOTION
FOR (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF
PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES AND EXPENSES
AND AWARD TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................................1

II.     SUMMARY OF THE LITIGATION ....................................................................4

     A.      Background and Defendants' Wrongful Conduct....................................................5

     B.      Defendants Misled the Market About the Renewal of the BioThrax
         Contract on May 5, 2016 .........................................................................................6

     C.      The Truth Is Revealed...............................................................................................7

     D.      Initial Complaint and Appointment of Lead Plaintiffs ............................................8

     E.      The Amended Complaint and Defendants' Motion to Dismiss............................8

     F.      Fact Discovery ..........................................................................................................9

     G.      Expert Discovery .....................................................................................................12

     H.      Lead Plaintiffs' Motion to Certify the Class...........................................................14

III.    SETTLEMENT......................................................................................................15

     A.      Settlement Negotiations ..........................................................................................15

     B.      Analysis of Factors Affecting Settlement ...............................................................15

     C.      Mailing and Publication of Notice of Settlement .................................................20

IV.     THE PLAN OF ALLOCATION ..........................................................................21

V.      ATTORNEYS' FEES AND EXPENSES................................................................24

VI.     PLAINTIFFS SHOULD BE REIMBURSED FOR THEIR REASONABLE
      TIME AND EXPENSES ........................................................................................28

VII.    CONCLUSION......................................................................................................29

I, Jonah H. Goldstein, declare as follows pursuant to 28 U.S.C. §1746:

## I.    PRELIMINARY STATEMENT

1.      I am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins

Geller" or "Lead Counsel"), Court-appointed Lead Counsel for Lead Plaintiffs City of Cape Coral

Municipal Firefighters' Retirement Plan ("City of Cape Coral") and City of Sunrise Police Officers'

Retirement Plan ("City of Sunrise"), and Certified Class Representative Geoffrey L. Flagstad

(collectively, "Plaintiffs"), and the certified Settlement Class in this securities class action (the

"Litigation").[1]  I am familiar with the proceedings in this Litigation and have personal knowledge of

the matters set forth herein based upon my firm's close supervision and active participation in the

Litigation.  If called as a witness, I could and would testify competently thereto.

2.      This declaration sets forth the background of the Litigation, the nature of the claims

asserted, its procedural history, the legal services provided by Robbins Geller, and the negotiations

that led to the proposed Settlement with Emergent BioSolutions Inc. ("Emergent" or the

"Company"), Fuad El-Hibri, Daniel J. Abdun-Nabi, Robert G. Kramer, and Adam R. Havey

(collectively, "Defendants").  This declaration demonstrates why the Settlement and Plan of

Allocation are fair, reasonable, and adequate and should be approved by the Court, and why the

application for an award of attorneys' fees and expenses, including awards to Lead Plaintiffs and

Class Representative Mr. Flagstad, are reasonable and should likewise be approved by the Court.

3.      The Settlement will resolve all claims asserted in the Litigation against Defendants on

behalf of a Settlement Class consisting of all Persons who purchased or otherwise acquired

Emergent publicly-traded common stock listed on the New York Stock Exchange between January

11, 2016 and June 21, 2016, inclusive (the "Settlement Class Period"), or their successors-in-interest

---

[1]   All capitalized terms not otherwise defined herein have the same meaning as those set forth in
the Stipulation of Settlement, dated October 16, 2018 (the "Stipulation").  ECF No. 101.

(the "Settlement Class").  ECF No. 101 at 11-12.[2]  The Court preliminarily approved the Settlement by Order entered October 25, 2018 (the "Preliminary Approval Order").  ECF No. 106.  To date, no purported objections to, or commentary on, the Settlement have been received by Settlement Class Members.  Nor have any requests for exclusion been received.[3]

4.    After more than two years of vigorously contested litigation, Plaintiffs and Lead Counsel have succeeded in obtaining a $6.5 million all-cash recovery, which has been deposited in an interest-bearing escrow account for the benefit of the Settlement Class.  The Settlement provides a highly favorable result for the Settlement Class, which faced the genuine possibility of a much smaller recovery or no recovery at all had the case continued to summary judgment or trial.  As set forth in the Stipulation, in exchange for the Settlement Amount, the proposed Settlement resolves all claims asserted, or that could have been asserted, by Plaintiffs and the Settlement Class against the Released Persons.

5.    Settlement with Defendants was reached only after Lead Counsel: (a) conducted an extensive investigation into the underlying facts; (b) thoroughly researched the law relevant to the Plaintiffs' and Settlement Class Members' claims and the Defendants' defenses; (c) prepared and filed a detailed Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") specifying Defendants' alleged violations of the federal securities laws (ECF No. 23); (d) researched, briefed, and argued a successful opposition to Defendants' motion to dismiss the

---

[2]    Excluded from the Settlement Class are: Emergent; the Individual Defendants; members of the Immediate Family of each of the Individual Defendants; the Officers and directors of Emergent during the Settlement Class Period; the heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.  Also excluded from the Settlement Class are those Persons who would otherwise be Settlement Class Members who timely and validly exclude themselves therefrom pursuant to ¶15 of the Preliminary Approval Order.  *Id.*

[3]    The deadline to object to the Settlement and/or request to be excluded is December 26, 2018.

Amended Complaint; (e) obtained class certification over Defendants' strenuous opposition, including Defendants' separate *Daubert* challenge to the qualifications, methodologies, and opinions of Plaintiffs' market efficiency, causation and damages expert, after a hearing before this Court; (f) successfully defeated Defendants' Rule 23(f) petition in the United States Court of Appeals for the Fourth Circuit; (g) vigorously pursued fact discovery of Defendants and third parties, resulting in the production of over 93,000 pages of documents, and the taking of three fact depositions; and (h) preparing to take the remaining fact depositions.  The parties ultimately attended a full-day in-person mediation with Jed Melnick, Esq. of JAMS, that resulted in the Settlement between Plaintiffs and Defendants.  Prior to the mediation, the parties exchanged memoranda setting forth their respective positions and addressing their opponents' positions.

6.      Thus, at the time the Settlement was reached, Plaintiffs and Lead Counsel had a well-founded understanding of the strengths and weaknesses of the claims and defenses, honed through their review and analysis of thousands of pages of documents, several depositions, and consultation with their economic expert and other consultants.

7.      Based on Plaintiffs' expert's analyses, under a best-case scenario in which a jury credited all of Plaintiffs' loss causation evidence and the certified class period[4] was upheld in its entirety, the maximum damages in the Litigation were approximately $25 million.  The Settlement accordingly translates to a recovery of approximately 25% of maximum provable damages, assuming that liability was fully established.

8.      The percentage of recovery here (25%) far exceeds the median settlement as a percentage of "simplified tiered damages" for the 27 settlements of securities class actions within the Fourth Circuit from 2008 through 2017 (1.8%).  *See* Laarni T. Bulan, Ellen M. Ryan & Laura E.

---

[4]      On June 8, 2018, the Court certified a class period of May 5, 2016, through June 21, 2016, inclusive.  *See* ECF No. 96.

Simmons, *Securities Class Action Settlements: 2017 Review and Analysis* at 20, App'x 3 (Cornerstone Research 2018) (attached hereto as Ex. 1).

9.       The Settlement has the full support of the Lead Plaintiffs and Mr. Flagstad, as set forth in the accompanying Declarations of: (i) Damon Alimonti on behalf of City of Cape Coral ("Alimonti Decl."); (ii) David M. Williams on behalf of City of Sunrise ("Williams Decl."); and (iii) Class Representative Geoffrey L. Flagstad ("Flagstad Decl.").

10.       Given the excellent result obtained and the significant litigation risks undertaken and overcome, we respectfully submit that the Settlement and Plan of Allocation are fair and reasonable in all respects, and that the Court should approve them pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.  For similar reasons, and for the additional reasons set forth herein, we respectfully submit that Lead Counsel's request for attorneys' fees and payment of litigation expenses (including Plaintiffs' expenses) is also fair and reasonable, and should be approved.

## II.      SUMMARY OF THE LITIGATION

11.       This federal securities class action against Emergent and certain of its officers was brought by Lead Plaintiffs under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5, on behalf of themselves and all purchasers (with certain exceptions) of Emergent common stock between January 11, 2016 and June 21, 2016, inclusive.

12.       Lead Plaintiffs allege that during the Settlement Class Period, Defendants made false and misleading statements and omissions relating to the renewal of a five-year contract, ending on September 30, 2016, for the procurement of up to 44.75 million doses of Emergent's anthrax vaccine, BioThrax, to the CDC (the "BioThrax Contract").  The relevant allegations in this Litigation are summarized below and more fully set forth in the Amended Complaint.  ECF No. 23.

1502898_1

## A.    Background and Defendants' Wrongful Conduct

13.    Defendant Emergent is a specialty biopharmaceutical company, headquartered in Gaithersburg, Maryland, focusing on countermeasures addressing public health threats, as well as emerging infectious diseases.  The primary purchaser of Emergent's products is the United States Government (hereinafter, "the Government").  ¶34.[5]

14.    Emergent derives a significant portion of its revenues from the manufacture and sale of BioThrax to the Government.  In 2015, 56% of the Company's total revenues and 82% of Emergent's $356.9 million in total product sales revenues were derived from the Company's exclusive BioThrax Contract with the Government.  Consequently, analysts and investors focused closely on the Company's ability to continue to secure long term procurement contracts with the Government calling for the delivery of significant annual doses of BioThrax into the strategic national stockpile or "SNS."  ¶40.

15.    Emergent and the Government entered into the BioThrax Contract, with a maximum value of $1.25 billion, which was set to expire on September 30, 2016. ¶41.  The Company stressed to investors that they anticipated its new manufacturing facility ("Building 55") would be licensed by late 2016 and that this expected capacity to produce 20-25 million doses per year in connection with its anticipated renewal of the BioThrax Contract would result in higher future revenues and profits as the Company delivered significantly higher annual doses to the SNS.  ¶¶42, 45, 47, 81, 83, 86-87, 89, 91, 93-94, 96, 98, 100, 102, 104.

16.    Pointing to, *inter alia*, the Government's goal of stockpiling 75 million anthrax doses, the current shortfall in the SNS, and the Government's investment of more than $100 million in Building 55, Defendants led investors and analysts to believe that renewal of the BioThrax Contract

---

[5]    References to "¶" or "¶¶" are to paragraphs of the Amended Complaint.

- 5 -

was on track, virtually inevitable, and would at least double the number of doses Emergent would manufacture annually, resulting in significantly increased revenues and profits. *Id.*

17.     Defendants signaled their knowledge of the critical terms of the renewal contract, including the amount of BioThrax the renewed contract would require. Starting even before the Settlement Class Period, more than a year before the BioThrax Contract was scheduled to terminate, Defendants told the market they were meeting with the Government to negotiate the terms for the renewal (¶¶46, 49), engaging in numerous additional communications on the subject (¶83), and retaining an army of lobbyists in furtherance of the renewal. ¶¶62-68. Moreover, Defendants led the market to believe they had private, inside visibility into the Government's requirements. ¶¶48, 96.

**B.     Defendants Misled the Market About the Renewal of the BioThrax Contract on May 5, 2016**

18.     Defendants' representations culminated in Emergent's announcements on May 5, 2016. On that date, Emergent announced that the CDC had, on April 26, 2016, informed the Company that, through the April 26 letter, the Government communicated that it would purchase a quantity "less than the total remaining doses available to be purchased" under that contract. ¶91. As a result, the Company stated that it was suspending its financial guidance for 2016 "[u]ntil such time as the Company can secure greater clarity on the number of BioThrax doses to be delivered in Q2 and Q3." *Id.*

19.     Despite recognizing the lack of clarity in the near term, Defendants painted a picture that was the polar opposite in the long term. In the same press release, Emergent announced that the Government had confirmed its intention to renew the BioThrax Contract. Defendant Mr. Abdun-Nabi (the Company's President and CEO) commented on the terms as follows:

> We are extremely pleased that the CDC has now confirmed its intention to award a follow-on BioThrax procurement contract on October 1, 2016. With our large-scale manufacturing facility coming online, ***we anticipate this will be a multi-year contract requiring significantly increased deliveries*** in order to satisfy the U.S.

government's stated requirements for a licensed anthrax vaccine in the Strategic National Stockpile. *Id.*

20.     Later that same day, elaborating on the intended award, Defendant Abdun-Nabi stated that, although he would not discuss the specific terms of the renewal contract, he could comment that those terms "***all tie in together***," and that, "***[a]s you can appreciate, it is one big, beautiful package*** . . . ." ¶93.

21.     As the Company's stock price headed toward a record high, the Individual Defendants sold over 360,000 shares of Emergent stock, reaping gross proceeds of more than $14.5 million during the Settlement Class Period.  ¶¶9, 69, 71, 113.  Indeed, from May 12, 2016 through May 27, 2016, as Emergent's common stock price rose, Defendant El-Hibri sold approximately 160,000 shares for proceeds of $6.7 million.  ¶¶113-115.  Similarly, after describing the renewed BioThrax Contract as "one big, beautiful package" on Emergent's May 5, 2016 conference call, Defendant Abdun-Nabi sold 17,400 of his personally held shares for both gross and net proceeds of nearly $750,000. *Id.*

**C.     The Truth Is Revealed**

22.     On June 22, 2016, Emergent disclosed that the Government sought only "the continued procurement of 29.4 million doses of BioThrax" over a five-year period, far from the five-year, 20-25 million dose-per-year BioThrax procurement contract that Defendants had led the market to expect.  ¶58.

23.     Not only was this drastically lower than what Defendants had told investors would likely be called for under the renewed BioThrax Contract, it was also substantially less than the 44.75 million doses under the expiring BioThrax Contract. *Id.*  Under the new contract, the Government was to purchase over 33% fewer BioThrax doses than under the expiring contract. *Id.* Stock analysts covering the Company discussed the clear link between the disclosure of the renewed

- 7 -

BioThrax Contract at fewer than expected doses and the resulting steep decline in Emergent's stock price.  ¶¶120-122.

24.      In response to this unexpected news, the price of Emergent's common stock plummeted, falling approximately $8 per share – roughly 20% – from a close of $39.32 per share on the evening of June 21, 2016, to a close of $31.33 per share on June 22, 2016, on extremely heavy trading volume of more than 9.5 million shares, or 21 times the average daily trading volume over the preceding ten trading days.  ¶¶8, 60.

### D.      Initial Complaint and Appointment of Lead Plaintiffs

25.      On July 19, 2016, Plaintiff William Sponn, individually and on behalf of all others similarly situated, initiated this lawsuit against Defendants, alleging violations of federal securities laws.  ECF No. 1.

26.      On October 26, 2016, the Court appointed City of Cape Coral and City of Sunrise as Lead Plaintiffs and approved their selection of Robbins Geller as lead counsel to represent the putative class.  ECF No. 22.

### E.      The Amended Complaint and Defendants' Motion to Dismiss

27.      On December 27, 2016, Lead Plaintiffs filed an Amended Complaint, asserting claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants, and claims under Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of a class of all purchasers of Emergent common stock from January 11, 2016 through June 21, 2016, inclusive, and who were damaged thereby.  ECF No. 23.

28.      The Amended Complaint was the result of a rigorous and extensive investigation over several months.  In connection with its investigation, Lead Counsel analyzed the evidence adduced from, *inter alia*: (i) reviewing and analyzing publicly available information concerning Defendants, including documents filed publicly by Emergent with the SEC, press releases, news articles, and

other public statements issued by or concerning Defendants; (ii) research reports issued by financial analysts concerning Emergent; and (iii) consulting with experts in the areas of loss causation and damages, and market efficiency.

29.     Defendants filed their motion to dismiss the Amended Complaint on February 27, 2017.  ECF No. 36.  Defendants argued, *inter alia*, that: (i) Defendants' statements were forward-looking and protected by the Private Securities Litigation Reform Act of 1995's (the "PSLRA") safe harbor; (ii) Lead Plaintiffs' allegations did not demonstrate the requisite scienter; and (iii) Lead Plaintiffs failed to establish loss causation.  *Id.*

30.     On April 28, 2017, Lead Plaintiffs filed their opposition to Defendants' motion to dismiss, arguing, among other things, that Defendants issued materially false and misleading statements that were not protected as forward-looking statements; Defendants acted with the requisite scienter in making their false and misleading statements; and that the Amended Complaint adequately alleged loss causation.  ECF No. 41.

31.     On May 30, 2017, Defendants filed their reply brief in further support of their motion to dismiss.  ECF No. 43.

32.     A hearing on Defendants' motion to dismiss was held on July 6, 2017.  The Court denied the motion by order on July 7, 2017.  ECF No. 46.  Defendants answered the Amended Complaint on July 28, 2017.  ECF No. 49.

**F.     Fact Discovery**

33.     Following the lifting of the PSLRA's discovery stay, Lead Plaintiffs promptly propounded detailed discovery requests and ultimately reviewed and analyzed a significant portion of the documents produced by both Defendants and third-parties; took the depositions of: (i) Michael Wernicke (Emergent's former, Vice President for Commercial Operations, North America), (ii) Allen Shofe (Emergent's Executive Vice President of Corporate Affairs), (iii) Tim Hecht (one of

- 9 -

Emergent's lobbyists during the Settlement Class Period), and (iv) René M. Stulz (Defendants' market efficiency expert); defended Rule 30(b)(6) depositions of representatives of both Lead Plaintiffs, Class Representative Flagstad, and the deposition of Lead Plaintiffs' market efficiency expert; analyzed Defendants' privilege logs; and negotiated and resolved numerous discovery disputes. Lead Plaintiffs also served non-party subpoenas on 11 third-parties.

34.     Lead Plaintiffs served their first set of document requests on Defendants on September 1, 2017. Defendants served their document requests on Lead Plaintiffs on the same date.

35.     The parties' objections, responses, and answers to one another's discovery requests prompted numerous meet and confer sessions as to the scope and manner of each party's responses, objections, and document production. Through these efforts and over the course of several months of extensive meet and confer sessions and protracted letter-writing on various discovery matters, the parties successfully came to agreement on many issues, including search terms and relevant custodians. The parties' extensive negotiations around the scope of document discovery resulted in numerous compromises that alleviated the need to raise disputes with the Court.

36.     As a result of Lead Counsel's efforts, Defendants produced 20,772 documents, numbering 88,292 pages, and third-parties produced 1,029 documents, numbering 5,329 pages. Lead Counsel dedicated extensive resources and technology to review, organize, and analyze the information produced by Defendants and third-parties.

37.     To facilitate the cost and time-efficient nature of the document review process, all of the documents were placed in an electronic database, known as Relativity, which was created and maintained at Robbins Geller. The database allowed Lead Counsel to search for and code documents through Boolean-type searches as well as by multiple categories, such as by author and/or

recipient, type of document, date, Bates number, etc.  The database also enabled the streamlined ability to cull and organize witness-specific documents in folders for review.

38.     Document review was structured to limit overall cost, with the bulk of the initial review being conducted by more junior attorneys.  All aspects of the attorney document review were carefully supervised to eliminate inefficiencies and to ensure a high quality work-product.  There were frequent conferences with the senior litigation attorneys to discuss important and/or "hot" documents, discovery preparation efforts, and case strategy.  The "hot" and highly relevant documents were all subject to further analysis and assessment by senior attorneys on an on-going basis.

39.     As reflected in the lodestar schedule submitted herewith by Robbins Geller, the team of core attorneys that litigated this case was concentrated and dedicated to this Litigation.[6]  *See* Ex. A to the Robbins Geller Fee Decl.

40.     Throughout the discovery process, Robbins Geller attorneys and paraprofessionals analyzed not only what was produced, but also tracked discovery that potentially was still outstanding.  We held numerous meet and confer sessions with Defendants' counsel and exchanged correspondence with them to ensure the production of all agreed-upon materials.

41.     Robbins Geller attorneys took the depositions of two Emergent representatives, a lobbyist for Emergent, as well as the deposition of Defendants' market efficiency expert. The deposition of Michael Wernicke, Emergent's primary point of contact with the CDC on the BioThrax Contract and the discussions related to its renewal, confirmed that Defendants were entirely unaware of the Government's BioThrax procurement plans throughout the Settlement Class

---

[6]     Submitted herewith is the Declaration of Jonah H. Goldstein Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Fee Decl.").

Period.   Similarly, the deposition of Allen Shofe, Emergent's Executive Vice President of Corporate

Affairs, established that nobody within Emergent knew the number of BioThrax doses that the CDC

was going to order for the follow-on BioThrax Contract prior to the Government's announcement.

In addition, the deposition of Tim Hecht, one of Emergent's external lobbyists during the Settlement

Class Period, revealed that he never received any information regarding the number of doses that the

Government was anticipating for the new BioThrax Contract.

42.     In taking the deposition of Professor Stulz, Plaintiffs obtained testimony that was

fatal to Defendants' market efficiency and price impact challenges.   For example, Plaintiffs

confirmed that Professor Stulz did not present any evidence that the market for Emergent stock was

inefficient during the Settlement Class Period.   In addition, Plaintiffs were able to successfully

discredit Defendants' challenges to a lack of price impact, through deposition testimony from

Professor Stulz that the news disclosed by Emergent on June 22, 2016, had an adverse impact on the

Company's stock price and was related to the Plaintiffs' allegations.

43.     In preparing for these depositions, Robbins Geller undertook extensive efforts to

analyze the complex factual and legal issues that were integral to Lead Plaintiffs' claims and

Defendants' potential defenses, as well as the issues related to proving loss causation and damages.

The depositions, and the documents discussed therein, provided us with a solid foundation from

which to understand the risks and strengths of the case.   In addition, we were actively preparing for

at least six more depositions, which were scheduled to take place in July and August 2018, but were

held in abeyance in light of the scheduled mediation.

### G.     Expert Discovery

44.     Considerable expert discovery was taken in connection with the motion for class

certification.   The parties each submitted expert reports in support of their respective positions.

45.    Lead Plaintiffs designated and served an expert report by Daniel S. Bettencourt, MBA, who was retained to provide an expert opinion on market efficiency and the common damages methodology applicable to the Settlement Class.  Mr. Bettencourt's report on market efficiency was based on detailed event studies concerning the movement of Emergent's stock prices in response to new information.

46.    On November 29, 2017, Lead Plaintiffs served Mr. Bettencourt's 47-page report (plus exhibits), in which he opined that the market for Emergent common stock was efficient during the Settlement Class Period.  Following the submission of his expert report, Defendants deposed Mr. Bettencourt on December 18, 2017.  Lead Counsel worked extensively with Mr. Bettencourt to prepare him for his deposition, including for Defendants' forthcoming attacks on, *inter alia*: (i) Mr. Bettencourt's qualifications to provide expert testimony under *Daubert* and Federal Rule of Evidence Rule 702; (ii) his finding that Emergent's stock traded in an efficient market during the Settlement Class Period; and (iii) his methodology to calculate class-wide damages.

47.    Defendants designated and served an expert report by René M. Stulz, Ph.D. on January 16, 2018.  Professor Stulz prepared a 37-page report, plus exhibits, in connection with Defendants' opposition to the class certification motion.  Plaintiffs took the deposition of Professor Stulz on February 9, 2018.  Defendants designated and served a 17-page rebuttal expert report by Professor Stulz on March 12, 2018, in connection with Defendants' reply in further support of their motion to strike the opinions of Mr. Bettencourt.

48.    The parties' expert reports demonstrated a significant disagreement between them as to market efficiency and modeling for damages.  Plaintiffs continued to work with their experts throughout the mediation process.

- 13 -

H.       **Lead Plaintiffs' Motion to Certify the Class**

49.       On November 29, 2017, Lead Plaintiffs filed a Motion for Class Certification and Appointment of Class Representatives and Class Counsel.  ECF No. 60.  On December 20, 2017, Lead Plaintiffs filed an Amended Motion for Class Certification and Appointment of Class Representatives and Class Counsel, seeking to appoint Lead Plaintiffs and Geoffrey L. Flagstad as Class Representatives on behalf of a class that consisted of all persons or entities who, between January 11, 2016 and June 21, 2016, purchased or otherwise acquired Emergent common stock, and were damaged thereby.  ECF Nos. 68-69.  Defendants opposed the motion on January 16, 2018, arguing, among other things, that the proposed class representatives were inadequate, that Lead Plaintiffs had failed to offer a damages theory that was consistent with their theory of liability allowed for certification, and that Lead Plaintiffs were not entitled to a class-wide presumption of reliance.  ECF No. 78.  Defendants also filed a motion to strike the opinions of Lead Plaintiffs' expert, Mr. Bettencourt.  ECF Nos. 81-82.

50.       Defendants took the deposition of representatives of both Lead Plaintiffs, Mr. Flagstad, and of Plaintiffs' expert, Mr. Bettencourt.  On February 16, 2018, Lead Plaintiffs submitted their reply in further support of class certification and their brief in opposition to the motion to strike. ECF Nos. 87-90.  Defendants filed their reply in further support of the motion to strike on March 12, 2018.  ECF No. 91.  Oral argument on both motions was held before Judge Titus on May 2, 2018.

51.       On June 8, 2018, the Court entered a Memorandum Opinion and an Order granting class certification for the period May 5, 2016 – June 21, 2016, appointing Mr. Flagstad as Class Representative, appointing Robbins Geller as Class Counsel, and denying Defendants' motion to strike.  ECF Nos. 96-97.  Lead Plaintiffs, however, retained their role as lead plaintiffs in this case. ECF No. 96.

52.     On June 25, 2018, Defendants filed a petition for permission to appeal the order granting class certification, pursuant to Fed. R. Civ. P. 23(f), in the United States Court of Appeals for the Fourth Circuit.  Plaintiffs filed their opposition to the Rule 23(f) petition on July 3, 2018. The Fourth Circuit denied Defendants' Rule 23(f) petition on July 25, 2018.

## III.    SETTLEMENT

### A.    Settlement Negotiations

53.     Beginning in or about August 2018, while simultaneously conducting fact discovery, the parties began to discuss the possibility of a settlement.  The parties engaged Jed Melnick, Esq. of JAMS to assist them in exploring a potential negotiated resolution of the claims against Defendants. A full-day mediation session was held on August 27, 2018, in New York, New York, and was attended by Lead Counsel and Defendants' counsel.  In advance of that mediation, the parties prepared extensive and detailed mediation statements that set forth each side's positions with respect to liability and damages.  The parties provided their materials to Mr. Melnick and to opposing counsel and engaged in a pre-mediation conference with Mr. Melnick's staff.  The mediation resulted in an agreement-in-principle between Plaintiffs and Defendants to settle the Litigation for $6.5 million.

### B.    Analysis of Factors Affecting Settlement

54.     Lead Counsel respectfully refers the Court to the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (the "Settlement Memorandum"), submitted herewith, for a full analysis of the facts and law supporting final approval of the Settlement.  As set forth in the Settlement Memorandum, courts in the Fourth Circuit consider the factors set forth in *In re Jiffy Lube Securities Litigation*, 927 F.2d 155, 159 (4th Cir. 1991) to determine whether a proposed settlement is fair, reasonable, and adequate.

- 15 -

55.     The pertinent criteria for evaluating the fairness and adequacy of a proposed class action settlement in this Circuit include the following factors: (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; (4) the experience of counsel; (5) the relative strength of plaintiffs' case on the merits; (6) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (7) the anticipated duration and expense of additional litigation; (8) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (9) the degree of opposition to the settlement.  *Id.* at 158-59.  Based on an analysis of these factors, the terms of the Settlement and Plan of Allocation before the Court are fair, reasonable, and adequate and should be approved.

56.     The first factor, the posture of the case at the time of settlement, fully supports the Settlement.  The parties stood slightly over a month before the conclusion of fact discovery. Plaintiffs have no doubt that Defendants would have filed a motion seeking summary judgment in their favor after the conclusion of discovery.

57.     The second factor, the extent of discovery that has been conducted, also supports the Settlement.  This Litigation was filed in 2016 and the parties were deeply entrenched in active litigation once Defendants' motion to dismiss was denied in July 2017.  In addition, through extensive negotiations, Lead Counsel ultimately secured a substantial production of approximately 90,000 pages of documents related to Defendants' alleged scienter and the alleged falsity of their statements.  The Settlement was only reached after Lead Counsel had reviewed and analyzed a significant amount of the documents produced.  In addition, we deposed corporate designees and were preparing to take the remaining fact depositions at the time of the Settlement.  Accordingly, this factor weighs strongly in favor of the Settlement.

- 16 -

58.     The third factor, the circumstances surrounding the negotiations, further supports approval of the Settlement.  The parties participated in arm's length mediation to facilitate this Settlement.  The mediation was presided over by Jed Melnick, Esq. of JAMS, a mediator with vast experience in securities class action matters.  As part of the process, the parties submitted and exchanged mediation statements and gave detailed presentations at the mediation explaining each side's position and responses to each other's arguments.  The parties, and Mr. Melnick, entered the mediation with an extensive understanding of each side's positions on all the critical issues in the Litigation.  As a result, this factor also militates in favor of the Settlement.

59.     The fourth factor, the experience of counsel, also favors the Settlement.  Robbins Geller and counsel for Defendants are nationally recognized for their experience and expertise in complex class action and securities litigation.  Included with the Robbins Geller Fee Declaration is my firm's résumé.  *See* Robbins Geller Fee Decl., Ex. G.  Recommendations from such qualified counsel further support this agreement.

60.     The fifth and sixth factors also favor the Settlement.  Although we believe that Plaintiffs would have ultimately prevailed on the merits at trial, Robbins Geller understands that a number of risks made the outcome of this Litigation uncertain.

61.     For example, Defendants argue that the remaining alleged misstatements and omissions concerning the BioThrax Contract were not actionable.  In particular, Defendants argue that Mr. Abdun-Nabi's May 5, 2016 "big, beautiful package" statement amounts to nothing more than classic puffery, because it did not mention an actual dose quantity, number, or range of BioThrax doses for the follow-on contract.  Defendants also point out that no securities analysts referenced Mr. Abdun-Nabi's "big, beautiful package" statement in their contemporaneously issued

- 17 -

reports following Emergent's May 5, 2016 earnings call.  Thus, Plaintiffs faced the risk that the strongest statement in the case would be held inactionable at the summary judgment stage.

62.     With respect to the issue of scienter, Defendants argue that because deposition and document discovery has shown that no one at Emergent was aware of the Government's procurement requirements before the issuance of the Sole-Source Notification on June 21, 2016, Plaintiffs could not prove this element of securities fraud to the Court or the jury.

63.     Defendants also have raised arguments regarding the alleged stock sales by the Individual Defendants.  In particular, Defendants point out that: (i) all of the stock sales during the May 5 – June 21 class period were made subject to non-discretionary Rule 10b5-1 trading plans; and (ii) none of the Individual Defendants sold a sufficient percentage of their personally held shares giving rise to a basis for suspicion under controlling case law.

64.     Even if Plaintiffs succeeded in establishing liability, significant risks remained relating to proving loss causation and damages.  For example, Defendants have argued that while Emergent's stock price went down on June 22, 2016, that decline does not give rise to liability because it was attributable to uncertainty and not fraud, as the price and the delivery schedule for BioThrax under the follow-on contract had not yet been determined and the Company had not yet been awarded a contract for its next-generation anthrax vaccine.  Defendants argued that on June 21, 2016, the Government was simply making preliminary announcements and the terms of the eventual follow-on BioThrax Contract, including an increased price for BioThrax and a front-loaded schedule, were positive developments for the Company.  In addition, Defendants contend that when the full terms of the follow-on BioThrax Contract were announced, on December 8, 2016, along with the terms of a new contract for NuThrax, the Company's stock price increased substantially.

- 18 -

Defendants have argued that gain this more than made up for the amount that the Company's stock price had declined after the announcement of the Sole-Source Notification of June 22, 2016.

65.     At trial the elements of loss causation and damages would have likely come down to an inherently unpredictable and hotly disputed "battle of the experts." Indeed, there is a very real risk that the Settlement Class would have recovered significantly less than the Settlement Amount – or even nothing at all.

66.     Although Plaintiffs firmly believe that the documentary and testimonial evidence they would offer at summary judgment and trial fully substantiates their claims, there is no way of predicting with absolute certainty which testimony, inferences or interpretations the Court or jury would accept.

67.     While Plaintiffs remain confident in their ability to prove their claims and successfully counter all of Defendants' arguments, when weighed against the immediate benefits of settlement, the risks of losing at trial or having the Litigation dismissed prior to trial indicate that the Settlement is in the best interests of the Settlement Class. There was certainly risk that Plaintiffs would not prevail and the Settlement Class could recover nothing. Lead Counsel submits that these factors militate strongly in favor of the Settlement.

68.     As to the seventh factor, the anticipated duration and expense of additional litigation, substantial resources would be expended to proceed through trial, as well as the likely post-trial appellate process, all without any guarantee of a better resolution for the Settlement Class. In addition, these expenditures would also result in a considerable expense to be borne by the Settlement Class out of any potential recovery at trial. Securities class actions are inherently complex, time consuming, and expensive, which is magnified when such cases proceed through trial.

1502898_1

The Settlement avoids these expenditures and provides an immediate recovery for the Settlement Class.  Therefore, this factor favors the Settlement.

69.     The eighth factor, the solvency of the Defendants and the likelihood of recovery on a litigated judgment, also supports approval of the Settlement.  While Emergent is a solvent entity, it is likely that it could be significantly impacted by a litigated judgment for the full amount of claimed damages.

70.     The ninth factor, the degree of opposition to the Settlement, also militates in favor of the Settlement.  As outlined below, notice is being widely disseminated to potential Settlement Class Members.  The lack of formal objections to the Settlement or requests to opt out of the Settlement Class weigh in favor of the Settlement.

71.     In light of the risks of establishing liability and damages, Lead Counsel and Plaintiffs respectfully submit that the Settlement represents a very favorable result for the Settlement Class.  It provides Settlement Class Members with a substantial benefit now, where there is a significant likelihood of less recovery or no recovery at all following trial.

      **C.     Mailing and Publication of Notice of Settlement**

72.     The Preliminary Approval Order, among other things, appointed Gilardi & Co. LLC ("Gilardi") as the Claims Administrator and it directed Gilardi to cause the mailing of the Amended Notice of Proposed Settlement of Class Action (the "Notice") and the Proof of Claim and Release (the "Proof of Claim") (together, the "Notice Package") to all potential Settlement Class Members identifiable with reasonable effort, no later than November 16, 2018.  ECF No. 106, ¶9.

73.     The Preliminary Approval Order also directed Gilardi to cause the Summary Notice to be published once in the national edition of *The Wall Street Journal* and once over a national newswire service, no later than November 21, 2018.  *Id.*, ¶12.

74.     The Declaration of Carole K. Sylvester Regarding Class Action Fairness Act Notification, Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Mailing Decl."), submitted herewith, states that over 5,300 Notice Packages have been mailed to potential Settlement Class Members, banks, brokers and nominees beginning on November 16, 2018, and that the Summary Notice will be published in the national edition of *The Wall Street Journal* and over *Business Wire* on November 21, 2018, in compliance with the provisions of the Preliminary Approval Order.  Mailing Decl., ¶¶6-13.

## IV.     THE PLAN OF ALLOCATION

75.     The Plan of Allocation is set forth in the Notice and provides that the Net Settlement Fund will be distributed to Settlement Class Members who submit valid, timely Proofs of Claim and whose claims for recovery have been allowed under the terms of the Stipulation, including the Plan of Allocation described below ("Authorized Claimants").  The Plan of Allocation provides that Settlement Class Members will be eligible to participate in the distribution of the Net Settlement Fund only if they transacted in Emergent common stock during the period January 11, 2016 through June 21, 2016.  No distributions will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00.

76.     The Plan of Allocation proposed by Plaintiffs, which was prepared with the assistance of Plaintiffs' damages consultant and is set forth in full in the Notice, ECF No. 101-2 at 16-21, is designed to achieve an equitable and rational distribution of the Net Settlement Fund to eligible claimants, and is consistent with Plaintiffs' damages theory.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

77.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulae tied to liability and

- 21 -

damages.  In developing the Plan of Allocation, Plaintiffs' damages consultant analyzed, among other things, the price decline associated with Emergent's allegedly corrective disclosure, adjusted to eliminate the effects attributable to general market or industry conditions and inactionable news.  In this respect, an inflation table was created as part of the Notice.  The table will be utilized in calculating Recognized Loss Amounts for Authorized Claimants.

78.     Based on the formulas stated below, under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Emergent publicly-traded common stock during the Settlement Class Period that is listed on the Proof of Claim and for which adequate documentation is provided.  If a Recognized Loss Amount calculates to a negative number or zero under the formula below, that Recognized Loss Amount will be zero.

| Emergent BioSolutions Common Stock CUSIP: 29089Q105 | |
|---|---|
| Inflation Period | Inflation per Share |
| January 11, 2016 – May 4, 2016[7] | $0.76 |
| May 5, 2016 – June 21, 2016 | $7.59 |

For shares of Emergent publicly-traded common stock *purchased, or acquired, on or between January 11, 2016 through May 4, 2016*, the recovery per share shall be as follows:

a)      If sold on or before June 21, 2016, the recovery shall be $0.00.

b)      If retained at the close of trading on June 21, 2016 and sold on or before September 19, 2016, the recovery shall be the least of: (i) the inflation at the time of purchase; (ii) the difference between the purchase price and the selling price; and (iii) the difference between the purchase price and the average closing price up to the date of sale.

---

[7]     The inflation per share of $0.76 for the period between January 11, 2016 through May 4, 2016 reflects a 90% reduction in the $7.59 per share inflation amount for the period between May 5, 2016 through June 21, 2016.  This reduction was made because the Court did not uphold claims related to the earlier time period as reflected in the Court's order on Defendants' motion to dismiss and certifying a class period of May 5, 2016 through June 21, 2016 in granting Plaintiffs' Amended Motion for Class Certification.  ECF Nos. 46, 97.

    c)      If retained at the close of trading on September 19, 2016, or sold thereafter, the recovery shall be the lesser of: (i) the inflation at the time of purchase; and (ii) the difference between the purchase price and $29.10.

For shares of Emergent publicly-traded common stock **purchased, or acquired, on or between May 5, 2016 through June 21, 2016**, the recovery per share shall be as follows:

    a)      If sold on or before June 21, 2016, the recovery shall be $0.00.

    b)      If retained at the close of trading on June 21, 2016 and sold on or before September 19, 2016, the recovery shall be the least of: (i) the inflation at the time of purchase; (ii) the difference between the purchase price and the selling price; and (iii) the difference between the purchase price and the average closing price up to the date of sale.

    c)      If retained at the close of trading on September 19, 2016, or sold thereafter, the recovery shall be the lesser of: (i) the inflation at the time of purchase; and (ii) the difference between the purchase price and $29.10.

79.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim and all required information postmarked or submitted online no later than February 16, 2019.  As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, notice and administration costs, and applicable taxes, the Net Settlement Fund will be distributed according to the Plan of Allocation.

80.     Gilardi, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants, as calculated in accordance with the Plan of Allocation.  The calculation will depend upon several factors, including when the Authorized Claimant's common stock was purchased and whether the stock was sold during the Settlement Class Period and, if so, when.

- 23 -

81.     To date, there have been no objections filed to the Plan of Allocation.  The Plan of Allocation is fair and reasonable, and should be approved.[8]

## V.     ATTORNEYS' FEES AND EXPENSES

82.     Lead Counsel, on behalf of Plaintiffs' Counsel, seeks an award of attorneys' fees of 33% of the Settlement Amount.  This percentage is well within the range of, and consistent with, the percentages of the common fund fees awarded to counsel in other securities class actions.  Based on the quality of Plaintiffs' Counsel's work and the benefit obtained for Settlement Class Members in light of the risks discussed above, the requested fee is reasonable.

83.     The Fourth Circuit has held that in exercising its discretion in awarding fees, district courts should consider the following criteria: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting the factors from *Johnson v. Ga. Highway*

---

[8]    Lead Counsel will address all objections received in their reply brief, to be filed on or before January 8, 2019.

*Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).[9] An analysis of these criteria demonstrates that the requested fee is fair and reasonable.[10]

84.     With respect to the first factor, Lead Counsel has diligently worked for the past two-plus years to develop this case. Lead Counsel conducted the Litigation in a well-organized fashion to ensure maximum efficiency, and devoted both substantial attorney resources and financial resources to the case. While leaving no stone unturned, Lead Counsel made a conscious effort to avoid unnecessary expenditure of efforts. In the time it litigated the case, Robbins Geller accumulated a lodestar of $3,111,888.50, which is extremely reasonable in light of the length and complexity of this Litigation.[11] The requested fee of 33% thus represents a ***negative*** multiplier of Lead Counsel's lodestar, which means that the requested fee award is below the lodestar amount Lead Counsel expended on this case. Courts within this Circuit routinely approve positive multipliers. *See In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) ("The fee awarded in this case, $61,320,000, results in a lodestar multiplier of 1.97. District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2–3 times lodestar."); *In re Massey Energy Co. Sec. Litig.*, No. 5:10-cv-00689-ICB (S.D. W. Va. June 4, 2014) (approving a 2.9 times lodestar multiplier); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 387 (D. Md. 2006) (approving a 2.6 times lodestar multiplier); *In re MicroStrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 787-88 (E.D. Va. 2001) (approving a 2.6 times lodestar multiplier).

---

[9]     The following factors do not pertain to this Litigation: preclusion of other employment; time limitations imposed by the client or the circumstances; and the nature and length of the professional relationship with the client. Thus, Plaintiffs will not analyze these factors.

[10]     *See also* Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses and Award to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee Memorandum"), filed herewith.

[11]     The Robbins Geller Fee Declaration attests to the number of hours spent prosecuting the Litigation.

- 25 -

85.     As discussed above, Lead Counsel faced significant risks in pursuing this Litigation. This was not a case where any recovery was assured.  Compounding the risk, Lead Counsel's fees are totally contingent and dependent upon a successful result and an award by this Court.  From the outset, Robbins Geller understood that it was embarking on complex, expensive, challenging, and lengthy litigation (with no guarantee of compensation for the investment of time, money, and effort the case would require).  In undertaking that responsibility, Lead Counsel was obligated to assure that sufficient resources of attorneys were dedicated to the prosecution of the Litigation and that funds were available to compensate staff and the considerable out-of-pocket costs a case such as this entails.

86.     With respect to the third *Barber* factor, Robbins Geller has national standing and its attorneys are among the most experienced securities lawyers in the country.  *See* Robbins Geller Fee Decl., Ex. G.  Few lawyers have the experience, professionalism, and knowledge to develop a successful litigation plan, shepherd the case through massive discovery, prepare the case for trial, and negotiate a substantial settlement in a case such as this.  Robbins Geller is highly experienced in prosecuting securities class actions and worked diligently and efficiently in prosecuting the Litigation.  Robbins Geller has successfully obtained some of the largest recoveries in history, including *In re Enron Corp. Securities Litigation*, No. H-01-3624 (S.D. Tex.) ($7.2 billion recovery, which is the largest ever in a securities class action); *Jaffe v. Household International, Inc.*, No. 02-C-05893 (N.D. Ill.) ($1.575 billion settlement, the largest ever following a securities fraud class action trial, the largest securities fraud settlement in the Seventh Circuit); and *In re UnitedHealth Group Inc. PSLRA Litigation*, No. 06-cv-1691 (D. Minn.) ($925 million recovery, the largest stock option backdating settlement).

87.     When Robbins Geller undertook to represent Lead Plaintiffs and the Settlement Class in this matter, it was with the knowledge that it was on a contingency basis and that it would spend many hours of hard work against some of the best defense lawyers in the United States with no assurance of ever obtaining any compensation for its efforts.  Robbins Geller was aware that the only way it would be compensated was to achieve a successful result for the Settlement Class.

88.     Defendants are represented by lawyers from Kirkland & Ellis LLP, a well-known and respected law firm whose lawyers vigorously represented the interest of their clients throughout the entirety of this case.  In the face of this experienced, formidable, and well-financed opposition, Robbins Geller developed this case so as to persuade Defendants to settle the Litigation on a basis favorable to the Settlement Class.

89.     This Court will also find that public policy considerations support the requested fee award.  Robbins Geller shouldered all of the risk of committing substantial resources to the prosecution of this Litigation, and of working long hours in a heavily contested matter, notwithstanding significant uncertainty as to whether the Litigation would ultimately succeed.

90.     Robbins Geller also requests payment for the expenses incurred in connection with the prosecution of the Litigation.  The requested expenses are reflected in the books and records maintained by Robbins Geller and are an accurate recording of the expenses incurred.  In total, Robbins Geller incurred expenses in the amount of $233,426.78.  *See* Ex. B to the Robbins Geller Fee Decl.

91.     While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date Robbins Geller has received no objections to the requested fee and no objections to the requested expenses.  Robbins Geller will respond to any

objections received by the December 26, 2018 deadline in its reply papers, which will be filed on or before January 8, 2019.

## VI.   PLAINTIFFS SHOULD BE REIMBURSED FOR THEIR REASONABLE TIME AND EXPENSES

92.     The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4).  Here, as explained in the Alimonti, Williams, and Flagstad declarations, submitted herewith, Plaintiffs are seeking reimbursement in the amount of $820 (City of Cape Coral), $14,543.81 (City of Sunrise), and $32,700 (Class Representative Flagstad) for their time related to their active participation in the Litigation.  *See* Alimonti Decl., ¶¶8-10; Williams Decl., ¶¶8-10; Flagstad Decl., ¶¶2-12.

93.     Many courts, including those in this Circuit, have approved reasonable payments to compensate class representatives for the time and effort devoted by them on behalf of a class.  In awarding $16,405 to one plaintiff and $6,723.73 to another, the court in *Genworth Financial* noted "[t]hese plaintiffs have justified their requests through their dedication of hundreds of hours of employee-time related to the supervision of this action, communications with attorneys, travel related to discovery, efforts related to filing briefs, and attending mediations.  These reasonable and modest costs shall be reimbursed."  210 F. Supp. 3d at 846.  *See also Epstein v. World Acceptance Corp.*, No. 6:14-cv-01606-MGL, ECF No. 212, at ¶8 (D.S.C. Dec. 18, 2017) (awarding $4,760.00 to lead plaintiff for the time it spent directly related to its representation of the settlement class) (attached to the Fee Memorandum); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009) (court awarded a total of $214,657

- 28 -

to the lead plaintiffs in the action "to compensate them for their reasonable costs and expenses incurred in managing this litigation and representing the Class" and holding that the lead plaintiffs' efforts were "precisely the types of activities that support awarding reimbursement of expenses to class representatives").

94.     As explained in one decision, courts "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks v. Stanley*, No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005).

95.     The amount sought here is based on Plaintiffs' active involvement in the Litigation from consideration of appointment as Lead Plaintiff to Settlement, which included, among other things, searching for and producing numerous documents.  In addition, representatives from both City of Cape Coral and City of Sunrise, traveled from Florida to Washington D.C. to be deposed. Similarly, Mr. Flagstad traveled more than four hours by car from his home to Kansas City, Missouri for his deposition.  As such, this request should be granted in its entirety.

## VII.     CONCLUSION

96.     In view of the significant recovery for the Settlement Class and the substantial risks of this Litigation, as described above and in the accompanying memorandum of law in support of approval of the Settlement, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement should be approved as fair and reasonable and that the proposed Plan of Allocation should likewise be approved as fair and reasonable.  In view of the significant recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, as described above and in the accompanying memorandum of law in

- 29 -

support of the fee and expense request, Lead Counsel respectfully requests that the Fee and Expense

Application, including awards to Plaintiffs, be approved in full.

     I declare under penalty of perjury that the foregoing facts are true and correct.  Executed this

20th day of November, 2018, at San Diego, California.

*/s/ Jonah H. Goldstein*
JONAH H. GOLDSTEIN

# EXHIBIT 1

CORNERSTONE RESEARCH

Economic and Financial Consulting and Expert Testimony

# Securities Class Action Settlements

**2017 Review and Analysis**

# Table of Contents

Highlights                                                                                               1

Author Commentary                                                                                        2

Total Settlement Dollars                                                                                 3

Mega Settlements                                                                                         4

Settlement Size                                                                                          5

Damages Estimates                                                                                        6

    Rule 10b-5 Claims: "Simplified Tiered Damages"                                  6

    '33 Act Claims: "Simplified Statutory Damages"                                  9

Analysis of Settlement Characteristics                                                                  11

    Accounting Allegations                                                          11

    Institutional Investors                                                         12

    Derivative Actions                                                              13

    Corresponding SEC Actions                                                       14

Time to Settlement and Case Complexity                                                                  15

Cornerstone Research's Settlement Prediction Analysis                                                   16

Research Sample                                                                                         17

Data Sources                                                                                            17

Endnotes                                                                                                18

Appendices                                                                                              19

About the Authors                                                                                       23

The views expressed in this report are solely those of the authors, who are responsible for the content,
and do not necessarily represent the views of Cornerstone Research.

# Table of Figures and Appendices

Figure 1: Settlement Statistics                                                                                                                          1

Figure 2: Total Settlement Dollars                                                                                                                    3

Figure 3: Mega Settlements                                                                                                                                4

Figure 4: Distribution of Post–Reform Act Settlements                                                                              5

Figure 5: "Simplified Tiered Damages" and "Estimated Damages"                                                            6

Figure 6: Median and Average "Simplified Tiered Damages"                                                                      7

Figure 7: Median Settlements as a Percentage of "Simplified Tiered Damages" by Damages Ranges      8

Figure 8: Settlements by Nature of Claims                                                                                                    9

Figure 9: Median Settlements as a Percentage of "Simplified Statutory Damages" by Damages Ranges   10

Figure 10: Median Settlements as a Percentage of "Simplified Tiered Damages" and Accounting Allegations   11

Figure 11: Median Settlement Amounts and Public Pension Plans                                                            12

Figure 12: Frequency of Derivative Actions                                                                                               13

Figure 13: Frequency of SEC Actions                                                                                                         14

Figure 14: Median Settlement by Duration from Filing Date to Settlement Hearing Date                       15

Appendix 1: Settlement Percentiles                                                                                                           19

Appendix 2: Select Industry Sectors                                                                                                           19

Appendix 3: Settlements by Federal Circuit Court                                                                                    20

Appendix 4: Median and Average Settlements as a Percentage of "Simplified Tiered Damages"          20

Appendix 5: Median and Average Maximum Dollar Loss (MDL)                                                              21

Appendix 6: Median and Average Disclosure Dollar Loss (DDL)                                                             21

Appendix 7: Median Docket Entries by "Simplified Tiered Damages" Range                                         22

Analyses in this report are based on 1,697 securities class actions filed after passage of the Private Securities Litigation Reform Act of 1995 (Reform Act) and settled from 1996 through year-end 2017. See page 17 for a detailed description of the research sample. For purposes of this report and related research, a settlement refers to a negotiated agreement between the parties to a securities class action that is publicly announced to potential class members by means of a settlement notice.

# Highlights

While the number of settlements in 2017 remained at relatively high levels, total settlement dollars dipped dramatically to $1.5 billion from $6.1 bilion in 2016. This decline can be attributed to a large percentage of settlements under $5 million combined with the absence of any settlements over $250 million.

- There were 81 securities class action settlements approved in 2017, a slight decrease from the number of cases settled in 2016 but the second-highest level since 2010. (page 3)

- The total value of settlements approved by courts in 2017 was $1.5 billion, the second-lowest level in the past 10 years. (page 3)

- There were four mega settlements—settlements of $100 million or more—in 2017 (compared to 10 in 2016), accounting for 43 percent of total settlement dollars (compared to 81 percent in 2016). (page 4)

- The median settlement amount in 2017 was $5.0 million, over 40 percent lower than both the 2016 median ($8.7 million) and the median for all prior post–Reform Act settlements ($8.5 million). (page 5)

- The average settlement amount in 2017 also declined, to $18.2 million. This was 75 percent lower than in 2016 and nearly 70 percent lower than the average for all prior post–Reform Act settlements. (page 5)

- For the first time in more than five years, there were no settlements exceeding $250 million. (page 5)

- Settlements in 2017 involved smaller cases compared to previous years. In particular, median and average "simplified tiered damages" in 2017 were the lowest over the last 10 years. (page 7)

- For 2017 cases with Rule 10b-5 claims, the average settlement amount as a percentage of "simplified tiered damages" was the highest in the last five years, driven by a sharply higher percentage for smaller cases. (page 8)

- Cases with companion derivative actions typically settle for higher amounts. In 2017, however, the median settlement for cases with companion derivative actions was lower than for cases without accompanying derivative actions. (page 13)

- Higher percentages of cases settling within two years of the filing date continued in 2017, reaching over 23 percent of all settlements. (page 15)

Figure 1: Settlement Statistics

(Dollars in Millions)

| | 1996–2016 | 2016 | 2017 |
|---|---|---|---|
| Number of Settlements | 1,616 | 85 | 81 |
| Total Amount | $93,193.2 | $6,118.0 | $1,473.6 |
| Minimum | $0.1 | $0.9 | $0.5 |
| Median | $8.5 | $8.7 | $5.0 |
| Average | $57.7 | $72.0 | $18.2 |
| Maximum | $8,794.7 | $1,608.6 | $210.0 |

Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used.

# Author Commentary

As projected in our 2016 report, the relatively high volume of settlements continued in 2017 but the number of very large settlements declined, contributing to the substantial drop in the size of settlements overall.

## 2017 Findings

The decline in settlement sizes can largely be attributed to the smaller size of these cases, reflected in the lower estimates of our proxy for plaintiff-style damages. A combination of low stock market volatility in the years in which the cases were filed, as well as substantially shorter class periods, contributed to the reduction in the damages proxy for cases settled in 2017. In addition, 2017 settlements were associated with considerably smaller issuer defendants.

The decline in case size leads to other trends. For example, consistent with what we would expect for smaller cases, the time from case filing to settlement was shorter in 2017.

However, not all developments in 2017 were driven by case size. For example, institutional investors appeared less frequently as lead plaintiffs, even in large cases. Recent literature has discussed the lack of economic incentives for institutions to serve as lead plaintiffs, other than the potential benefit to public pension plans from political contributions by plaintiff attorneys, and has called for reform to improve the lead plaintiff selection process.[1]

In addition, the proportion of settled securities class actions accompanied by corresponding derivative actions was among the highest we have observed in more than 15 years. Nearly half of all cases—and more than half of all settlements for $5 million or less—involved an accompanying derivative action.

These results are unexpected since, historically, accompanying derivative actions have been associated with larger class actions and larger settlement amounts. Moreover, they are interesting in light of arguments considering whether derivative litigation is an effective mechanism to monitor corporate governance and whether eliminating derivative litigation altogether may be a viable option.[2]

## "Simplified Tiered Damages"

In this report we focus on a "simplified tiered damages" proxy for estimating plaintiff-style damages in cases with Rule 10b-5 claims (see page 6). This replaces the measure traditionally used in settlement research. We view this proxy as an enhancement to settlement research, as this estimate

of per-share inflation is conceptually more closely aligned with the typical plaintiff approach. This measure is more fully described in *Estimating Damages in Settlement Outcome Modeling*.

---

*What stands out in 2017 is the drop in mid-range to large settlements, due largely to a reduction in the proxy for damages, as well as the size of the issuer defendant firms involved.*

*Dr. Laura E. Simmons*
*Senior Advisor*
*Cornerstone Research*

---

## Looking Ahead

Recent data on case filings can provide insights into potential settlement trends. See Cornerstone Research's *Securities Class Action Filings—2017 Year in Review*.

The record numbers of cases filed in the previous two years might suggest that the high volume of settlements will continue. However, these data also show higher rates of dismissals, which could offset the increase in filings in terms of settlement activity.

The latest data also suggest that smaller firms have become more common targets of securities class actions, but there is no evidence that indicates the unusually low levels of "simplified tiered damages" observed in 2017 will necessarily continue in upcoming years.

On the other hand, recent filings data support the potential continuation of a reduced level of institutional investors serving as lead plaintiffs, whose presence is typically associated with higher settlement amounts. In addition, we expect the rate of settlements for issuers in healthcare and related industry sectors, such as biotech and pharmaceuticals, to persist given the prevalence of these industries among newly filed cases.

—*Laarni T. Bulan, Ellen M. Ryan, and Laura E. Simmons*

# Total Settlement Dollars

- The total value of settlements approved by courts in 2017 declined substantially to $1.5 billion, less than a quarter of the total amount approved in 2016.

- The median settlement in 2017 was $5.0 million, over 40 percent lower than in 2016.

- While there were only four fewer cases settled in 2017 compared to 2016, the absence of very large settlements (exceeding $250 million) and the decline in the median settlement amount contributed to the decline in 2017 total settlement dollars.

- The decline in the median settlement amount was primarily driven by a reduction in "simplified tiered damages" for cases settled in 2017. (See page 6 for a discussion of this measure.)

---------------------------------------------------

*The total value of settlements was the second lowest in the last 10 years.*

---------------------------------------------------

Figure 2: Total Settlement Dollars
2008–2017

(Dollars in Millions)



Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used.

# Mega Settlements

- There were four mega settlements (settlements equal to or greater than $100 million) in 2017, with the largest settlement amounting to $210 million.

- Total mega settlement dollars in 2017 were $630 million compared to $5 billion (adjusted for inflation) in 2016.

- Mega settlements have accounted for 70 percent of all settlement dollars from 2008 through 2016, but this percentage varies substantially from year to year.

*The total value of mega settlements in 2017 was nearly 90 percent lower than in 2016.*

- While mega settlements typically comprise the majority of the total value of settled cases, only 43 percent of 2017 settlement dollars came from mega settlements.

Figure 3: Mega Settlements
2008–2017

■ Total Mega Settlement Dollars as a Percentage of All Settlement Dollars
■ Number of Mega Settlements as a Percentage of All Settlements



Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used.

# Settlement Size

- In 2017, both the number and proportion of settlements less than or equal to $5 million were the highest in the last 10 years.

- Fifteen cases settled for $2 million or less (historically referred to as "nuisance suits") in 2017.

- As reported in Cornerstone Research's *Securities Class Action Filings—2017 Year in Review,* three plaintiff law firms (The Rosen Law Firm, Pomerantz LLP, and Glancy Prongay & Murray) have increasingly been appointed as counsel in smaller-than-average cases.[3] In 60 percent of cases settling for $2 million or less, the lead or co-lead plaintiff counsel included at least one of these plaintiff law firms.

- The respective median and average settlement amounts in 2017 were approximately 40 percent and 70 percent lower than the median and average for all prior post–Reform Act settlements.

- Of the cases settled in 2017, 33 percent were between $5 million and $25 million, compared to 42 percent among all prior post–Reform Act settlements, indicating a decline in mid-range settlements.

*In 2017, 51 percent of settlements were for $5 million or less.*

Figure 4: Distribution of Post–Reform Act Settlements
1996–2017

(Dollars in Millions)



Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used.

# Damages Estimates

## Rule 10b-5 Claims: "Simplified Tiered Damages"

A key factor in a meaningful analysis of settlement outcomes is a proxy for damages claimed by plaintiffs. *Estimating Damages in Settlement Outcome Modeling* introduced a new method for estimating that proxy that is conceptually more closely aligned with the approach typically followed by plaintiffs in current securities class action litigation matters.[4] This report concentrates on analysis of "simplified tiered damages" instead of the simplified "estimated damages" proxy used in previous reports.

-------------------------------------------------

*Like "estimated damages," "simplified tiered damages" is highly correlated with settlement amounts and has comparable explanatory power in regression analyses of settlement amount determinants.*

-------------------------------------------------

"Simplified tiered damages" bases per-share inflation estimates on the dollar value of a defendant's stock price movements on the specific dates detailed in the plan of allocation in the settlement notice. When there is a single alleged corrective disclosure date, the measure is calculated using a constant dollar value line that reflects the price change at the end of the class period. When there are multiple dates identified in the settlement notice, the measure is calculated using a tiered dollar value line that reflects the cumulative price changes associated with those dates.[5,6]

Generally, "simplified tiered damages" is smaller than the corresponding "estimated damages" upon which our historical reports have concentrated, due to differences in the methods used to estimate per-share inflation.[7] As a result, settlements as a percentage of "simplified tiered damages" is larger than settlements as a percentage of "estimated damages."

Figure 5: "Simplified Tiered Damages" and "Estimated Damages"
2008–2017

(Dollars in Millions)



Note: Damages figures are adjusted for inflation based on class period end dates. Damages are estimated for cases alleging a claim under Rule 10b-5 (whether alone or in addition to other claims).

"Simplified tiered damages" uses simplifying assumptions to estimate per-share damages and trading behavior. It provides a measure of potential shareholder losses that allows for consistency across a large volume of cases, thus enabling the identification and analysis of potential trends. Our prediction models find this measure to be the most important factor in predicting settlement amounts. However, it is not intended to represent actual economic losses borne by shareholders. Determining any such losses for a given case requires more in-depth economic analysis.

---

*Median and average "simplified tiered damages" were at a 10-year low.*

---

- "Simplified tiered damages" is correlated with stock market volatility at the time of a case filing. The decline in median and average "simplified tiered damages" in 2017 is consistent with low stock market volatility in 2014 and 2015, when the majority of cases settled in 2017 were filed.

- Simplified tiered damages" is also correlated with the length of the class period. In 2017, the median class period for settled cases was 32 percent lower than the median in 2016.

- Higher "simplified tiered damages" are generally associated with larger issuer defendants (measured by total assets or market capitalization of the issuer). In 2017, the median issuer defendant total assets of $547 million was 37 percent smaller than for cases settled over the prior nine years.

Figure 6: Median and Average "Simplified Tiered Damages"
2008–2017

(Dollars in Millions)



Note: "Simplified tiered damages" are adjusted for inflation based on class period end dates. Damages are estimated for cases alleging a claim under Rule 10b-5 (whether alone or in addition to other claims).



- Larger cases typically settle for a smaller percentage of "simplified tiered damages."

- The median settlement as a percentage of "simplified tiered damages" increased for the second consecutive year, reaching 5.2 percent in 2017—a level in line with the 10-year median.

- For the smallest cases, the median settlement as a percentage of "simplified tiered damages" in 2017 increased by more than 120 percent compared to the prior year.

*The average settlement as a percentage of "simplified tiered damages" was the highest in the last five years due, in part, to a spike in small cases.*

- As observed over the last decade, smaller cases settle more quickly. Cases with less than $25 million in "simplified tiered damages" settled within 2.4 years on average, compared to more than 3.8 years for cases with "simplified tiered damages" of greater than $25 million.



Figure 7: Median Settlements as a Percentage of "Simplified Tiered Damages" by Damages Ranges 2008–2017

(Dollars in Millions)

Note: "Simplified tiered damages" are adjusted for inflation based on class period end dates. Damages are estimated for cases alleging a claim under Rule 10b-5 (whether alone or in addition to other claims).

## '33 Act Claims: "Simplified Statutory Damages"

- For cases involving Section 11 and/or Section 12(a)(2) claims ('33 Act claims) only, shareholder losses are estimated using a model where alleged inflation per share is the difference between the statutory purchase price and the statutory sales price, referred to here as "simplified statutory damages."[8] Only the offered shares are assumed to be eligible for damages.

- "Simplified statutory damages" is typically smaller than "simplified tiered damages," reflecting differences in the methodology used to estimate alleged inflation per share, as well as differences in the shares eligible to be damaged (i.e., only offered shares are included).

- In the last decade, cases involving combined claims (Rule 10b-5 and Section 11 and/or Section 12(a)(2) claims) had, on average, nearly 50 percent more docket entries than cases involving only Rule 10b-5 claims—indicating the more complex nature of these matters.

- Among cases settled in 2017, 75 percent of those involving only Section 11 and/or Section 12(a)(2) claims settled within three years from the filing date, while only 53 percent of cases involving Rule 10b-5 claims settled as quickly.

--------------------------------------------------------------

*Median settlement amounts are substantially higher for cases involving '33 Act claims and Rule 10b-5 allegations than for those with only Rule 10b-5 claims.*

--------------------------------------------------------------

Figure 8: Settlements by Nature of Claims
2008–2017

(Dollars in Millions)

| | Number of Settlements | Median Settlement | Median "Simplified Statutory Damages" | Median Settlement as a Percentage of "Simplified Statutory Damages" |
|---|---|---|---|---|
| Section 11 and/or Section 12(a)(2) Only | 70 | $4.5 | $83.3 | 7.5% |

| | Number of Settlements | Median Settlement | Median "Simplified Tiered Damages" | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|---|
| Both Rule 10b-5 and Section 11 and/or Section 12(a)(2) | 135 | $12.8 | $315.5 | 5.8% |
| Rule 10b-5 Only | 552 | $7.8 | $188.3 | 5.0% |

Note: Settlement dollars and damages are adjusted for inflation; 2017 dollar equivalent figures are used. Damages are adjusted for inflation based on class period end dates.

- Similar to cases with Rule 10b-5 claims, settlements as a percentage of "simplified statutory damages" for cases with only '33 Act claims are smaller for cases that have larger damages.

- Over the period 2008–2017, the average settlement as a percentage of "simplified statutory damages" with a named underwriter defendant was 12.8 percent, compared to 7.4 percent without a named underwriter defendant.

*Since 2008, 84 percent of settled cases with only '33 Act claims had a named underwriter defendant.*

Figure 9: Median Settlements as a Percentage of "Simplified Statutory Damages" by Damages Ranges 2008-2017

(Dollars in Millions)



Note: "Simplified statutory damages" are adjusted for inflation based on class period end dates; 2017 dollar equivalent figures are used.

# Analysis of Settlement Characteristics

## Accounting Allegations

This analysis examines three types of accounting issues among settled cases involving Rule 10b-5 claims: (1) alleged GAAP violations, (2) restatements, and (3) reported accounting irregularities.[9] For further details regarding settlements of accounting cases, see Cornerstone Research's annual report on *Accounting Class Action Filings and Settlements*.

- The proportion of settled cases alleging GAAP violations in 2017 was 53 percent, continuing a three-year decline from a high of 67 percent in 2014.

- Settled cases with restatements are generally associated with higher settlements as a percentage of "simplified tiered damages" compared to cases without restatements.

- Of cases settled in the prior nine years with accounting-related allegations, 23 percent involved a named auditor codefendant. In 2017, this dropped to 13 percent.

*The infrequency of reported accounting irregularities among settled cases continued for the third straight year.*

Figure 10: Median Settlements as a Percentage of "Simplified Tiered Damages" and Accounting Allegations 2008–2017



# Institutional Investors

- Institutions, including public pension plans (a subset of institutional investors) tend to be involved in cases with higher "simplified tiered damages."

- The decline in public pension plan involvement in 2017 settlements in part reflects the smaller cases involved. However, even within larger cases (e.g., cases with "simplified tiered damages" greater than $50 million), public pension plans were less frequently involved in 2017 than in prior years.

- In 2017, 39 percent of settlements with "simplified tiered damages" greater than $50 million involved a public pension plan as lead plaintiff, compared to 48.6 percent for 2008–2016.

*The proportion of settlements with a public pension plan as lead plaintiff declined to the lowest level over the past 10 years.*

- Cases in which public pension plans serve as lead or co-lead plaintiff are typically associated with larger issuer defendants, longer class periods, securities in addition to common stock, accounting allegations, and other indicators of more serious cases, such as criminal charges. These cases are also associated with longer intervals from filing to settlement. (See page 15 for additional details regarding length of time from filing to settlement.)

Figure 11: Median Settlement Amounts and Public Pension Plans
2008–2017

(Dollars in Millions)



Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used.

# Derivative Actions

Derivative cases accompanying securities class actions, as described in previous annual reports, are more frequently filed when corresponding securities class actions involve a financial statement restatement or public pension plan lead plaintiff.

As discussed in *Piling On? An Empirical Study of Parallel Derivative Suits*,[10] there is substantial overlap between plaintiff attorneys that tend to file accompanying derivative actions and attorneys that are frequent players in securities class actions. Since most derivative actions are filed as "piggyback suits" to class actions, the latter finding is consistent with plaintiff counsel who are not selected for lead counsel representation in certain securities class actions choosing to follow up with derivative actions.

------------------------------------------------

*The percentage of settled cases involving an accompanying derivative action was one of the highest in the last 10 years.*

------------------------------------------------

- The increase in the proportion of settled cases involving an accompanying derivative action was driven by a surge in derivative cases corresponding to relatively small settlements. Of cases settling for $5 million or less in 2017, 51 percent were accompanied by derivative actions, compared to 37 percent for the prior nine years.

- Historically, cases involving accompanying derivative actions have tended to settle for higher amounts. In 2017, however, the median settlement for cases with companion derivative actions was $4.3 million, compared to $6.2 million for cases without accompanying derivative actions.

Figure 12: Frequency of Derivative Actions
2008–2017



# Corresponding SEC Actions

Cases with a corresponding SEC action related to the allegations are typically associated with significantly higher settlement amounts and higher settlements as a percentage of "simplified tiered damages."[11]

- Compared to 2011–2014, the relatively high level of class actions settled over the last three years with corresponding SEC actions is consistent with the SEC's stated focus on financial reporting and disclosure matters during this period.[12]

- Cases with corresponding SEC actions tend to involve larger issuer defendants. For cases settled during 2008–2017, average assets for issuer defendant firms were $135 billion for cases with corresponding SEC actions, compared to only $31 billion for cases without a corresponding SEC action.

- Corresponding SEC actions are also frequently associated with delisted firms. Out of the total 159 settlements during 2008–2017 involving cases with corresponding SEC actions, 63 cases (40 percent) involved issuer defendants that had been delisted.

------------------------------------------------

*Over 20 percent of settled cases involved a corresponding SEC action.*

------------------------------------------------

Figure 13: Frequency of SEC Actions
2008–2017



■ Settlements without a Corresponding SEC Action
■ Settlements with a Corresponding SEC Action

| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|------|------|------|------|------|------|
| Without SEC Action | 75 | 77 | 62 | 58 | 45 | 53 | 53 | 58 | 70 | 64 |
| With SEC Action | 22 | 22 | 23 | 7 | 11 | 13 | 10 | 19 | 15 | 17 |

# Time to Settlement and Case Complexity

- In 2017, more than 23 percent of cases settled within two years of the filing date, compared to less than 16 percent during 2008–2016.

- Rule 10b-5 cases settling in less than two years in 2017 had median "simplified tiered damages" of only $85 million, compared to a median of $130 million for all settlements in 2017.

- Historically, cases that have taken longer to settle have been associated with higher settlements.

- The median settlement amount for cases taking more than two years to settle was two times the median settlement amount for cases that settled within two years.

- Consistent with the decline in settlement size in 2017, a smaller proportion (17 percent) of cases settled at least four years after filing, compared to 33 percent during 2008–2016.

*The average time from filing to settlement was the lowest in the past decade.*

- The number of docket entries associated with a case at the time of settlement (see Appendix 7) is highly correlated with the time to settlement, as well as factors that add to case complexity, such as third-party defendants. Accordingly, this variable has been used in prior research as a proxy for the effort incurred by plaintiff counsel in litigating the securities class actions.[13] The number of docket entries at the time of settlement is a statistically significant explanatory variable in regression analyses of settlement outcome determinants (see page 16).

Figure 14: Median Settlement by Duration from Filing Date to Settlement Hearing Date
2008–2017

(Dollars in Millions)



Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used.

# Cornerstone Research's Settlement Prediction Analysis

This research applies regression analysis to examine the relationships between settlement outcomes and certain security case characteristics. Regression analysis is employed to better understand and predict the total settlement amount, given the characteristics of a particular securities case. Regression analysis can also be applied to estimate the probabilities associated with reaching alternative settlement levels. It is also helpful in exploring hypothetical scenarios, including how the presence or absence of particular factors affect predicted settlement amounts.

## Determinants of Settlement Outcomes

Based on the research sample of post–Reform Act cases that settled through December 2017, the factors that were important determinants of settlement amounts included the following:

- "Simplified tiered damages"

- Maximum Dollar Loss (MDL)

- Most recently reported total assets of the issuer defendant firm

- Number of entries on the lead case docket

- The year in which the settlement occurred

- Whether a restatement of financials related to the alleged class period was announced

- Whether there was a corresponding SEC action against the issuer, other defendants, or related parties

- Whether Section 11 and/or Section 12(a) claims were alleged in addition to Rule 10b-5 claims

- Whether the issuer defendant was distressed

- Whether a public pension was a lead plaintiff

- Whether the plaintiffs alleged that securities other than common stock were damaged

Regression analyses shows that settlements were higher when "simplified tiered damages," MDL, issuer defendant asset size, or the number of docket entries were larger, or when Section 11 and/or Section 12(a) claims were alleged in addition to Rule 10b-5 claims.

Settlements were also higher in cases involving financial restatements, a corresponding SEC action, a public pension involved as lead plaintiff, or securities other than common stock alleged to be damaged.

Settlements were lower if the settlement occurred in 2010 or later, or if the issuer was distressed.

Almost 75 percent of the variation in settlement amounts can be explained by the factors discussed above.

# Research Sample

# Data Sources

- The database used in this report focuses on cases alleging fraudulent inflation in the price of a corporation's common stock (i.e., excluding cases with alleged classes of only bondholders, preferred stockholders, etc., and excluding cases alleging fraudulent depression in price and M&A cases).

- The sample is limited to cases alleging Rule 10b-5, Section 11, and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. These criteria are imposed to ensure data availability and to provide a relatively homogeneous set of cases in terms of the nature of the allegations.

- The current sample includes 1,697 securities class actions filed after passage of the Reform Act (1995) and settled from 1996 through 2017. These settlements are identified based on a review of case activity collected by Securities Class Action Services LLC (SCAS).[14]

- The designated settlement year, for purposes of this report, corresponds to the year in which the hearing to approve the settlement was held.[15] Cases involving multiple settlements are reflected in the year of the most recent partial settlement, provided certain conditions are met.[16]

In addition to SCAS, data sources include Dow Jones Factiva, Bloomberg, the Center for Research in Security Prices (CRSP) at University of Chicago Booth School of Business, Standard & Poor's Compustat, court filings and dockets, SEC registrant filings, SEC litigation releases and administrative proceedings, LexisNexis, and public press.

# Endnotes

1   See Adam C. Pritchard and Stephen J. Choi, "Lead Plaintiffs and Their Lawyers: Mission Accomplished, or More to Be Done?," Harvard Law School Forum on Corporate Governance and Financial Regulation, May 25, 2017. See also Charles Silver and Sam Dinkin, "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," *DePaul Law Review* 57, no. 2 (2008).

2   See Kevin LaCroix, "Should Shareholder Derivative Litigation Be Eliminated?," *The D&O Diary*, October 4, 2017; and Stephen Bainbridge, "Is There a Case for Abolishing Derivative Litigation?," ProfessorBainbridge.com, October 3, 2017.

3   See *Securities Class Action Filings—2017 Year in Review,* Cornerstone Research (2018), page 35. Among 2017 settlements, The Rosen Law Firm and Pomerantz LLP have identifiable lead or co-lead roles.

4   See *Estimating Damages in Settlement Outcome Modeling*, Cornerstone Research (2017). Note that "simplified tiered damages" referenced in the current report is identical to the measure referred to as "tiered damages" in *Estimating Damages in Settlement Outcome Modeling*.

5   "Simplified tiered damages" is calculated for cases that settled after 2005. Importantly, the "simplified tiered damages" approach used for purposes of settlement research does not examine the mix of information associated with the specific dates listed in the plan of allocation, but simply applies the stock price movements on those dates to an estimate of the "true value" of the stock during the alleged class period (or "value line"). The dates used to identify the applicable value line may be supplemented with information from the operative complaint at the time of settlement.

6   Damages calculations have two components, an estimate of the inflation per share and an estimate of the number of shares damaged. Both "simplified tiered damages" and "estimated damages," as well as the proxy discussed in this report for plaintiff-style damages in '33 Act cases, use a similar methodology to estimate the number of shares damaged. In particular, these damages proxies utilize an estimate of the number of shares damaged based on reported trading volume and the number of shares outstanding. Specifically, reported trading volume is adjusted using volume reduction assumptions based on the exchange on which the issuer defendant's common stock is listed. No adjustments are made to the underlying float for institutions, insiders, or short-selling activity. Because of these and other simplifying assumptions, the damages measures used in settlement outcome modeling are overstated relative to damages estimates developed in conjunction with case-specific economic analysis.

7   As described in prior reports, per-share inflation for "estimated damages" for cases involving Rule 10b-5 claims is calculated using a market-adjusted, backward-pegged value line.

8   The statutory purchase price is the lesser of the security offering price or the security purchase price. Prior to the first complaint filing date, the statutory sales price is the price at which the security was sold. After the first complaint filing date, the statutory sales price is the greater of the security sales price or the security price on the first complaint filing date. Similar to "simplified tiered damages," the estimation of "simplified statutory damages" makes no adjustments to the underlying float for institutions, insiders, or short-selling activity.

9   The three categories of accounting issues analyzed in this report are: (1) GAAP violations—cases with allegations involving Generally Accepted Accounting Principles (GAAP); (2) restatements—cases involving a restatement (or announcement of a restatement) of financial statements; and (3) accounting irregularities—cases in which the defendant has reported the occurrence of accounting irregularities (intentional misstatements or omissions) in its financial statements.

10   Stephen J. Choi, Jessica Erickson, and Adam C. Pritchard, "Piling On? An Empirical Study of Parallel Derivative Suits," *Journal of Empirical Legal Studies* 14, no. 4 (2007): 653–682.

11   It could be that the merits in such cases are stronger, or simply that the presence of an accompanying SEC action provides plaintiffs with increased leverage when negotiating a settlement. For purposes of this research, an SEC action is evidenced by the presence of a litigation release or an administrative proceeding posted on www.sec.gov.

12   For example, see Andrew Ceresney, Director, Division of Enforcement, U.S. Securities and Exchange Commission, "Directors Forum 2016 Keynote Address" (San Diego, CA, January 25, 2016).

13   See Laura Simmons, "The Importance of Merit-Based Factors in the Resolution of 10b-5 Litigation," University of North Carolina at Chapel Hill Doctoral Dissertation (1996); and Michael A. Perino, "Institutional Activism through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions," St. John's Legal Studies Research Paper No. 06-0055 (2006).

14   Available on a subscription basis.

15   Movements of partial settlements between years can cause differences in amounts reported for prior years from those presented in earlier reports.

16   This categorization is based on the timing of the settlement approval. If a new partial settlement equals or exceeds 50 percent of the then-current settlement fund amount, the entirety of the settlement amount is re-categorized to reflect the settlement hearing date of the most recent partial settlement. If a subsequent partial settlement is less than 50 percent of the then-current total, the partial settlement is added to the total settlement amount and the settlement hearing date is left unchanged.

# Appendices

## Appendix 1: Settlement Percentiles
(Dollars in Millions)

|  | Average | 10th | 25th | Median | 75th | 90th |
|---|---|---|---|---|---|---|
| 2017 | $18.2 | $1.5 | $2.5 | $5.0 | $15.0 | $34.5 |
| 2016 | $72.0 | $1.9 | $4.3 | $8.7 | $33.7 | $149.1 |
| 2015 | $40.7 | $1.4 | $2.2 | $6.7 | $16.8 | $97.2 |
| 2014 | $18.9 | $1.7 | $3.0 | $6.2 | $13.6 | $51.8 |
| 2013 | $76.1 | $2.0 | $3.2 | $6.8 | $23.3 | $86.8 |
| 2012 | $65.4 | $1.3 | $2.9 | $10.1 | $37.9 | $122.8 |
| 2011 | $22.8 | $2.0 | $2.7 | $6.3 | $19.6 | $45.5 |
| 2010 | $40.1 | $2.2 | $4.8 | $12.6 | $28.1 | $89.5 |
| 2009 | $42.9 | $2.7 | $4.4 | $9.1 | $22.9 | $75.9 |
| 2008 | $32.4 | $2.3 | $4.3 | $9.1 | $21.6 | $57.4 |
| 1996–2017 | $43.5 | $1.7 | $3.5 | $8.3 | $21.3 | $74.1 |

Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used.

## Appendix 2: Select Industry Sectors
## 2008–2017
(Dollars in Millions)

| Industry | Number of Settlements | Median Settlement | Median "Simplified Tiered Damages" | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|---|
| Technology | 109 | $9.8 | $199.8 | 2.2% |
| Financial | 113 | $21.2 | $459.1 | 2.0% |
| Telecommunications | 49 | $8.0 | $160.1 | 2.1% |
| Retail | 44 | $6.6 | $140.8 | 2.3% |
| Pharmaceuticals | 88 | $8.6 | $339.6 | 2.5% |
| Healthcare | 19 | $8.0 | $127.3 | 3.0% |

Note: Settlement dollars and "simplified tiered damages" are adjusted for inflation; 2017 dollar equivalent figures are used. "Simplified tiered damages" are calculated only for cases involving Rule 10b-5 claims.

Appendix 3: Settlements by Federal Circuit Court
2008–2017

(Dollars in Millions)

| Circuit | Number of Settlements | Median Settlement | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|
| First | 24 | $7.3 | 2.0% |
| Second | 185 | $12.0 | 2.0% |
| Third | 63 | $8.7 | 2.4% |
| Fourth | 27 | $8.4 | 1.8% |
| Fifth | 40 | $7.6 | 2.4% |
| Sixth | 33 | $12.9 | 3.3% |
| Seventh | 38 | $9.7 | 1.7% |
| Eighth | 19 | $8.5 | 3.2% |
| Ninth | 191 | $8.0 | 2.3% |
| Tenth | 19 | $8.6 | 2.3% |
| Eleventh | 47 | $6.0 | 2.3% |
| DC | 4 | $38.7 | 3.7% |

Note: Settlement dollars are adjusted for inflation; 2017 dollar equivalent figures are used. Settlements as a percentage of "simplified tiered damages" calculated only for cases alleging Rule 10b-5 claims.

Appendix 4: Median and Average Settlements as a Percentage of "Simplified Tiered Damages"
2008–2017



Note: "Simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims.

**Appendix 5: Median and Average Maximum Dollar Loss (MDL)**
**2008–2017**

(Dollars in Millions)



Note: MDL is adjusted for inflation based on class period end dates. MDL is the dollar value change in the defendant firm's market capitalization from the trading day with the highest market capitalization during the class period to the trading day immediately following the end of the class period.

**Appendix 6: Median and Average Disclosure Dollar Loss (DDL)**
**2008–2017**

(Dollars in Millions)



Note: DDL is adjusted for inflation based on class period end dates. DDL is the dollar value change in the defendant firm's market capitalization between the trading day immediately preceding the end of the class period and the trading day immediately following the end of the class period.

Appendix 7: Median Docket Entries by "Simplified Tiered Damages" Range
2008–2017

(Dollars in Millions)



Note: "Simplified tiered damages" are adjusted for inflation; 2017 dollar equivalent figures are used. "Simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims.

# About the Authors

### Laarni T. Bulan

Ph.D., Columbia University; M.Phil., Columbia University; B.S., University of the Philippines

Laarni Bulan is a principal in Cornerstone Research's Boston office, where she specializes in finance. Her work has focused on securities damages and class certification issues, insider trading, merger valuation, risk management, market manipulation and trading behavior, and real estate markets. She has also consulted on cases related to financial institutions and the credit crisis, municipal bond mutual funds, asset-backed commercial paper conduits, credit default swaps, foreign exchange, and securities clearing and settlement. Dr. Bulan has published several academic articles in peer-reviewed journals. Her research covers topics in dividend policy, capital structure, executive compensation, corporate governance, and real options. Prior to joining Cornerstone Research, Dr. Bulan had a joint appointment at Brandeis University as an assistant professor of finance in its International Business School and in the economics department.

### Ellen M. Ryan

M.B.A., American Graduate School of International Management; B.A., Saint Mary's College

Ellen Ryan is a director in Cornerstone Research's Boston office, where she works in the securities practice. Ms. Ryan has consulted on economic and financial issues in a variety of cases, including securities class actions, financial institution breach of contract matters, and antitrust litigation. She also has worked with testifying witnesses in corporate governance and breach of fiduciary duty matters. Prior to joining Cornerstone Research, Ms. Ryan worked for Salomon Brothers in New York and Tokyo. Currently she focuses on post–Reform Act settlement research as well as general practice area business and research.

### Laura E. Simmons

Ph.D., University of North Carolina at Chapel Hill; M.B.A., University of Houston; B.B.A., University of Texas at Austin

Laura Simmons is a senior advisor with Cornerstone Research. She is a certified public accountant and has more than 25 years of experience in accounting practice and economic and financial consulting. Dr. Simmons has focused on damages and liability issues in securities litigation, as well as on accounting issues arising in a variety of complex commercial litigation matters. She has served as a testifying expert in cases involving accounting analyses, securities case damages, research on securities lawsuits, and other issues involving empirical analyses.

Dr. Simmons's research on pre– and post–Reform Act securities litigation settlements has been published in a number of reports and is frequently cited in the public press and legal journals. She has spoken at various conferences and appeared as a guest on CNBC addressing the topic of securities case settlements. She has also published in academic journals, with recent research focusing on the intersection of accounting and litigation. Dr. Simmons was previously an accounting faculty member at the Mason School of Business at the College of William & Mary. From 1986 to 1991, she was an accountant with Price Waterhouse.

The authors acknowledge the research efforts and significant contributions of their colleagues at Cornerstone Research. Please direct any questions and requests for additional information to the settlement database administrator at settlement.database@cornerstone.com.

Many publications quote, cite, or reproduce data, charts, or tables from Cornerstone Research reports. The authors request that you reference Cornerstone Research in any reprint, quotation, or citation of the charts, tables, or data reported in this study.

**Boston**
617.927.3000

**Chicago**
312.345.7300

**London**
+44.20.3655.0900

**Los Angeles**
213.553.2500

**New York**
212.605.5000

**San Francisco**
415.229.8100

**Silicon Valley**
650.853.1660

**Washington**
202.912.8900

cornerstone.com

© 2018 by Cornerstone Research.
All rights reserved. Cornerstone Research is a registered service mark of Cornerstone Research, Inc.
C and design is a registered trademark of Cornerstone Research, Inc.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 20, 2018, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which

will send notification of such filing to the e-mail addresses on the attached Electronic Mail

Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States

Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/ Jonah H. Goldstein
JONAH H. GOLDSTEIN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  JonahG@rgrdlaw.com

# Mailing Information for a Case 8:16-cv-02625-RWT City of Cape Coral Municipal Firefighters' Retirement Plan et al v Emergent Biosolutions, Inc., HQ et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Robert D Gerson**
  rgerson@rgrdlaw.com

- **Jonah H Goldstein**
  jonahg@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com,ldeem@rgrdlaw.com

- **Francis P Karam**
  fkaram@rgrdlaw.com

- **Dana Whitehead McKee**
  dwm@browngold.com,kgates@browngold.com,dcaimona@browngold.com

- **Mark T Millkey**
  mmillkey@rgrdlaw.com,e_file_ny@rgrdlaw.com,1781895420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Yosef J. Riemer**
  yosef.riemer@kirkland.com,kenymanagingclerk@kirkland.com,ecf-0034f2ed07b9@ecf.pacerpro.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew Solum**
  msolum@kirkland.com

- **Ellen Gusikof Stewart**
  elleng@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)